# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

————————————

STATE OF TENNESSEE,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
XAVIER BECERRA, in his official capacity, OFFICE OF POPULATION
AFFAIRS, and JESSICA S. MARCELLA, in her official capacity,

*Defendants-Appellees*.

————————————

On Appeal from the Judgment of the United States District Court for the
Eastern District of Tennessee (No.3:23-cv-384-TRD-jem)

## BRIEF OF APPELLANT

JONATHAN SKRMETTI
  *Attorney General*
J. MATTHEW RICE
  *Solicitor General*
WHITNEY HERMANDORFER
  *Director of Strategic Litigation*
HARRISON GRAY KILGORE
  *Strategic Litigation Counsel*
PHILIP HAMMERSLEY
  *Assistant Solicitor General*
TRENTON MERIWETHER
  *Assistant Attorney General*
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
*Counsel for the State of Tennessee*

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................... 1

JURISDICTIONAL STATEMENT ............................................................... 2

STATEMENT OF THE ISSUES ................................................................... 3

INTRODUCTION ........................................................................................ 4

BACKGROUND .......................................................................................... 7

I. Statutory and Legal Background. ........................................................ 7

A. Title X and Section 1008's no-abortion-funding limit ..................... 7

B. HHS's shifting interpretations of its Title X abortion authority ....... 8

C. The 2021 Rule, *Dobbs*, and this Court's decision in *Ohio* ............... 9

II. Factual Background and Procedural History ........................................ 12

A. Tennessee develops a leading Title X program .............................. 12

B. HHS reaffirms its approval of Tennessee's
"wonderful" Title X program after *Dobbs* ...................................... 13

C. HHS suddenly reverses course and rescinds
Tennessee's Title X grant ................................................................. 14

D. Tennessee files suit .......................................................................... 15

LEGAL STANDARD .................................................................................. 16

SUMMARY OF ARGUMENT .................................................................... 17

ARGUMENT ............................................................................................... 19

I. Tennessee Will Likely Succeed on the Merits ...................................... 19

A. The Rescindment Violates the Spending Clause ............................. 19

B. The Rescindment Violates the APA .................................................. 38

II. Tennessee Faces Irreparable Harm Absent This Injunction .................. 54

III. An Injunction Will Not Harm HHS or the Public Interest ................... 57

CONCLUSION ............................................................................................ 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
    46 F.4th 489 (6th Cir. 2022) .............................................................. 55, 56

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    141 S. Ct. 2485 (2021) ............................................................................ 27

*All. for Hippocratic Med. v. FDA*,
    78 F.4th 210 (5th Cir. 2023) ................................................................... 47

*Anspec Co. v. Johnson Controls, Inc.*,
    922 F.2d 1240 (6th Cir. 1991) ................................................................ 30

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ........................................................................... 21, 34

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ................................................................ 39

*Baugh v. Novak*,
    340 S.W.3d 372 (Tenn. 2011) ................................................................. 30

*Bennett v. Ky. Dep't of Educ.*,
    470 U.S. 656 (1985) ................................................................................. 33

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................... 38, 40

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ............................................................................ 19

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ................................................................................. 36

*Carter v. Welles-Bowen Realty, Inc.*,
    736 F.3d 722 (6th Cir. 2013) .................................................................. 41

iii

*Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n*,
    812 F.2d 288 (6th Cir. 1987) ..................................................... 16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ...................................................................... 9

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) .................................................................... 37

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ............................................ 20, 25

*Clark v. Martinez*,
    543 U.S. 371 (2005) .................................................................... 44

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................ 35, 53

*Cnty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................... 55

*Cummings v. Premier Rehab Keller, PLLC*,
    596 U.S. 212 (2022) ............................................................ 21, 30

*Cutter v. Wilkinson*,
    423 F.3d 579 (6th Cir. 2005) ................................................... 19

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ............................................................ 32, 33

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ............................................................ *passim*

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ............................................................ 41, 52

*FCC v. Fox Telev. Stations, Inc.*,
    556 U.S. 502 (2009) .................................................. 49, 50, 51, 52

*FEC v. Cruz*,
    596 U.S. 289 (2022) ............................................................ 37, 38

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010).................................................................35

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006).............................................41

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002).................................................................34

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
   878 F.3d 524 (6th Cir. 2017) ...............................................55

*Indep. Cmty. Bankers of Am. v.*
   *Bd. of Governors of Fed. Rsrv. Sys.*,
   195 F.3d 28 (D.C. Cir. 1999)................................................40

*INS v. Chadha*,
   462 U.S. 919 (1983).................................................................35

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005).................................................................32

*Japarkulova v. Holder*,
   615 F.3d 696 (6th Cir. 2010) ...............................................36

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ................................................57

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ..........................................54, 57

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022) .........................................*passim*

*Kentucky v. Yellen*,
   67 F.4th 322 (6th Cir. 2023) ................................................31

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)................................................29, 38, 41

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986).................................................................28

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) .................................................................... 20

*Maryland v. King*,
    567 U.S. 1301 (2012) ................................................................. 56

*Mich. Fam. Res., Inc. v. SEIU Loc. 517M*,
    475 F.3d 746 (6th Cir. 2007) (en banc) ...................................... 30

*W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) .............................. 23, 24, 25, 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ................................................................ 46, 49

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ................................................................... 42

*Nat'l Council for Adoption v. Blinken*,
    4 F.4th 106 (D.C. Cir. 2021) ..................................................... 52

*Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*,
    960 F.3d 872 (6th Cir. 2020) ..................................................... 41

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ................................................................... 57

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ................................................................... 31

*NLRB v. Int'l Hod Carriers', Union*,
    287 F.2d 605 (9th Cir. 1961) ..................................................... 30

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ..................................................... 16

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023) ............................................. *passim*

*OPM v. Richmond*,
    496 U.S. 414 (1990) ................................................................... 20

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
139 S. Ct. 2051 (2019) ........................................................ 39, 44

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ................................................... *passim*

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ................................................... 27

*Roe v. Wade*,
410 U.S. 113 (1973) ................................................... 43

*Rust v. Sullivan*,
500 U.S. 173 (1991) ................................................... *passim*

*Shalala v. Guernsey Mem'l Hosp.*,
514 U.S. 87 (1995) ................................................... 53

*South Dakota v. Dole*,
483 U.S. 203 (1987) ................................................... 23

*Springer v. Gov't of Philippine Islands*,
277 U.S. 189 (1928) ................................................... 20

*Tenn. Hosp. Ass'n v. Azar*,
908 F.3d 1029 (6th Cir. 2018) ................................... 53

*Tennessee v. Dep't of Ed.*,
615 F. Supp. 3d 807 (E.D. Tenn. 2022) ....................... 52

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
992 F.3d 350 (5th Cir. 2021) ........................... 20, 23, 25

*Tiger Lily, LLC v. United States Dep't of Hous. & Urban Dev.*,
5 F.4th 666 (6th Cir. 2021) ................................... 35

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................... 52

*U.S. Dep't of Navy v. FLRA*,
665 F.3d 1339 (D.C. Cir. 2012) ........................... 19, 21

*United States v. Hansen*,
143 S. Ct. 1932 (2023) ................................................... 42

*Va. Dep't of Educ. v. Riley*,
106 F.3d 559 (4th Cir. 1997) (en banc) ................................................ 22, 24

*Van Buren v. United States*,
141 S. Ct. 1648 (2021) ............................................................................... 43

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................................................... 25, 26, 27, 43

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ...................................................................... 27

*Wilson v. Comm'r of Soc. Sec.*,
378 F.3d 541 (6th Cir. 2004) ............................................................... 38, 44

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ...................................................................................... 57

*Younger v. Harris*,
401 U.S. 37 (1971) ..................................................................................... 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ................................................................................... 20

## Constitutional Provisions

Tenn. Const. art. I, § 36 .............................................................................. 11

U.S. Const. art. I, § 8, cl. 1 ......................................................................... 19

U.S. Const. art. I, § 9, cl. 7 ......................................................................... 19

## Statutes

5 U.S.C. § 705 ............................................................................................ 16

5 U.S.C. § 706 ............................................................................................ 53

18 U.S.C. § 1461 ........................................................................................ 12

28 U.S.C. § 1292 .......................................................................................... 2

28 U.S.C. § 1331 .......................................................................................... 2

42 U.S.C. § 300 ................................................................. 7, 32, 41

42 U.S.C. § 300a ...................................................................... 43

42 U.S.C. § 300a-4 ............................................................. 5, 7, 34

42 U.S.C. § 300a-6 ............................................................. *passim*

42 U.S.C. § 300a-7 ................................................................... 42

Consolidated Appropriations Act, 2021,
   Public Law 116-260 (2020) ................................................. 42

Tenn. Code Ann. § 39-15-201 ............................................. 50, 51

Tenn. Code Ann. § 39-15-202 .................................................. 50

Tenn. Code Ann. § 39-15-209 .................................................. 50

Tenn. Code Ann. § 39-15-213 ................................. 11, 12, 13, 56

Tenn. Code Ann. § 39-15-214 .................................................. 11

Tenn. Code Ann. § 63-6-1103 .................................................. 12

Tenn. Code Ann. § 63-6-1104 .................................................. 12

Tenn. Code Ann. § 63-6-1106 .................................................. 12

1883 Tenn. Pub. Acts, ch. 140 ................................................. 11

**Other Authorities**

42 C.F.R. § 59.5 ...................................................... 25, 44, 45, 46

53 Fed. Reg. 2922 (Feb. 2, 1988) ......................................... 8, 34

65 Fed. Reg. 41270 (July 3, 2000) .............................................. 8

84 Fed. Reg. 7714 (Mar. 4, 2019) ......................................... 8, 33

86 Fed. Reg. 56144 (Oct. 7, 2021) ............................... 9, 22, 47, 48

87 Fed. Reg. 42053 (July 8, 2022) ............................................ 14

2 Debates on the Federal Constitution (J. Elliot 2d ed. 1854)......................... 20

*Black's Law Dictionary* (11th ed. 2019).......................................................... 45

Bradford R. Clark,
  *Separation of Powers as a Safeguard of Federalism*,
  79 Tex. L. Rev. 1321 (2001)....................................................................... 25

Cambridge Dictionary...................................................................................... 42

Office of Population Affairs,
  *Fiscal Year 2023 Title X Service Grant Awards* ........................................ 43

State of Ohio et al.,
  Comments Regarding Proposed Rule "Ensuring Access to
  Equitable, Affordable, Client-Centered, Quality Family Planning
  Services" (April 15, 2021)............................................................................. 9

5 Williston on Contracts (4th ed.).................................................................... 30

**STATEMENT REGARDING ORAL ARGUMENT**

Because this case raises important constitutional, statutory, and administrative-law issues regarding the validity of a significant action by a federal agency, Appellant the State of Tennessee requests oral argument.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear the case under 28 U.S.C. § 1331, as it involves the meaning of a federal statute. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's denial of a preliminary injunction.

# STATEMENT OF THE ISSUES

1.     Whether HHS likely exceeded its constitutional authority by stripping Tennessee's Title X funding by enforcing an HHS-created condition derived from an admittedly ambiguous statute.

2.     Whether HHS likely violated the Administrative Procedure Act by exceeding its Title X authority to strip Tennessee's program funding for failure to counsel and refer for illegal abortions; acting arbitrarily and capriciously by stripping Tennessee's funding without addressing contrary regulatory provisions, its prior approval of Tennessee's approach to abortion referrals, or the many important aspects of the regulatory problem its approach to illegal abortions raises; and failing to follow required procedures before applying a new policy of requiring illegal-abortion counseling and referrals.

3.     Whether Tennessee has shown risk of irreparable harm when it faces many millions in imminent financial losses—with $7 million in losses occurring as soon as July 2024—that HHS has deemed unrecoverable, as well as irreparable harms to its grantee good-standing, reputational, and sovereign interests.

4.     Whether the balance of the equities warrants restoring Tennessee's longstanding Title X funding when HHS has found Tennessee the only Title X provider able to offer services with integrity statewide.

**INTRODUCTION**

Title X of the Public Health Services Act provides federal funding so that States and others can provide family planning services. The statute expressly *prohibits* those funds from flowing to "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Yet, HHS has long said this provision, and thus Title X, is ambiguous with respect to the agency's authority to impose abortion-related conditions on program participants. For decades, HHS has relied on that statutory ambiguity to defend flip-flopping rules on whether States must counsel and refer women for elective abortions. And now HHS has wielded its abortion-referral rule to strip Tennessee's Title X funding because the State will not counsel and refer for elective abortions that are *illegal* in the State. HHS has already rerouted millions in Tennessee's Title X funding to pro-abortion groups; within months, HHS will deprive Tennessee of $7 million more.

This Court should preliminarily enjoin HHS's unprecedented defunding decision. Tennessee has a strong likelihood of success on the merits because HHS's decision violates core constitutional and administrative-law limits. The Spending Clause requires "Congress *itself*" to speak "with a 'clear voice'" when conditioning funding, particularly when a condition implicates "core aspect[s] of state sovereignty." *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022). HHS fails this mandate thrice over: Its condition (at very most) appears only in a *rule* the agency

adopted, based on statutory text HHS has long deemed ambiguous, on a "matter[] of great social significance and moral substance" that *States* once again control. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 300 (2022).

In response, HHS argued, and the district court accepted, that Title X's abortion ambiguity is irrelevant. It was enough, they reasoned, that a separate boilerplate provision of Title X authorizes HHS to provide grants "in accordance with such regulations" HHS "may promulgate." 42 U.S.C. § 300a-4(a). Translation: The only "clear" Spending-Clause condition a statute need set is one allowing agencies to adopt whatever after-the-fact conditions they want. That sweeping view would render the Spending Clause—and this Circuit's precedents interpreting it—a dead letter and fail nondelegation muster to boot. The novelty of this argument is telling. HHS has long sourced its power to require abortion counseling-and-referral activities in Title X's ambiguity on abortion conditions—as this Court's decision in *Ohio v. Becerra*, 87 F.4th 759, 766-68 (6th Cir. 2023), highlights. Having leveraged this ambiguity to defeat statutory challenges, HHS now must face the constitutional consequences. If the Spending Clause's clear-statement rule bars anything, it is HHS's attempt to subvert core state prerogatives with a controversial illegal-abortion-counseling-and-referral condition Congress nowhere mentioned in Title X.

HHS's defunding decision further flouts Title X itself and the Administrative Procedure Act (APA). The challenged HHS action ("the Rescindment")—stripping

Tennessee's funding—must satisfy the APA by adhering to HHS's statutory authority and deriving from reasoned decision-making. HHS's decision fails both requirements. Whatever *Chevron* leeway HHS has to mandate abortion counseling and referrals, requiring a State to promote *illegal* abortions is a bridge too far. HHS's position moreover raises important legal, public-health, compliance, and reliance problems the agency has never addressed, let alone adequately. This Court, in *Ohio*, foresaw this result, warning that HHS's application of its counseling-and-referral condition in States where abortion is generally illegal would "undoubtedly" raise new legal problems. Neither Title X, nor the APA, nor existing precedent permits HHS to blindly apply pre-*Dobbs* abortion conditions as if States' fundamental shift in post-*Dobbs* abortion policy never happened.

The Rescindment inflicts textbook irreparable harm. HHS already denied Tennessee many millions in 2023 and does not dispute that Tennessee will lose another $7 million in funding as soon as July 2024. Yet HHS's sovereign immunity—and its choice to disburse Tennessee's funds to Planned Parenthood and others—leave Tennessee without any guarantee of eventual recovery. Compounding Tennessee's imminent loss, HHS's decision irreparably harms Tennessee's reputation, good standing as a federal grantee, Title X employees and patients, and sovereign interests in furthering its legislatively enacted pro-life policies.

Conversely, preliminary relief would not harm HHS or the public interest. Tennessee has been an exemplary Title X grant recipient and a program participant for fifty years. HHS gave Tennessee a glowing program review in October 2022 shortly before switching course to carry out the agency's promote-abortion-at-all-costs agenda. Indeed, HHS found Tennessee the only entity in the State equipped to provide Title X services with integrity—meaning the public would benefit from Tennessee's continued funding. The public interest likewise favors requiring HHS to abide by legal limits before conditioning $263 million in annual Title X funding on a controversial condition that contravenes myriad state laws against terminating fetal life. A preliminary injunction is warranted.

## BACKGROUND

### I. Statutory and Legal Background.

#### A. Title X and Section 1008's no-abortion-funding limit.

Congress enacted Title X of the Public Health Service Act, 42 U.S.C. § 300, *et seq.*, to provide federal funding for family planning services. Title X authorizes the Secretary to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Those grants and contracts are "made in accordance with such regulations as the Secretary may promulgate." *Id.* §

300a-4(a). But Congress placed a guardrail on that authority. Section 1008 of Title X provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6.

## B. HHS's shifting interpretations of its Title X abortion authority.

HHS has always agreed that Section 1008 of Title X prevents it from requiring (or permitting) grantees to *perform* abortions. By contrast, HHS's view on its power to require grantees to *refer and counsel* for abortion procedures has "flipped back and forth" between irreconcilable formulations. *Ohio*, 87 F.4th at 765.

Sometimes HHS has understood Section 1008 to *permit* abortion counseling and referrals in Title X programs. Other times, HHS has invoked its Section 1008 authority to *require* abortion counseling and referrals by Title X participants. And still other times, HHS has interpreted Section 1008 to *prohibit* Title X participants from counseling and referring for abortion. These changes occurred in 1971 (no funding), the mid-1970s (directive counseling prohibited, nondirective counseling allowed), 1981 (requiring counseling and referrals required), 1988 (barring both counseling and referrals), 2000 (requiring both counseling and referrals), and 2019 (permitting nondirective counseling, but prohibiting referrals). *See id.* at 765-768. Amid these dizzying changes, though, one HHS position has remained constant: HHS has always viewed its abortion-condition-setting "authority" as linked to Section 1008's scope. 84 Fed. Reg. 7714, 7722 (Mar. 4, 2019); *see,* 65 Fed. Reg.

41270, 41270-72 (July 3, 2000); 53 Fed. Reg. 2922, 2923-25 (Feb. 2, 1988).

In *Rust v. Sullivan*, the Supreme Court also held that Section 1008 dictates HHS's ability to set abortion conditions. 500 U.S. 173, 184-87 (1991). The Court considered whether HHS's 1988 rule prohibiting abortion counseling and referrals fell within the agency's rulemaking authority as limited by Section 1008. *Id.* at 183-84. The Court held that Section 1008 is "ambiguous" because it "does not speak directly to the issues of counseling [or] referral[s]." *Id.* at 184. The "legislative history," according to the Court, was similarly "ambiguous" as to what Section 1008 requires. *Id.* at 186. The Court therefore evaluated the rule under the two-step framework from *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and deferred to HHS's reasonable interpretation of Section 1008, *Rust*, 500 U.S. at 184-87.

### C. The 2021 Rule, *Dobbs*, and this Court's decision in *Ohio*.

HHS's latest rule came in October 2021. 86 Fed. Reg. 56144 (Oct. 7, 2021) ("2021 Rule"). Among other things, the 2021 Rule replaced the 2019 rule's ban on abortion referrals with a mandate that Title X projects make abortion referrals upon request. *Id.* at 56179. HHS imposed this mandate without meaningfully addressing warnings from States that this approach would "contradict medical ethics"

9

as shown by "state laws from around the country."[1]

A new round of litigation ensued. Ohio challenged the 2021 Rule as unlawful under the APA and sought injunctive relief. *See Ohio*, 87 F.4th at 767-68. This Court recognized that it could not evaluate the 2021 Rule "with a blank slate" given the Supreme Court's decision in *Rust*. *Id.* at 768. But because the "doctrinal land-scape" around *Chevron* "has shifted dramatically since" the *Rust* decision, the court found itself "in an odd spot." *Id.* at 769. *Rust* "remains binding precedent," but the *Chevron* analysis undergirding it has "'become pitted with exceptions and cave-ats[,]'" and the Court has "fundamentally chang[ed] how courts should perform a *Chevron* deference analysis." *Id.* at 769-70 (citations omitted).

This Court nonetheless held that it was "bound by *Rust*'s determination that § 1008 is ambiguous under step one of *Chevron*." *Id.* at 770. And because the 2021 Rule was not "an impermissible" interpretation of that ambiguous section, the court upheld the referral mandate. *Id.* at 772. The panel further held that "the Supreme Court's holding in *Rust* require[d] [it] to reject the States' argument that the referral mandate is arbitrary and capricious." *Id.* at 775.

*Ohio* thus upheld HHS's general authority to set abortion-counseling-and-

---

[1] Ohio and twenty other States, Comments Regarding Proposed Rule "Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services" 12-13 (April 15, 2021), https://perma.cc/U522-YRYJ.

referral conditions under Section 1008. But in so doing, this Court stated that *Dobbs* would affect HHS's Title X decision-making moving forward—an issue that was not presented by Ohio's facial challenge, since *Dobbs* came after the 2021 Rule's promulgation. *Ohio*, 87 F.4th at 774 n.7 (citing *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020)). This Court noted that "[t]he impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect' of the question now," meaning that application of the 2021 Rule's referral mandate against States with post-*Dobbs* laws criminalizing abortion would require new and different scrutiny. *Id.*

Tennessee is one such State. Tennesseans have repeatedly affirmed the importance of safeguarding fetal life. This pro-life policy has a substantial pedigree dating back centuries, *see, e.g.*, 1883 Tenn. Pub. Acts, ch. 140, pp. 188-89 (generally criminalizing elective abortions), and persists across myriad state laws today, *e.g.*, Tenn. Code Ann. § 39-15-213; *id.* § 39-15-214(5)-(6) (2020)). These laws flow directly from the Tennessee Constitution, which expressly specifies that "[n]othing in this Constitution secures or protects a right to abortion." Tenn. Const. art. I, § 36.

Tennessee had prepared for *Dobbs* by passing the Human Life Protection Act of 2019, which took effect 30 days after the *Dobbs* judgment. That act makes it a felony to "perform[] or attempt[] to perform an abortion," except in situations of molar or ectopic pregnancies or when a pregnant woman faces other serious risks to

her life or health.  *See generally* Tenn. Code Ann. § 39-15-213.  Tennessee law fur-

ther prohibits doctors from prescribing or dispensing abortion pills to women in the

State other than through in-person visits—rendering telehealth medication abortions

unlawful.  *Id.* §§ 63-6-1103 to 1106.  This limit tracks federal law.  18 U.S.C. § 1461.

## II.    Factual Background and Procedural History.

### A. Tennessee develops a leading Title X program.

Tennessee's Department of Health received its first Title X grant in 1971, and

over the next five decades, HHS renewed Tennessee's Title X funding without fail.

Amosun Decl., R.1-5, PageID#131.  The program provides services in over 100 Title

X facilities statewide.  Program Review, R.1-1, PageID#36.  The program provides

an array of family planning and health services ranging from abstinence training, to

natural family planning and fertility methods, to pregnancy testing and infertility

services.  Amosun Decl., R.1-5, PageID#132.  Tennessee's program has also pro-

vided all options counseling, including counseling on pregnancy termination as re-

quested by the pregnant client, to the extent legal in Tennessee.  *Id.*

Each year, Tennessee serves over 40,000 individuals through Title X, most of

whom qualify as low income and depend on the State for vital services.  *Id.*; Program

Review, R.1-1, PageID#36.  HHS has commended Tennessee for developing a

"leading" Title X program, recognizing the State's "strong" performance.  *See* Pro-

gram Review, R.1-1, PageID#36; Oct. 19 Email, R.1-2, PageID#96.

## B. HHS reaffirms its approval of Tennessee's "wonderful" Title X program after *Dobbs.*

In March 2022, the Office of Population Affairs (OPA), which administers Title X within HHS, again issued Tennessee a new Title X grant. Mar. 2022 Notice of Award, R.1-7, PageID#170-86. The 5-year grant extended through 2027. *Id.* at PageID#170. Tennessee was to receive approximately $7 million each year. *See* Amosun Decl., R.1-5, PageID#132.

Months later, *Dobbs* triggered a chain of events. OPA in late June 2022 put out guidance about *Dobbs*'s impact on Title X. *Dobbs* FAQ, R.1-6, PageID#161-69. That guidance stated that Title X recipients are still required to provide counseling and referrals for abortion, but it did not address how providers in states that outlaw abortion could comply. *Id.* at PageID#164-66. OPA instead advised that "[t]here are no geographic limits for Title X recipients making referrals," but "Title X recipients are required to provide for coordination and use of referrals and linkages with [providers] who are in close physical proximity to the Title X site, when feasible[.]" *Id.* at PageID#165. OPA also recommended using telehealth for making "necessary referral[s] to other medical facilities." *Id.*

*Dobbs* also started the clock for Tennessee's criminal abortion prohibition to take effect, with most abortions becoming illegal in August 2022. *See* Tenn. Code Ann. § 39-15-213. Tennessee's Department of Health accordingly adjusted its Title X program. On July 1, 2022, the Department updated its protocol to clarify that it

would comply with the 2021 Rule's referral mandate by "provid[ing] information and counseling regarding all options *that are legal in the State of Tennessee*." *See* Amosun Decl., R.1-5, PageID#132-33, 135 (emphasis added).

Also in July, OPA began a pre-scheduled review of Tennessee's Title X program. *Id.* at PageID#133. During that review, the State told OPA about its post-*Dobbs* policy. *Id.* OPA still found that Tennessee's program "met" the 2021 Rule's counseling-and-referral expectations, even though "[n]o referrals for abortion are made" under the post-*Dobbs* policy. Program Review, R.1-1, PageID#56. Indeed, OPA lauded Tennessee's Health Department as "the only agency" in the state capable of "administer[ing] Title X funds with integrity." *Id.* at PageID#36. An OPA official passing along Tennessee's report praised the State for "such a wonderful review and leading a strong Title X program." Oct. 19 Email, R.1-2, PageID#96. Tennessee continued serving thousands of patients following the review. Supp. Amosun Decl., R.21-1, PageID#334.

## C. HHS reverses course and rescinds Tennessee's Title X grant.

In *Dobbs*'s wake, President Biden ordered agencies like HHS to assess "potential actions" in light of States' restored ability to regulate abortion—including under Title X. *See* 87 Fed. Reg. 42053 (July 8, 2022).

In response, OPA performed another audit of Tennessee's program in January 2023. This review had one focus—ensuring the program complied with HHS's

abortion-counsel-and-referral dictates. Jan. 25 Ltr., R.1-8, PageID#187. Tennessee reminded OPA of the State's post-*Dobbs* policy of referring only for lawful pregnancy terminations. Feb. 13 Ltr., R.1-3, PageID#98-99. But this time, OPA disapproved the State's program, deciding Tennessee must counsel and refer for *abortions prohibited by state law*. Mar. 1 Ltr., R.1-9, PageID#189-90. Either that, or Tennessee should refer illegal abortions "out of state." Mar. 20 Ltr., R.1-11, PageID#195.

Tennessee disagreed that HHS's 2021 Rule mandated illegal abortion referrals, and stated it would follow its post-*Dobbs* policy. Mar. 13 Ltr., R.1-10, PageID#192. OPA then rescinded Tennessee's five-year grant; the lone reason was Tennessee's failure to follow HHS's interpretation of the 2021 Rule as imposing an illegal-abortion-counseling-and-referral condition. Mar. 20 Ltr., R.1-11, PageID#193-95. HHS ultimately reallocated the $7 million Tennessee was to receive in 2023 to Planned Parenthood and similar groups. Compl., R.1, PageID#18-19. HHS did not acknowledge its prior statement that only Tennessee's Department of Health could "administer Title X funds with integrity and without a gap in services." Program Review, R.1-1, PageID#36.

### D. Tennessee files suit.

Tennessee sued to invalidate HHS's rescindment of the State's Title X grant. Expecting that HHS would disburse another year's funds on April 1, 2024, the State sought a preliminary injunction, which the district court denied. Op. & Order

("Op."), R.30, PageID#815-57. Tennessee immediately appealed. Not. of App., R.31, PageID#858-59.

To obviate the need for emergency proceedings, Tennessee sought clarity regarding when HHS planned to disburse Tennessee's 2024 grant money to other parties. Ultimately, "counsel for HHS advised that HHS can voluntarily reserve, on a temporary basis, Title X funding in an amount (approximately $7.1 million) sufficient to preserve Tennessee's ability to later access its 2024 Title X allocation should Tennessee prevail in this appeal." 6th Cir. Dkt. 11 at 6. This Court granted Tennessee's consented-to motion for expedited briefing. 6th Cir. Dkt. 12. Because HHS has committed to hold funds only through July 2024, Tennessee respectfully requests resolution of its appeal by mid-July 2024.

## LEGAL STANDARD

Tennessee seeks a preliminary injunction and a stay of the Rescindment under 5 U.S.C. § 705. Both aim to "preserve status or rights" pending judicial review, *id.*, and require balancing whether (1) a plaintiff is "likely to succeed on the merits"; (2) the plaintiff is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of the equities tips in [the plaintiff's] favor"; and (4) an "injunction is in the public interest," *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)); *see Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (§ 705).

16

This Court reviews the district court's "legal conclusions de novo and its factual findings for clear error." *Husted*, 697 F.3d at 428.

## SUMMARY OF ARGUMENT

The balance of factors favors a preliminary injunction.

I.       Tennessee has a strong likelihood of success on the merits.  HHS's unprecedented decision to defund Tennessee's Title X program for failing to counsel and refer for illegal abortions violates constitutional and APA safeguards on agency action.  HHS's contrary arguments are incorrect, as was the district court's wholesale adoption of HHS's sweeping position.

A.       HHS unconstitutionally imposed a novel Title X condition of its own making to rescind Tennessee's longstanding funding.

The Constitution gives Congress exclusive spending-and-appropriations authority.  This Court has instructed that agencies can impose Spending Clause conditions only through clear statutory language, not by regulation.  And HHS agrees that Title X does not clearly set out HHS's power to set abortion conditions.  So HHS cannot impose its own rule-made mandate that grantees must counsel and refer for illegal abortions.  This novel HHS condition also fails because HHS has long acknowledged Title X's ambiguity, and the condition concerns a significant and controversial policy issue that Congress must address.  At a minimum, HHS cannot retroactively rescind Tennessee's Title X funds by applying the condition to illegal

abortions in a way the 2021 Rule did not clearly disclose, let alone adequately justify. The district court's contrary conclusions misapply binding precedent, exaggerate the consequences of enforcing the Spending Clause, and would create independent constitutional defects with HHS's rulemaking delegation.

B.     As a new agency action, the Rescindment must independently satisfy the APA.  But the new condition it imposes exceeds HHS's authority under Title X and conflicts with the agency's regulations.  The Rescindment also derives from arbitrary-and-capricious decision-making, because HHS did not consider important regulatory problems, explain its switch in position, or account for the State's reliance interests.  Moreover, notice-and-comment was required before HHS could impose its condition.

II.     Tennessee will suffer textbook irreparable harm absent injunctive relief.  Tennessee imminently faces a Title X funding deprivation that exceeds the losses that constituted irreparable harm in *Ohio*.  And HHS's action continues to inflict irreparable harm on Tennessee's grantee-standing, reputational, and sovereign interests.

III.  A preliminary injunction would not prejudice HHS's or the public's interests.  Tennessee has been an exemplary Title X provider for 50 years, leading HHS to deem it the only entity capable of serving all Tennesseans with integrity. Restoring Tennessee's funding would thus further the core aims of Title X while

18

protecting the public's interest in federal agencies' following the law.

## ARGUMENT

### I. Tennessee Will Likely Succeed on the Merits.

Tennessee has a strong likelihood of merits success because HHS flouted Spending Clause and APA limits by defunding Tennessee's Title X program.

### A. The Rescindment Violates the Spending Clause.

The Spending Clause gives Congress authority to "lay and collect Taxes, … to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress's "control of the purse" through this provision is among its "most important authorities." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). Here, HHS unlawfully seized Congress's Spending Clause power to impose a controversial condition on Title X funding that the statute nowhere contains. At minimum, HHS cannot adopt *this* condition after decades of claiming that it lacks clear abortion-condition authority.

#### 1. The Constitution vests Congress with exclusive power to set Spending Clause conditions.

The Constitution exclusively grants Congress the power of the purse, which Congress alone—not agencies acting after the fact—can exercise by setting clear conditions on Spending Clause programs. *See* U.S. Const. art. I, § 8, cl. 1 (Spending Clause); U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).

Start with Spending Clause "first principles." *Cutter v. Wilkinson*, 423 F.3d

579, 584 (6th Cir. 2005).  Because *Congress* has "exclusive power over the federal purse," *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (citation omitted); *see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018), it follows from basic separation-of-powers principles that the Executive Branch "cannot exercise [the] legislat[ure's]" spending authority, *see Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 201 (1928); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  On that point, the founders agreed:  It "was undisputed that the executive would have no prerogative power to tax, spend, or borrow."  Michael W. McConnell, The President Who Would Not Be King: Executive Power under the Constitution 101 (2020).

That structural limitation on Congress's spending power is "vital to the integrity and maintenance of the system of government ordained by the constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).  By vesting the legislature with sole spending-and-appropriations authority, the Constitution promotes accountability by ensuring that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good."  *OPM v. Richmond*, 496 U.S. 414, 428 (1990).  Furthermore, by "separat[ing] the 'purse' from the 'sword,'" congressional control over spending also prevents executive overreach. *Tex. Educ. Agency v. U.S. Dep't of Educ.,* 992 F.3d 350, 361-62 (5th Cir. 2021) (citations omitted).  It does so because the founders learned from experience that

combining those powers in a single branch "would furnish [that] body with all the means of tyranny." 2 Debates on the Federal Constitution 348-49 (J. Elliot 2d ed. 1854) (A. Hamilton).  That makes the spending power "one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'"  *U.S. Dep't of Navy*, 665 F.3d at 1346 (citation omitted).

Congress may "set the terms on which it disburses federal funds" pursuant to its "broad power under the Spending Clause."  *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022).  But "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citation omitted).  This clear-statement rule reflects that "'[l]egislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'"  *Id.* (citation omitted).  Because "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain,'" *id.* (citation omitted), conditions on grants must be stated clearly so States accepting funds are fully aware of their obligations, *Yellen*, 54 F.4th at 348.

### 2. HHS lacked constitutional authority to impose the illegal-abortion-counseling-and-referral condition on Title X funding.

**a.**    HHS does not and cannot dispute that Title X itself lacks any clear

21

abortion-counseling-and-referral conditions.

In Title X, Congress exercised its power under the Spending Clause by authorizing HHS to make grants "to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services." 42 U.S.C. § 300a-(a). Because the States in *Ohio* did not raise the Spending Clause in their facial challenge to the 2021 Rule—which only considered HHS's pre-*Dobbs* authority—this Court could not consider whether Title X provides clear notice of an illegal-abortion-counseling-and-referral condition. It does not.

HHS does not claim—indeed, it *cannot* claim—that the condition follows from Section 1008's plain text. After all, *Rust* held that "the language of § 1008" is "ambiguous" on the "issues of counseling [and] referral[s]." 500 U.S. at 184. So even if the 2021 Rule's referral mandate is a permissible interpretation of Section 1008, *Ohio*, 87 F.4th at 772, it is not clearly disclosed by Section 1008. So too for HHS's application of that mandate against States that have outlawed elective abortions. HHS acknowledged as much at the rulemaking stage, explaining that its authority to impose the referral mandate as a spending condition derives from Title X's "ambigu[ity]" on the issue. 86 Fed. Reg. at 56149 (citation omitted). And that is the point. An *unclear* statute lacks the requisite *clear* congressional authorization for the new condition. *See Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir.

1997) (en banc).[2]

That statutory ambiguity leaves no room for a court to conclude that Title X *clearly* requires Tennessee to provide counseling and referrals for abortions that are illegal under state law—the hurdle Spending-Clause conditions must clear. The Constitution thus bars HHS from defunding Tennessee for failure to follow a condition Title X nowhere contains.

**b.** The illegal-abortion-counseling-and-referral condition allegedly derives from the 2021 Rule, but HHS cannot use rulemaking to seize congressional spending power by adding novel conditions to spending programs.

"[T]he ability to place conditions on federal grants ultimately comes from the Spending Clause." *Tex. Educ. Agency*, 992 F.3d at 362; *see South Dakota v. Dole*, 483 U.S. 203, 206 (1987). And because the spending power belongs only to Congress, *supra* 20-21, spending conditions for grants "must come directly from the statute" rather than an agency, *Tex. Educ. Agency*, 992 F.3d at 361. "Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'" *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (citation omitted).

---

[2] Judge Luttig's dissenting panel opinion was adopted in relevant part by a majority of the en banc Fourth Circuit. *See Va. Dep't of Educ.*, 106 F.3d at 561.

That is why this Court decided in *Yellen* that spending conditions generally cannot come from agencies. 54 F.4th at 353-54. *Yellen* involved spending legislation that empowered Treasury to disburse stimulus funds for pandemic-relief purposes. *Id.* at 328. Those funds were conditioned on grantees complying with a vague statutory requirement that did not provide states "clear notice" about how "to maintain compliance" with the applicable conditions. *Id.* at 352 (citation omitted). The statute "*itself* [was] impermissibly vague about whichever obligations it impose[d] on the states," so this Court held that the agency could not enforce the challenged condition. *Id.* at 353.

In *Yellen*, Treasury had promulgated a rule interpreting the vague spending conditions *before* States had accepted the stimulus funds at issue. *Id.* So the Court next considered "whether Treasury's Rule could provide clear notice of [spending] conditions left otherwise indetermin[ed] by the statute." *Id.* The Court held that it could not. Because the rule involved "control over taxation"—"a core aspect of state sovereignty"— it was "insufficient merely that an agency reasonably liquidated ambiguities in the relevant statute." *Id.* at 354. The Treasury could not enforce the challenged spending condition because it did not come from "Congress *itself.*" *Id.*

*Yellen* puts the Sixth Circuit in good company. The Fourth and Eleventh Circuits agree that regulations alone cannot satisfy the clear-statement rule. *See*, *e.g.*, *Morrisey*, 59 F.4th at 1147; *Va. Dep't of Educ.*, 106 F.3d at 567. Those decisions

24

rest on separation-of-powers principles, *see Morrisey*, 59 F.4th at 1147, and the recognition that when a statute is silent, it is "axiomatic" that Congress has not "unambiguously conditioned the States' receipt of federal monies in the manner asserted," *Va. Dep't of Educ.*, 106 F.3d at 567. Just like "an agency cannot choose its own intelligible principle," so too it "cannot provide the content that makes a funding condition ascertainable." *Morrisey*, 59 F.4th at 1148.

Separation-of-powers interests align with these Spending Clause limits. In today's age, "those in the Executive Branch" increasingly seek "to use pen-and-phone regulations as substitutes for laws passed by the people's representatives." *West Virginia v. EPA*, 597 U.S. 697, 752-53 (2022) (Gorsuch, J., concurring). The result reduces States' power to protect their interests through the Constitution's bicameral process of lawmaking. *See* Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex. L. Rev. 1321, 1339-46 (2001). Allowing the Executive Branch to "clai[m] for itself Congress's exclusive spending power," *San Francisco*, 897 F.3d at 1234, also undermines electoral accountability at the heart of the Spending Clause, *see* P. Hamburger, Purchasing Submission 103–05 (2021), and produces the combination of powers that the founders feared, *Tex. Educ. Agency*, 992 F.3d at 362.

**c.** Those precedents and principles doom the Rescindment, which rests on HHS's determination that Tennessee violated 42 C.F.R. § 59.5(a)(5)(ii)'s

regulatorily imposed abortion-counseling-and-referral condition, Mar. 20 Ltr., R.1-11, PageID#193-95; Supp. Amosun Decl., R.21-1, PageID#334, rather than any condition imposed by Congress, *see Yellen*, 54 F.4th at 353.

### 3. HHS's counseling-and-referral condition generates unique Spending Clause difficulties.

HHS's attempt to impose conditions through rulemaking is particularly egregious here. *First*, HHS has set a spending condition on a matter of great political importance at the core of the state domain under an admittedly ambiguous law. *Second*, HHS unveiled its position on illegal abortions only after awarding Tennessee the grant at issue, which makes the rescindment unlawful.

**a.** For three reasons, HHS's action here represents a particularly flagrant seizure of Congress's exclusive spending power:

For one, the challenged spending condition implicates "a matter of great 'political significance.'" *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring) (quoting *NFIB v. OSHA*, 595 U.S. 109, 117 (2022)). Courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *Id.* at 723 (majority opinion) (citation omitted). Although Title X "does not speak directly to the issues of counseling [or] referral[s]" for abortions, *Rust*, 500 U.S. at 184, HHS "claims the power to resolve" that policy issue, *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring), which concerns issues of "profound moral and social importance," *Dobbs*, 597 U.S. at 269. Given "[t]he importance" of abortion

26

policies, and the "earnest and profound debate across the country" about those policies, HHS's asserted authority is "all the more suspect." *West Virginia*, 597 U.S. at 732 (citations omitted).

For two, the challenged condition "intrudes into an area that is the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). Tennessee has general police power to "regulat[e] health and welfare" through limits on "the medical profession," *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023), and through regulations that "protec[t] fetal life," *Dobbs*, 597 U.S. at 262. "For Congress to impose conditions in *that* area, it must do so in clear and unmistakable terms." *Yellen*, 54 F.4th at 354.

When "core aspect[s] of state sovereignty" are at stake, "it is insufficient merely that an agency reasonably liquidated ambiguities in the relevant statute." *Id.* Otherwise, HHS could compel a State to undermine its duly enacted abortion laws as a condition for receiving substantial funding—"supersed[ing]" the "historic police powers of the States." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Given these "implications for the balance of power between the Federal Government and the States," the need for *Congress* to impose conditions is at its apex. *Yellen*, 54 F.4th at 354 (citation omitted).

For three, HHS's condition-setting authority in this specific context is uniquely ambiguous. Congress rarely gives "[e]xtraordinary grants of regulatory

authority ... through ... 'vague terms.'" *West Virginia*, 597 U.S. at 723 (citation omitted). Yet here, the scope of the agency's authority is just that—vague—because whatever condition-setting power HHS has is limited by Section 1008's ambiguous restriction against using funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. The degree of ambiguity is unique here because HHS has at various times taken the position (upheld by courts) that counseling and referrals for abortions is forbidden, permitted, and required by Title X. Where the statute is hopelessly unclear, the agency lacks authority to impose conditions on this major policy issue.

If the Spending Clause's clear-statement rule means anything, it is that agencies cannot impose spending conditions on major policy questions that intrude into areas of state authority, especially by relying on an ambiguous grant of authority that has repeatedly shifted "as new administrations have come into power." *Ohio*, 87 F.4th at 765. Allowing HHS to enforce the spending condition, even when the best interpretation of Title X might render the agency devoid of authority to impose it at all, "would be to grant to the agency power to override Congress." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374-75 (1986). Thus, whatever power agencies have to implement spending-power statutes, HHS exceeded that authority here.

**b.** Even if HHS had authority to impose its new rule-made abortion condition, any Spending Clause conditions must be set out clearly *before* a State accepts

funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). The problem for HHS is that it unveiled its illegal-abortion-counseling-and-referral condition long after Tennessee accepted its Title X grant. So Tennessee lacked clear notice that it must comply with that condition to receive its Title X grant.

In March 2022, HHS awarded Tennessee a five-year grant of Title X funds after reviewing Tennessee's policies and concluding that it complied with HHS's requirements. The "Project Period Start Date" for that "Federal Award" was April 1, 2022, and its "End Date" is March 31, 2027. Mar. 2022 Notice of Award, R.1-7, PageID#170. After *Dobbs*, HHS reviewed Tennessee's policies once again, and once again found Tennessee in compliance. Amosun Decl., R.1-5, PageID#132-33; Oct. 19 Email, R. 1-2, PageID#96. It was not until after President Biden's newly issued directives that HHS decided that Tennessee's policies were a problem.

HHS claims that the 2021 Rule unambiguously forbids Tennessee from limiting its counseling and referrals to pregnancy-termination "options that are legal in the State of Tennessee." Mar. 1 Ltr., R.1-9, PageID#189. But the 2021 Rule is silent on how its obligations apply post-*Dobbs*, specifically for States like Tennessee that criminalized certain abortions *after* HHS promulgated the 2021 Rule. As *Ohio* explains, when HHS issued the 2021 Rule, *Dobbs* "had not yet happened." 87 F.4th at 774 n.7. So the agency had no reason to issue an "'authoritative' or 'official position,'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (citation omitted), on how the

rule's referral mandate applies to grantees that criminalize abortions that were constitutionally protected when HHS issued the rule.

The 2021 Rule's failure to address that issue arguably renders the regulation ambiguous on whether counseling and referrals can be limited to options that are legal under state law. *See Mich. Fam. Res., Inc. v. SEIU Loc. 517M*, 475 F.3d 746, 754-55 (6th Cir. 2007) (en banc). Indeed, even if HHS ultimately has the more persuasive interpretation, the regulation is "*silent* rather than unambiguous" about the scope of its legal obligations. *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1248 n.1 (6th Cir. 1991) (Kennedy, J., concurring).

That silence is hardly the only problem with HHS's position. The "contract-law analogy" employed in Spending-Clause cases also establishes that Tennessee lacked adequate notice. *Cummings*, 596 U.S. at 219 (citation omitted). Most relevant, Tennessee could not have reasonably known that HHS's abortion condition would operate irrespective of abortion's "supervening illegality." *Cf. NLRB v. Int'l Hod Carriers', Union*, 287 F.2d 605, 610 (9th Cir. 1961). Moreover, courts generally interpret contracts to avoid rendering them void for violating public policy. *See* 5 Williston on Contracts § 12:3 (4th ed.). HHS's interpretation raises doubts about the validity of the condition because state public policy makes clear that "[t]he freedom of contract must give way to the preservation of the public health, safety, morals, or general welfare." *Baugh v. Novak*, 340 S.W.3d 372, 383 (Tenn. 2011).

HHS seeks to enforce a novel condition undisclosed at the time of grant acceptance to strip Tennessee of funding to which it would otherwise be entitled. In that sense, this case presents the precise concerns that Judge Bush warned about in his statement regarding denial of en banc rehearing in *Yellen*. There, he explained that the *Pennhurst* rule exists "to provide clarity to states when Congress *passes* the law, not just when the Executive chooses to enforce it." *Kentucky v. Yellen*, 67 F.4th 322, 326 (6th Cir. 2023) (Bush, J., statement regarding denial of reh'g en banc). Here, though, HHS leveraged that uncertainty to apply a novel requirement against Tennessee well after the State accepted the grant.

By seeking to enforce *Pennhurst*'s requirements, Tennessee is not playing a game of "gotcha." To protect "Our Federalism," *Younger v. Harris*, 401 U.S. 37, 44 (1971), the clear-statement rule "provides assurance that, before a state gives up some of its power in exchange for federal grant money, the state's eyes are wide open: it knows what the consequences are," *Yellen*, 67 F.4th at 324. Thus, that rule is "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (Roberts, C.J, opinion).

Because HHS ignored those principles, Tennessee could not weigh those tradeoffs because it had no way of knowing when it accepted the Title X funds that it would be required to surrender its sovereign interest in not promoting abortions

that are illegal under state law.  That undermines reliance interests and erodes the stability that Title X and the Spending Clause seek to promote.  Congress's grant schemes often span decades—just as Title X does.  States in turn devote substantial time and resources to building up programs in reliance on the federal funding they receive.  Tennessee's Title X program, for example, has a 50-year record resting on a complex statewide infrastructure developed with immense effort.  Giving HHS after-the-fact power to alter funding conditions hampers the provision of "effective family planning methods and services" by toggling state participation on and off at will.  42 U.S.C. § 300(a).  The problem is even worse in the context of Title X funding, which HHS issues in 5-year stints—meaning an HHS flip-flop (like the one between 2019 and 2021) risks punishing grantees partway through their grant performance, as HHS now seeks to do to Tennessee.

### 4.  The district court's contrary reasoning is unavailing.

The district court's resolution of Tennessee's claim misapplies the Supreme Court's and this Court's precedents, creates new constitutional problems, and exaggerates the consequences of enforcing constitutional limits on the spending power.

The district court first erred by concluding based on Supreme Court precedent that "notice of spending conditions can be provided by agency regulations."  Op., R.30, PageID#828 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) and *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)).  Neither of the two

cases the district court relied on supports that proposition. In *Jackson*, the Court held that "Title IX *itself* ... supplied sufficient notice" of the relevant spending condition. 544 U.S. at 183 (emphasis added). And in *Davis*, the Court reiterated that "*Congress* [must] speak with a clear voice" when disbursing funds under the Spending Clause, and it found that "[t]he *statute*" by its "plain terms" provided that clarity. *See* 526 U.S. at 640, 643, 650 (emphases added) (citation omitted). The regulations merely bolstered the Court's conclusions about what the plain text required; the Court did not hold that the regulations by themselves satisfied *Pennhurst*. Indeed, the Court has expressed its "reluctan[ce] to conclude" that States may lose their funding based on later-adopted agency interpretations of the relevant statute. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985).

Next, the district court erred by concluding that Title X's boilerplate rulemaking provision solves HHS's clear-statement-rule problem. The court reasoned that "the statutory provision at issue … is not Title X's prohibition on abortion being used as a method of family planning but rather its … requirement that grantees abide by HHS regulations." Op. R.30, PageID#830 n.6. And because *that* statutory requirement, which purportedly derives from Section 1006, is "unambiguous," *id.*, Title X put grantees on clear and unambiguous notice that they can review HHS regulations to find the applicable grant conditions.

That reasoning does not avoid the constitutional problem for many reasons.

33

For starters, Section 1006 imposes no spending conditions at all because it does not create "legal duties" that grantees must follow. *Pennhurst*, 451 U.S. at 23. HHS has consistently interpreted Section 1006—not as creating conditions of compliance for grantees—but as a "grant of regulatory rulemaking authority" to the agency. 84 Fed. Reg. at 7722; *see* 53 Fed. Reg. at 2925. As its subtitle heading suggests, Section 1006(a) empowers HHS to "promulgat[e] … regulations," and it instructs *the agency* to make "[g]rants and contracts … in accordance" with those regulations. 42 U.S.C. § 300a-4(a). Section 1006(b) in turn directs HHS to disburse grants "in such installments" and "subject to … conditions" as the agency deems "appropriate." *Id.* § 300a-4(b). Although Section 1006 puts States on notice that HHS "may" promulgate regulations, *id.* § 300a-4(a), and that it "may" impose conditions, *id.* § 300a-4(b), those provisions stop short of setting any spending conditions themselves. They "speak only to the Secretary" about how HHS may "distribut[e] … public funds," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287, 290 (2002), and do not create any duties or rights for grantees, *cf. id.* at 287.

Even if Section 1006 did impose a spending condition, that provision does not instruct grantees with "unambiguous" clarity that they must follow the illegal-abortion-counseling-and-referral condition to receive funding. A state official deciding whether to accept HHS funds would review Section 1006 alongside Section 1008's funding condition. *Pennhurst*, 451 U.S. at 18. After reading those provisions, the

official would know that grantees must follow certain conditions and regulations. But the official would not "clearly understand that one of the obligations of [Title X] is the obligation to" provide counseling and referrals for abortions that are illegal under state law. *Arlington Cent. Sch. Bd. Dist. of Educ.*, 548 U.S. at 296.

It is no answer that "any state official seeking to identify the conditions of accepting a grant can easily find them in HHS regulations." Op., R.30, PageID#828. That is because the Spending Clause requires that clarity to come from "Congress *itself*," *Yellen*, 54 F.4th at 354—not the agency. Even if Congress purported to give HHS authority to set conditions, that does not solve the constitutional problem either. After all, "the separation of powers does not depend on … whether 'the encroached-upon branch approves the encroachment.'" *Free Enter. Fund v. Pub. Co. Acct. Over-sight Bd.*, 561 U.S. 477, 497 (2010) (citation omitted). By delegating to HHS the power to set conditions of its own choosing, Congress impermissibly "yield[ed] up its own powers," *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring), and allowed HHS to make an end-run around the "single, finely wrought," "step-by-step, deliberate and deliberative" lawmaking "process." *INS v. Chadha*, 462 U.S. 919, 951, 959 (1983). It cannot be that all Spending Clause problems can be averted by merely passing a statute allowing agencies to adopt whatever after-the-fact conditions they want. That sweeping view not only would render the Spending Clause—and this Circuit's precedents interpreting it—toothless. It also

would effectuate a standardless shift of massive lawmaking power to agencies the nondelegation doctrine does not tolerate. *See Tiger Lily, LLC v. United States Dep't of Hous. & Urban Dev.*, 5 F.4th 666, 672 (6th Cir. 2021).

In any event, courts generally cannot "uphold administrative action based on reasons different from those given by the agency." *Japarkulova v. Holder*, 615 F.3d 696, 701 (6th Cir. 2010) (amended opinion) (*Chenery* doctrine). Until litigation began, HHS never asserted that Section 1006 provides the condition that Tennessee allegedly violated. When HHS began its review in January 2023, it stated that the purpose of the review was "to ensure compliance with the requirements for non-directive options counseling and referral" in the 2021 Rule, Jan. 25 Ltr., R.1-8, PageID#187, which "defin[ed] what abortion-related activities were permissible" considering Section 1008, 86 Fed. Reg. at 56145. After its review, HHS warned Tennessee that its "policy for providing nondirective options counseling ... is not in compliance with the Title X regulatory requirements." Mar. 1 Ltr., R.1-9, PageID#189. HHS finally rescinded Tennessee's funding because it determined that "Tennessee is out of compliance with the Title X regulatory requirements." Mar. 20 Ltr., R.1-11, PageID#193. That record makes it clear that HHS rescinded Tennessee's funding because it believed that the State violated a regulatory—not statutory—requirement. So the Court "may not accept appellate counsel's post hoc rationalizations" that the *statute* rather than the *regulation* supplies the relevant

spending condition that Tennessee allegedly violated. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (citation omitted).

The district court also erred by warning that, under Tennessee's approach to the Spending Clause, "significant parts of the federal grant system would vanish." Op., R.30, PageID#831. So long as "authorize[d] … to do so by statute," *FEC v. Cruz*, 596 U.S. 289, 301 (2022), agencies may enforce spending conditions that follow clearly from the statute, as indicated by traditional tools of statutory meaning like text, context, structure, and history, *see Morrisey*, 59 F.4th at 1148. This Court has essentially recognized as much by acknowledging that agencies may by regulation provide "implementation details," *Yellen*, 54 F.4th at 353-54, even though it may not create new conditions in areas of major policy significance, *see id.* at 354. That harmonizes an agency's condition-setting authority with its rulemaking authority in contexts where *Chevron* does not apply. *See Ohio*, 87 F.4th at 769 (noting uncertainty about whether *Cheron* will be overruled). Anyway, even if the Spending Clause *does* limit an agency's condition-setting authority, that is a feature of the constitutional design—not a flaw. *Cf. Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (explaining that the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department").

Finally, the district court did not dispute that after-the-fact Spending Clause conditions are unlawful. It instead rejected the argument that Tennessee lacked

notice of the illegal-abortion-counseling-and-referral condition by remarking that "the 2021 Rule was in place at the time Tennessee applied for and accepted Title X funding in March 2022." Op., R.30, PageID#829. But Tennessee's argument is that the *2021 Rule* fails to disclose the condition with the clarity that *Pennhurst* requires. *Supra* 28-32. *Ohio* supports that reading by noting HHS did not address how the 2021 Rule would apply in a post-*Dobbs* context or to States where abortion is illegal. 87 F.4th at 774 n.7. That Tennessee knew about that rule when it accepted Title X funds does not support that it also knew it would be required to counsel and refer women to receive abortions that are illegal under state law.

## B. The Rescindment Violates the APA.

The Rescindment is a separate agency action, distinct from HHS's promulgation of the 2021 Rule. Because every final agency action gets fresh APA review, the Rescindment must independently satisfy governing statutes, regulations, and administrative-law limits. *See Bennett v. Spear*, 520 U.S. 154, 175 (1997). It falls short on each front.

### 1. The Rescindment Exceeds HHS's Authority.

An agency "literally has no power to act … unless and until Congress authorizes it to do so by statute." *FEC*, 596 U.S. at 301. Agencies are also bound to comply with their own regulations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). Even if an agency has some interpretive authority under *Chevron* (for

statutes) or *Auer* (for regulations), judicial deference is not reflexive.  The agency's

position still "must fall 'within the bounds of reasonable interpretation.'" *Kisor*, 139

S. Ct. at 2416 (citation omitted).  The Rescindment's illegal-abortion-counseling-

and-referral condition flunks that standard, placing it outside HHS's authority.

    **a.**    <u>Title X</u>.  This Court concluded that *Rust*'s reading of Section 1008 still

governs, and required upholding HHS's 2021 Rule under *Chevron*.  *Ohio*, 87 F.4th

at 770.  But this case is not a "naked attempt to relitigate" *Rust* or *Ohio*, Op., R.30,

PageID#833, because not even *Chevron* leeway permits HHS's unprecedented leap

to require illegal abortion referrals and counseling here.[3]

    *Rust* and *Ohio* only considered facial challenges to rules interpreting Sec-

tion 1008.  While the Supreme Court "revolutionized administrative law by … al-

lowing" such "facial, pre-enforcement challenges," it did not foreclose parties' "tra-

ditional[]" ability to "raise an as-applied challenge … in an enforcement proceed-

ing."  *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051,

2060 (2019) (Kavanaugh, J., concurring in the judgment).  When a facial challenge

fails, parties may still "bring as-applied challenges against any alleged unlawful ap-

plications."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442

---

[3] Tennessee reserves its right to revisit the issue of *Chevron* and *Ohio*'s reading of
Section 1008 of Title X in light of the Supreme Court's forthcoming decisions in
*Loper Bright Enters. v. Raimondo* (No. 22-451) and *Relentless, Inc. v. U.S. Dep't of
Commerce* (No. 22-1219).

(D.C. Cir. 2012). That's because a regulation can survive facial scrutiny if even one circumstance "exists under which [it] would be valid," but the same regulation may be unlawful as applied otherwise. *See Rust*, 500 U.S. at 182-83 (citation omitted).

The district court failed to appreciate this critical distinction between a facial challenge to a rule, which involves only the rulemaking record, and a challenge to an agency's adjudication or enforcement, which is a discrete agency action that must independently pass APA muster. Op., R.30, PageID#833. Rather than a facial attack on the 2021 Rule, Tennessee challenges the Rescindment—HHS's decision, in a post-*Dobbs* world, to strip funds from a State that generally outlaws abortion. *See* Br. of United States 7, 34-36, 40-41, *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, No. 22-1008 (U.S.). That action must independently satisfy HHS's statutory authority. *See Bennett*, 520 U.S. at 175. Indeed, *Ohio* recognized exactly that, explaining that the "impact of *Dobbs*" would be relevant to future HHS Title X funding decisions, because state laws criminalizing abortion are "undoubtedly an 'important aspect' of the question now." 87 F.4th at 774 n.7. That language would make no sense if the 2021 Rule perpetually insulated all of HHS's abortion-related actions. Thus, Tennessee may "pursue substantive objections" to the Rescindment, "including claims that [HHS] lacked the statutory authority" for its post-*Dobbs* decision to impose its counseling-and-referral condition despite abortion's illegality in the State. *See Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Rsrv. Sys.*,

40

195 F.3d 28, 34 (D.C. Cir. 1999).  And HHS lacks that authority.

**b.**  Section 1008 directs that no program funds "shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.  Tennessee preserves its argument that the best reading of that provision, in light of its text, context, and history, is that it absolutely bars HHS from conditioning Title X funding on grantees' counseling or referring for abortion procedures.  But for now, this Court need only conclude that HHS's action of mandating counseling and referrals for illegal abortion procedures is a new step not salvaged by *Chevron* or *Rust*.

For starters, deference applies only to positions agencies "promulgate[] in the exercise of th[eir] authority" to "make rules carrying the force of law."  *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013) (citation omitted).  And the Rescindment came via a one-off letter from HHS, *not* a "regulation or formal adjudication," making its view that Title X permits HHS to mandate counseling and referrals for *illegal* abortions ineligible for deference.  *Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 880 (6th Cir. 2020).  The arbitrary and capricious nature of the Rescindment, *infra* 46-52, further ensures it "receives no *Chevron* deference."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

Even if deference doctrines applied, HHS flunks them.  To stand, HHS's position still "must fall 'within the bounds of reasonable interpretation.'"  *Kisor*, 139 S. Ct. at 2415-16 (citation omitted).  But the Rescindment's illegal-abortion-

41

counseling-and-referral condition is "utterly unreasonable and thus impermissible" at *Chevron*'s second step. *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006). Title X only funds grantees that offer "a broad range of *acceptable* … family planning methods." 42 U.S.C. § 300(a) (emphasis added). There is nothing "acceptable" about grantees counseling and referring for *illegal* abortions. *See, e.g.*, Acceptable, Cambridge Dictionary ("able to be agreed to or approved of"), http://tinyurl.com/2tbunrt2; Acceptable, Black's Law Dictionary (11th ed. 2019) ("capable, worthy, and sure of being favorably received"). HHS below suggested that "acceptable" refers *only* to a service's "medical suitability," but did not define that term, source it in the statute, or explain why a procedure Tennessee bans would be medically suitable. PI Resp., R.26, PageID#375.

Other statutory limits on HHS's power to issue abortion mandates highlight the impermissibility of its condition here. Congress prohibited HHS from forcing individual state employees to participate in abortion-related activities. 42 U.S.C. § 300a-7(b)(2)(B). Other provisions are of a piece. *See* Consolidated Appropriations Act, 2021, Public Law 116-260, Div. H, section 507(d) (2020) (Weldon Amendment). If HHS cannot compel individuals to participate in abortions, surely it cannot force an entire state program to do so contrary to state law. HHS's response—that there is no Title X or other bar on an approach that would "coopt the abortion policies of entire state[s]," PI Resp., R.26, PageID#375—indicts the

42

impermissibility of its illegal-abortion mandate and would generate anti-comman-

deering problems, *see Murphy v. NCAA*, 584 U.S. 453, 476-77 (2018).

Title X's history provides more "important … context." *United States v.*

*Hansen*, 143 S. Ct. 1932, 1943 (2023). When Congress passed Title X, all but four

States *prohibited* elective abortions. *See Roe*, 410 U.S. at 140 n.37. HHS's position

thus means that Congress authorized substantial "formula grants to States," 42

U.S.C. § 300a, all while silently empowering HHS to deny funding to nearly every

State based on their abortion laws. This head-scratching outcome "underscores the

implausibility of the Government's interpretation." *Van Buren v. United States*,

141 S. Ct. 1648, 1661 (2021).

Several other canons and principles confirm HHS lacks statutory authority to

rescind Tennessee's funds. *First*, the major-questions doctrine means HHS needed

"clear congressional authorization" before taking the economically and politically

significant step of requiring a State to refer and counsel for illegal abortions in a

program involving some $263 million in annual grants. *West Virginia*, 597 U.S. at

723.[4] Because "§ 1008 is ambiguous," it cannot provide the clear authority required

to sustain this seismic policy shift. *See Ohio*, 87 F.4th at 770. *Second*, HHS similarly

---

[4] Office of Population Affairs, *Fiscal Year 2023 Title X Service Grant Awards*, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (last visited Apr. 5, 2024).

lacks the "clear statement" it needs before invading a "core aspect of state sover-eignty" like Tennessee's prerogative over the health and welfare of its citizens. *Yellen*, 54 F.4th at 354. And because the Rescindment collides with the Spending Clause and its clear-statement rule, *supra* 19-32, constitutional avoidance principles undermine HHS's position. *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005).

Comparing Tennessee to 1832 South Carolina, the district court misunder-stood this argument as asserting a right to "nullify a federal agency's prior interpre-tation of a statute." Op., R.30, PageID#834 n.10. Tennessee's argument is instead that Title X does not authorize HHS's unprecedented action to strip a State's funds for failing to counsel and refer for illegal abortions. The facial validity of the 2021 Rule does not justify a different outcome, including because HHS did not justify its pre-*Dobbs* referral mandate as applied to post-*Dobbs* illegal abortions. *See PDR Network*, 139 S. Ct. at 2060 (Kavanaugh, J., concurring in the judgment).

*HHS Regulations*. HHS's Rescindment also conflicts with at least two other HHS regulations, violating "an elemental principle of administrative law" that agencies must follow their own rules. *Wilson*, 378 F.3d at 545.

*First*, Title X programs must ensure that "services [are] performed under the direction of a clinical services provider, with services offered within their scope of practice and *allowable under state law.*" 42 C.F.R. § 59.5(b)(6) (emphasis added). Tennessee's position, by ensuring Title X providers remain within the "scope of

44

allowable practice under Tennessee law," Feb. 13 Ltr., R.1-3, PageID#98, reasonably gives credence to this state-law caveat.  HHS's Rescindment runs over it.

The district court disagreed based on the "plain meaning" of the regulation, which it divined from the regulation's purpose rather than its text.  *See* Op., R.30, PageID#834, 838-40 (holding that *Auer* deference is unnecessary).  In particular, the district court asserted that the phrase "allowable under state law" only relates to "*who* specifically may serve" as Title X "clinical services provider[s]," but "has no relation to … the *services* being provided."  *Id.* at PageID#840 (citing 86 Fed. Reg. at 56163-64) (emphases in original).  But the plain text of the regulation states otherwise, and *no* provider may perform illegal abortion services in Tennessee.

*Second*, the Rescindment conflicts with the requirement that grantees "[p]rovide for coordination and use of referrals and linkages [with other healthcare providers], who are in close physical proximity to the Title X site, when feasible.…" 42 C.F.R. § 59.5(b)(8).  This text sets two limits on referrals: (i) the referred-to provider must be "in close physical proximity to the Title X site," and (ii) the referral only needs to occur "when feasible."  *Id.*  Yet HHS's only solution for enabling Tennessee's compliance is for providers to refer and counsel patients to receive abortions out of State.  Mar. 20 Ltr., R.1-11, PageID#195.  It is not feasible—*i.e.*,

"reasonable" or "practica[l]" to expect[5]—for Tennessee's Title X providers to refer women for procedures that are state crimes, let alone in a cross-country fashion.

The district understood 42 C.F.R. § 59.5(b)(8) to always require referrals, with the feasibility requirement being only a suggestion for where those referrals should occur. Op., R.30, PageID#837. That misreads the regulation. In the dependent clause "who are in close physical proximity to the Title X site," the "who" specifically relates to the immediately preceding list of healthcare providers and health-service projects. 42 C.F.R. § 59.5(b)(8); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144 (2012). However, the "when feasible" requirement, which comes after that dependent clause set off by commas, modifies grantees' general obligations to "provide for coordination and use of referrals and linkages" to those providers. *See* 42 C.F.R. § 59.5(b)(8).

Thus, the feasibility requirement does not apply *only* to referrals in close physical proximity. This reading retains the HHS's "inten[t] to *expand* access to health services," Op., R.30, PageID#838 (emphasis in original), while recognizing it is not "feasible" for Title X providers to make referrals for illegal procedures, whether near or far. The district court's counter interpretation would require providers to *always* refer patients for *any* procedure—even to far flung locations, against the provider's

---

[5] "Feasibility," *Black's Law Dictionary* 17c (11th ed. 2019).

medical judgment, and in a manner that would spawn new compliance challenges and health risks. *See id.* at PageID#838-39; *infra* 47-49.

## 2. The Rescindment Is Arbitrary and Capricious.

Agency actions must have a "rational connection between the facts found and the choice made," considering all "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The Rescindment falls short in ways *Ohio* foresaw.

*Failure to Address Important Regulatory Problems.* After *Dobbs*, state laws prohibiting abortion are "undoubtedly an 'important aspect'" of HHS's regulatory problem. *Ohio*, 87 F.4th at 774 n.7. But the Rescindment did not grapple with the myriad problems implicated by its illegal-abortion condition.

For example, Tennessee outlaws "deliver[ing]" most abortions, undercutting a key justification for the 2021 Rule, *see Ohio*, 87 F.4th at 773 (quoting 86 Fed. Reg. at 56,154), and disproving that the 2021 Rule remains free of "any federalism implications," 86 Fed. Reg. at 56,168. Whatever merit that claim had when HHS promulgated the rule, its application here undermines Tennessee's core sovereign interests in protecting fetal life, *see Dobbs*, 597 U.S. at 262, 289. But HHS ignored this intrusion on Tennessee's sovereignty before requiring it to refer for abortions.

HHS's terse out-of-state referral "solution" also ignores problems of its own making. Not *all* out-of-state referrals are medically appropriate and not *all* women

have the time and means to travel.[6]  HHS also ignores the burdens that out-of-state

referrals pose for Tennessee hospitals and emergency rooms that will bear the costs

of caring for patients first treated by far-flung physicians.  *See, e.g.*, *All. for Hippo-*

*cratic Med. v. FDA*, 78 F.4th 210, 230-32 (5th Cir. 2023) (reciting evidence on trend

of women receiving out-of-state abortions then requiring emergency care in States

where abortion is illegal).  Nor did the Rescindment account for the "greatly in-

creased compliance costs" of monitoring state-by-state abortion laws to identify le-

gal referrals.  86 Fed. Reg. at 56,145 (citing similar costs as a reason for rescinding

2019 Rule).  Or the additional legal problems with a regime reliant upon provision

of abortions by "telehealth" and mail-shipped medications that Tennessee and fed-

eral law forbid.  Mar. 1 Ltr., R.1-9, PageID#190; *supra* 12.

     The Rescindment's specific effect on Tennesseans is even more acute.  HHS

rescinded the 2019 Rule based on the view that the rule drove out Title X grantees

and created "negative public health consequences."  *See, e.g.*, 86 Fed. Reg. at

56,146-48.  HHS's action here likewise denies funding to "the only agency" HHS

declared capable of administering Title X "without a gap in services in the state."

Program Review, R.1-1, PageID#36.  Yet the Rescindment did not address the

---

[6] *Cf., e.g.*, Br. of Cal. Women's Law Ctr. as *Amicus Curiae* 30, *Dobbs*, 142 S. Ct.
2228 (noting that "many women cannot afford to return to" out-of-state providers
"for follow-up appointments," and may "instead have to self-treat any after-effects
or seek care at an emergency facility").

potential gaps in care it would create. *See generally* Mar. 20 Ltr., R.1-11, PageID#193-95. Nor does HHS's action square with its stated goal of "increas[ing] [Title X] participation by states," 86 Fed. Reg. at 56,168, as its similar defending of Oklahoma's Title X program confirms, *Oklahoma v. HHS*, 5:23-cv-01052 (W.D. Okla.), Dkt. 1.

The district court permitted HHS to sidestep these defects since the 2021 Rule previously required abortion referrals. Op., R.30, PageID#843. But this Court instructed that "[t]he impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect,'" that now must be considered. *Ohio*, 87 F.4th at 774 n.7. And HHS's Rescindment is a distinct agency action that must survive fresh APA scrutiny. *Supra* 38-40. The argument is not that *Dobbs* required HHS to "reconsider whether it should have promulgated the 2021 Rule in the first place." Op., R.30, PageID#842 (citation omitted). Rather, because reasoned decision-making requires accounting for important aspects at the time a decision is made, HHS needed to consider *Dobbs*'s impact given its relevancy to the soundness and justification of HHS's Rescindment. *See Ohio*, 87 F.4th at 774 n.7; *State Farm*, 463 U.S. at 43.

*Unlawful Position Switch.* An agency must "provide [a] reasoned explanation" for any switch in policy, which "ordinarily demand[s] that it display an awareness that it *is* changing position[s]." *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). The Rescindment came just months after HHS

49

approved Tennessee's Title X program with full awareness the State's post-*Dobbs* policy that "[n]o referrals for abortion are made." Program Review, R.1-1, PageID#56. But HHS never explained its 180-degree pirouette.

Before HHS's program review, Tennessee implemented its new policy to refer and counsel only for "options that are legal in the State of Tennessee." Amosun Decl., R.1-5, PageID#132-33, 135. That meant referrals for partial-birth, pre-waiting-period, and post-viability abortions were immediately prohibited. Tenn. Code Ann. §§ 39-15-201, -202, -209. And OPA recognized that all elective abortions would become unavailable by August 2022. Program Review, R.1-1, PageID#63. Thus, OPA acknowledged that under Tennessee's program "[n]o referrals for abortion are made." *Id.* at PageID#56, 59.

Even so, OPA found that Tennessee was "in compliance," complementing the State on it "wonderful review." Oct. 19 Email, R.1-2, PageID#96. OPA's only note on abortion counseling and referrals was to observe that one Tennessee subgrantee had "out-of-state abortion referral resources." Program Review, R.1-1, Page ID#63. And while OPA requested updates after Tennessee's trigger law took effect, at no point did it suggest that the 2021 Rule "required [Tennessee] to refer women for [all] abortion[s] after its abortion ban went into effect." Op., R.30, PageID#846 n.17.

That requirement only appeared after OPA undertook a second audit. Jan. 25 Ltr., R.1-8, PageID#187. At that point, OPA claimed that only referring and

counseling for options that are legal in Tennessee violated the 2021 Rule. Mar. 20 Ltr., R.1-11, PageID#195. But OPA never acknowledged its earlier contrary position nor explained its shift, as the APA required. *See Fox*, 556 U.S. at 515.

The district court held otherwise based on a faulty understanding of the factual setting and nature of Tennessee's program review. According to the district court, at the time of the July program review, "abortion was still legal in Tennessee." Op., R.30, PageID#846. But that is incorrect: Even before the review, Tennessee's new policy excluded referrals for illegal partial-birth, pre-waiting-period, and post-viability abortions, to name a few. Tenn. Code Ann. §§ 39-15-201, -202, -209. Even with the then-current abortion-law restrictions, OPA approved Tennessee's program. And OPA knew Tennessee's trigger law would make the policy even more constrictive in one month's time. Program Review, R.1-1, PageID#63.

Thus, while not suggesting that state abortion laws would modify the 2021 Rule, Op., R.30, PageID#844, OPA's initial approval of Tennessee's program did suggest that it would make exceptions for such laws, *id.* at PageID#846. Whatever OPA's general FAQ guidance says, *id.* at PageID#844, OPA's later and specific approval of Tennessee's program via an October 2022 report trumps. OPA's unexplained position-switch just months later was unlawful. *Fox*, 556 U.S. at 515.

<u>*Disregard of Reliance Interests.*</u>  The Rescindment also overlooked Tennessee's legitimate reliance interests. For 50 years, Tennessee has received Title X

funding, developing a "leading" program that serves nearly 40,000 Tennesseans. Program Review, R.1-1, PageID#36. Over those five decades, Tennessee has retained significant autonomy to administer its Title X program according to state laws regulating the medical profession and medical ethics. The Rescindment—by requiring that Tennessee ignore its criminal code and contradict its sovereign interests—upended Tennessee's "legitimate reliance" on running a Title X program consistent with state law. *Regents*, 140 S. Ct. at 1913 (quotations omitted).

The district court rejected these reliance interests, reasoning that "HHS never changed its position as to what the 2021 Rule required." Op., R.30, PageID#848. But States could not ban elective abortions before *Dobbs*, so the Rescindment necessarily provided a new answer to a question the 2021 Rule nowhere confronted. *Ohio*, 87 F.4th 774 n.7. And that answer—that States must ignore their own law—defies the agency's prior practice. Thus, the district court erred in considering only Tennessee's reliance on HHS's initial program approval. *Id.* at PageID#849. Tennessee had likewise counted on HHS maintaining its "longstanding polic[y]" respecting state laws regulating medical professionals. *Encino*, 579 U.S. at 222. Reneging on that 50-year promise by pulling Tennessee's grant—risking decades of investments, relationships, and goodwill—merited a "more detailed justification." *Fox*, 556 U.S. at 515.

### 3. The Rescindment Is Procedurally Invalid.

Rules that "create legal effects" rather than explain "*pre-existing* legal obligations" must undergo notice-and-comment. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) (citation omitted). The illegal-abortion condition imposed by the Rescindment is such a "legislative rule." *Id.* at 109; *see Tennessee v. Dep't of Ed.*, 615 F. Supp. 3d 807, 839-40 (E.D. Tenn. 2022) (detailing the qualities of legislative rules), *appeal pending*, 6th Cir. No. 22-5807. So new "APA rule-making [was] required," but it never came. *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995). This procedural ground is an independent basis to invalidate the Rescindment.

In dismissing this argument, Op., R.30, PageID#850, the district court again failed to appreciate that the Rescindment is an application of the 2021 Rule that imposes *new* requirements. *See Ohio*, 87 F.4th at 774 n.7. Nor did HHS's post-*Dobbs* announcement of its new illegal-abortion condition solve the problem. That FAQ document is only informal guidance, not a notice-and-comment rule, so the Rescindment's new approach remains procedurally void. *See* 5 U.S.C. § 706(2)(D); *see also Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (requiring notice-and-comment when agency action is "inconsistent with ... existing regulations").

## II. Tennessee Faces Irreparable Harm Absent This Injunction.

The district court recognized that Tennessee will suffer "imminent and irreparable harm" absent injunctive relief. Op., R.30, PageID#852. Yet it denied relief because, in its view, Tennessee would suffer "only a small degree of irreparable harm." *Id.* at PageID#855. That is wrong. Without injunctive relief, Tennessee will suffer severe financial, reputational, and sovereign harms.

First, the Rescindment will cause Tennessee severe financial losses that it cannot later recover. Tennessee lost $7 million in Title X funds last year, it will lose another $7 million this summer, and it will continue hemorrhaging those funds until the HHS's unlawful policy is enjoined. HHS itself has said that Tennessee cannot recover any disbursed grant funds—confirming irreparable harm. PI Opp'n, R.26, PageID#389; *cf. Kentucky v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023). The Rescindment creates even more fiscal harm by eliminating sizeable price discounts that Tennessee enjoyed when buying family planning drugs with Title X funds. Amosun Decl., R.1-5, PageID#134. Those financial losses are irreparable, as this Court has already held in the context of lost Title X funding. *Ohio*, 87 F.4th at 782-83.

The district court trivialized Tennessee's financial injury by describing the $7 million loss as "relatively minor" because it is only "a very small fraction" of the total federal funding TDH receives. Op., R.30, PageID#852. But that $7 million loss far surpasses the $1.8 million in Title X funds this Court found adequate to

justify injunctive relief in Ohio's suit against HHS. *Ohio*, 87 F.4th at 782-83. And that $7 million does not include the tens of millions in funds that Tennessee will lose over the course of this litigation because it refuses to follow the unlawful condition. Whatever the total federal funding, the loss of tens of millions of dollars is "significant." Op., R.30, PageID#853 n.24.

Second, the Rescindment threatens the viability of Tennessee's Title X program. There is no guarantee the State will fill the funding gap left by the Rescindment. Supp. Amosun Decl., R.21-1, PageID#335. And if the State does not, its Title X program ends, erasing decades of building a "leading" program, *id.*, along with the goodwill of communities that know and rely on its services, *see Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017).

The district court rejected this argument by suggesting that there is "no evidence that the legislature is considering cutting funding for the Title X project." Op., R.30, PageID#853. That speculation misses the broader context. The unlawful Rescindment forces Tennessee either to abandon its Title X program (an irreparable harm) or divert limited taxpayer funds from other worthwhile projects (an irreparable harm). So even if the court is right that the Title X program will likely survive, the diversion of funds necessary to fill the gap also causes irreparable harm. *Cf. Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017).

Third, the Rescindment will cause irreparable reputational harm that

materially affects Tennessee's ability to secure future federal grants. HHS terminated Tennessee's Title X funding because it believes the State violated material terms of its federal grant. That unlawful termination brands Tennessee with breaching the terms of the agreement, which is "precisely" the type of reputation-hampering pronouncement that "constitute[s] irreparable harm." *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022). That matters because federal law requires HHS to report the violation to the federal grantee clearinghouse, which threatens Tennessee's "ability to obtain [any] future Federal funding." Mar. 1 Ltr., R.1-9, PageID#190.

The district court dismissed that reputational injury because it believed Tennessee never proved the harm was "likely to occur" or "the extent of the harm if it were to occur." Op., R.30, PageID#853. But, as the court itself noted, federal law requires HHS to report Tennessee's noncompliance to the public database. *Id.* at PageID#854 n.25. So unless the Court believes that HHS intends to violate federal law, the reputational damage *is* "likely to occur." And while Tennessee did not quantify "the extent of [that] harm," *id.* at PageID#853, that is because reputational injuries "are difficult to quantify monetarily," *ACT, Inc.*, 46 F.4th at 503-04, which is why the Court should grant relief.

Fourth, HHS's interference with Tennessee's "sovereign interest" in setting its own abortion laws is a "form of irreparable injury." *Maryland v. King*, 567 U.S.

1301, 1303 (2012) (Roberts, C.J., in chambers). HHS penalizes Tennessee for re-fusing to promote abortion procedures that the State has outlawed, which impairs Tennessee's sovereign decision about how to regulate abortions. The court's treat-ment of the harm to those sovereign interests discounts the federalism interests at stake. Tennessee adopted a policy that promotes preserving fetal life. Tenn. Code Ann. § 39-15-213. HHS penalizes Tennessee for refusing to act against those poli-cies and encourage procedures that are illegal under state law.

## III. An Injunction Will Not Harm HHS or the Public Interest.

This Court "balance[s] the competing claims of injury and must consider the effect on each party of the granting ... of the requested relief." *Winter*, 555 U.S. at 24. With Tennessee's strong likelihood of success and impending irreparable harm, the defendants "fac[e] a high hurdle" in showing the last factors "warrant withhold-ing relief." *Biden*, 57 F.4th at 556. They cannot clear it.

HHS will not be harmed by the grant of a preliminary injunction. HHS la-beled Tennessee's Health Department as "the only agency" capable of administer Title X funds in the state with integrity. Program Review, R.1-1, PageID#36. It is thus HHS's action that hampers the public's interest by stripping many of family planning services, *supra* 12, and generating new public-health risks HHS nowhere addressed, *supra* 47-49. HHS's aim of promoting abortion access through Title X cannot outweigh these considerations, given Title X's limit on use of funds for

abortion purposes. 42 U.S.C. § 300a-6. Regardless, without HHS's "power to regulate" using its interpretation, this Court cannot "weigh [the] tradeoffs" of HHS's pursuit of "desirable ends." *OSHA*, 595 U.S. at 120. Instead, "the public's true interest lies in a correct application" of the law. *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022).

## CONCLUSION

This Court should enjoin HHS from enforcing its new illegal-abortion-counseling-and-referral condition on Tennessee and from withholding Tennessee's Title X grant disbursements.

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE
  *Solicitor General*
WHITNEY D. HERMANDORFER
  *Director of Strategic Litigation*
HARRISON GRAY KILGORE
  *Strategic Litigation Counsel*
PHILIP HAMMERSLEY
  *Assistant Solicitor General*
TRENTON MERIWETHER
  *Assistant Attorney General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Matt.Rice@ag.tn.gov
Whitney.Hermandorfer@ag.tn.gov

Harrison.Kilgore@ag.tn.gov
Philip.Hammersley@ag.tn.gov
Trenton.Meriwether@ag.tn.gov

*Counsel for the State of Tennessee*

# CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 12,931 words.  *See* Fed. R. App. P. 27(d)(2)(A).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 5 day of April 2024 on the following:

Courtney L. Dixon
Brian James Springer
Civil Division, Appellate Staff
U.S. Department of Justice
Tel: (202) 353-8189
courtney.l.dixon@usdoj.gov
brian.j.springer@usdoj.gov

*Counsel for Defendants*

/s/ Whitney Hermandorfer
WHITNEY HERMANDORFER
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

## DESIGNATION OF COURT DOCUMENTS

The following record documents are relevant to this appeal:

| Docket Entry No. | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1-32 |
| 1-1 | TN Program Review Report | 33-95 |
| 1-2 | Oct. 19, 2022 OPA Email. | 96-97 |
| 1-3 | Feb. 13 TDoH Ltr. to OPA. | 98-101 |
| 1-4 | Goodwin Declaration w Exhibits. | 102-130 |
| 1-5 | Amosun Declaration w Exhibits. | 131-160 |
| 1-6 | Dobbs FAQ. | 161-169 |
| 1-7 | Mar. 2022 Notice of Award. | 170-186 |
| 1-8 | Jan. 25 OPA Ltr. to TDoH. | 187-188 |
| 1-9 | Mar. 1 OPA Ltr. to Tenn. Dep't of Health. | 189-191 |
| 1-10 | Mar. 13 Tenn. Dep't of Health Ltr. | 192 |
| 1-11 | Mar. 20 OPA Ltr. to Tenn. Dep't of Health. | 193-195 |
| 1-12 | Mar. 2023 Notice of Award. | 196-199 |
| 1-17 | OPA May 30 Email. | 213-214 |
| 1-18 | Oliver Declaration with Attachment. | 215-221 |
| 20 | Tennessee's Motion for Preliminary Injunction | 292-296 |
| 21 | Memorandum in Support of Motion for Preliminary Injunction | 299-332 |
| 21-1 | Memorandum in Support of Motion for Preliminary Injunction Attachment #1 Supplemental Amosun Declaration | 333-336 |
| 26 | Defendants' Opposition to Motion for Preliminary Injunction | 361-392 |
| 27 | Tennessee's Reply in Support of Motion for Preliminary Injunction | 393-409 |
| 30 | Memorandum Opinion Denying Motion for Preliminary Injunction | 815-857 |
| 31 | Tennessee's Notice of Appeal from Order Denying Preliminary Injunction | 858-859 |
| 34 | USCA Case Number | 865-867 |

**ADDENDUM**

For the Court's convenience, this addendum includes:

- 42 U.S.C. § 300, *et seq.* ("Title X")

- 42 C.F.R. § 59.1, *et seq.* ("Title X Implementing Regulations")

# STATUTORY & REGULATORY PROVISIONS

## Title X of the Public Health Service Act, 42 U.S.C. § 300, *et seq.* ("Title X")

### § 300 Project grants and contracts for family planning services

#### (a) Authority of Secretary

The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). To the extent practical, entities which receive grants or contracts under this subsection shall encourage familiy[1] participation in projects assisted under this subsection.

#### (b) Factors determining awards; establishment and preservation of rights of local and regional entities

In making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance. Local and regional entities shall be assured the right to apply for direct grants and contracts under this section, and the Secretary shall by regulation fully provide for and protect such right.

#### (c) Reduction of grant amount

The Secretary, at the request of a recipient of a grant under subsection (a), may reduce the amount of such grant by the fair market value of any supplies or equipment furnished the grant recipient by the Secretary. The amount by which any such grant is so reduced shall be available for payment by the Secretary of the costs incurred in furnishing the supplies or equipment on which the reduction of such grant is based. Such amount shall be deemed as part of the grant and shall be deemed to have been paid to the grant recipient.

#### (d) Authorization of appropriations

For the purpose of making grants and contracts under this section, there are authorized to be appropriated $30,000,000 for the fiscal year ending June 30, 1971; $60,000,000 for the fiscal year ending June 30, 1972; $111,500,000 for the fiscal year ending June 30, 1973, $111,500,000 each for the fiscal years ending June 30, 1974, and June 30, 1975; $115,000,000 for fiscal year 1976; $115,000,000 for the fiscal year ending September 30, 1977; $136,400,000 for the fiscal year ending September 30, 1978; $200,000,000 for the fiscal year ending September 30, 1979; $230,000,000 for the fiscal year ending September 30, 1980; $264,500,000 for the fiscal year ending September 30, 1981; $126,510,000 for the fiscal year ending September 30, 1982; $139,200,000 for the fiscal year ending September 30, 1983; $150,830,000 for the fiscal year ending September 30, 1984; and $158,400,000 for the fiscal year ending September 30, 1985.

## § 300a. Formula grants to States for family planning services

### (a) Authority of Secretary; prerequisites

The Secretary is authorized to make grants, from allotments made under subsection (b), to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services. No grant may be made to a State health authority under this section unless such authority has submitted, and had approved by the Secretary, a State plan for a coordinated and comprehensive program of family planning services.

### (b) Factors determining amount of State allotments

The sums appropriated to carry out the provisions of this section shall be allotted to the States by the Secretary on the basis of the population and the financial need of the respective States.

### (c) "State" defined

For the purposes of this section, the term "State" includes the Commonwealth of Puerto Rico, the Northern Mariana Islands, Guam, American Samoa, the Virgin Islands, the District of Columbia, and the Trust Territory of the Pacific Islands.

### (d) Authorization of appropriations

For the purpose of making grants under this section, there are authorized to be appropriated $10,000,000 for the fiscal year ending June 30, 1971; $15,000,000 for

the fiscal year ending June 30, 1972; and $20,000,000 for the fiscal year ending June 30, 1973.

## § 300a-1. Training grants and contracts; authorization of appropriations

(a) The Secretary is authorized to make grants to public or nonprofit private entities and to enter into contracts with public or private entities and individuals to provide the training for personnel to carry out family planning service programs described in section 300 or 300a of this title.

(b) For the purpose of making payments pursuant to grants and contracts under this section, there are authorized to be appropriated $2,000,000 for the fiscal year ending June 30, 1971; $3,000,000 for the fiscal year ending June 30, 1972; $4,000,000 for the fiscal year ending June 30, 1973; $3,000,000 each for the fiscal years ending June 30, 1974 and June 30, 1975; $4,000,000 for fiscal year ending 1976; $5,000,000 for the fiscal year ending September 30, 1977; $3,000,000 for the fiscal year ending September 30, 1978; $3,100,000 for the fiscal year ending September 30, 1979; $3,600,000 for the fiscal year ending September 30, 1980; $4,100,000 for the fiscal year ending September 30, 1981; $2,920,000 for the fiscal year ending September 30, 1982; $3,200,000 for the fiscal year ending September 30, 1983; $3,500,000 for the fiscal year ending September 30, 1984; and $3,500,000 for the fiscal year ending September 30, 1985.

## § 300a-2. Conduct, etc., of research activities

The Secretary may—

> (1) conduct, and

> (2) make grants to public or nonprofit private entities and enter into contracts with public or private entities and individuals for projects for,

research in the biomedical, contraceptive development, behavioral, and program implementation fields related to family planning and population.

## § 300a-3. Informational and educational materials development grants and contracts; authorization of appropriations

(a) The Secretary is authorized to make grants to public or nonprofit private entities and to enter into contracts with public or private entities and individuals to assist in developing and making available family planning and population growth

information (including educational materials) to all persons desiring such information (or materials).

(b) For the purpose of making payments pursuant to grants and contracts under this section, there are authorized to be appropriated $750,000 for the fiscal year ending June 30, 1971; $1,000,000 for the fiscal year ending June 30, 1972; $1,250,000 for the fiscal year ending June 30, 1973; $909,000 each for the fiscal years ending June 30, 1974, and June 30, 1975; $2,000,000 for fiscal year 1976; $2,500,000 for the fiscal year ending September 30, 1977; $600,000 for the fiscal year ending September 30, 1978; $700,000 for the fiscal year ending September 30, 1979; $805,000 for the fiscal year ending September 30, 1980; $926,000 for the fiscal year ending September 30, 1981; $570,000 for the fiscal year ending September 30, 1982; $600,000 for the fiscal year ending September 30, 1983; $670,000 for the fiscal year ending September 30, 1984; and $700,000 for the fiscal year ending September 30, 1985.

## § 300a-4. Grants and contracts

### (a) Promulgation of regulations governing execution; amount of grants

Grants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate. The amount of any grant under any section of this subchapter shall be determined by the Secretary; except that no grant under any such section for any program or project for a fiscal year beginning after June 30, 1975, may be made for less than 90 per centum of its costs (as determined under regulations of the Secretary) unless the grant is to be made for a program or project for which a grant was made (under the same section) for the fiscal year ending June 30, 1975, for less than 90 per centum of its costs (as so determined), in which case a grant under such section for that program or project for a fiscal year beginning after that date may be made for a percentage which shall not be less than the percentage of its costs for which the fiscal year 1975 grant was made.

### (b) Payment of grants

Grants under this subchapter shall be payable in such installments and subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made.

### (c) Prerequisites; "low-income family" defined

A grant may be made or contract entered into under section 300 or 300a of this title for a family planning service project or program only upon assurances satisfactory to the Secretary that--

> (1) priority will be given in such project or program to the furnishing of such services to persons from low-income families; and
> (2) no charge will be made in such project or program for services provided to any person from a low-income family except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge.

For purposes of this subsection, the term "low-income family" shall be defined by the Secretary in accordance with such criteria as he may prescribe so as to insure that economic status shall not be a deterrent to participation in the programs assisted under this subchapter.

**(d) Suitability of informational or educational materials**

> (1) A grant may be made or a contract entered into under section 300 or 300a-3 of this title only upon assurances satisfactory to the Secretary that informational or educational materials developed or made available under the grant or contract will be suitable for the purposes of this subchapter and for the population or community to which they are to be made available, taking into account the educational and cultural background of the individuals to whom such materials are addressed and the standards of such population or community with respect to such materials.
>
> (2) In the case of any grant or contract under section 300 of this title, such assurances shall provide for the review and approval of the suitability of such materials, prior to their distribution, by an advisory committee established by the grantee or contractor in accordance with the Secretary's regulations. Such a committee shall include individuals broadly representative of the population or community to which the materials are to be made available.

**§ 300a-5. Voluntary participation by individuals; participation not prerequisite for eligibility or receipt of other services and information**

The acceptance by any individual of family planning services or family planning or

population growth information (including educational materials) provided through financial assistance under this subchapter (whether by grant or contract) shall be voluntary and shall not be a prerequisite to eligibility for or receipt of any other service or assistance from, or to participation in, any other program of the entity or individual that provided such service or information.

## § 300a-6. Prohibition against funding programs using abortion as family planning method

None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.

## § 300a-7. Sterilization or abortion

## (a) Omitted

## (b) Prohibition of public officials and public authorities from imposition of certain requirements contrary to religious beliefs or moral convictions

The receipt of any grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disabilities Services and Facilities Construction Act by any individual or entity does not authorize any court or any public official or other public authority to require--

(1) such individual to perform or assist in the performance of any sterilization procedure or abortion if his performance or assistance in the performance of such procedure or abortion would be contrary to his religious beliefs or moral convictions; or

(2) such entity to--

(A) make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions, or

(B) provide any personnel for the performance or assistance in the performance of any sterilization procedure or abortion if the performance or assistance in the performance of such procedures or abortion

by such personnel would be contrary to the religious beliefs or moral convictions of such personnel.

## (c) Discrimination prohibition

(1) No entity which receives a grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disabilities Services and Facilities Construction Act after June 18, 1973, may--

> (A) discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel, or

> (B) discriminate in the extension of staff or other privileges to any physician or other health care personnel,

because he performed or assisted in the performance of a lawful sterilization procedure or abortion, because he refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting sterilization procedures or abortions.

(2) No entity which receives after July 12, 1974, a grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services may--

> (A) discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel, or

> (B) discriminate in the extension of staff or other privileges to any physician or other health care personnel,

because he performed or assisted in the performance of any lawful health service or research activity, because he refused to perform or assist in the performance of any such service or activity on the grounds that his performance or assistance in the performance of such service or activity would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting any such service or activity.

**(d) Individual rights respecting certain requirements contrary to religious beliefs or moral convictions**

No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions.

**(e) Prohibition on entities receiving Federal grant, etc., from discriminating against applicants for training or study because of refusal of applicant to participate on religious or moral grounds**

No entity which receives, after September 29, 1979, any grant, contract, loan, loan guarantee, or interest subsidy under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disabilities Assistance and Bill of Rights Act of 2000 may deny admission or otherwise discriminate against any applicant (including applicants for internships and residencies) for training or study because of the applicant's reluctance, or willingness, to counsel, suggest, recommend, assist, or in any way participate in the performance of abortions or sterilizations contrary to or consistent with the applicant's religious beliefs or moral convictions.

**§ 300a-8. Penalty for United States, etc., officer or employee coercing or endeavoring to coerce procedure upon beneficiary of Federal program**

Any--

> (1) officer or employee of the United States,
>
> (2) officer or employee of any State, political subdivision of a State, or any other entity, which administers or supervises the administration of any program receiving Federal financial assistance, or
>
> (3) person who receives, under any program receiving Federal financial assistance, compensation for services,

who coerces or endeavors to coerce any person to undergo an abortion or sterilization procedure by threatening such person with the loss of, or disqualification for the receipt of, any benefit or service under a program receiving Federal financial

assistance shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

## Title X's Implementing Regulations, 42 C.F.R. § 59.1, *et seq.*

### § 59.1 To what programs do these regulations apply?

The regulations of this subpart are applicable to the award of grants under section 1001 of the Public Health Service Act (42 U.S.C. 300) to assist in the establishment and operation of voluntary family planning projects. These projects shall consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children.

### § 59.2 Definitions.

As used in this subpart:

Act means the Public Health Service Act, as amended.

Adolescent-friendly health services are services that are accessible, acceptable, equitable, appropriate and effective for adolescents.

Clinical services provider includes physicians, physician assistants, nurse practitioners, certified nurse midwives, and registered nurses with an expanded scope of practice who are trained and permitted by state-specific regulations to perform all aspects of the user (male and female) physical assessments recommended for contraceptive, related preventive health, and basic infertility care.

Client-centered care is respectful of, and responsive to, individual client preferences, needs, and values; client values guide all clinical decisions.

Culturally and linguistically appropriate services are respectful of and responsive to the health beliefs, practices and needs of diverse patients.

Family means a social unit composed of one person, or two or more persons living together, as a household.

Family planning services include a broad range of medically approved services, which includes Food and Drug Administration (FDA)-approved contraceptive products and natural family planning methods, for clients who want to prevent

pregnancy and space births, pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, and other preconception health services.

Health equity is when all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances.

Inclusive is when all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, individuals who belong to underserved communities, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality.

Low-income family means a family whose total annual income does not exceed 100 percent of the most recent Poverty Guidelines issued pursuant to 42 U.S.C. 9902(2). "Low-income family" also includes members of families whose annual family income exceeds this amount, but who, as determined by the project director, are unable, for good reasons, to pay for family planning services. For example, unemancipated minors who wish to receive services on a confidential basis must be considered on the basis of their own resources.

Nonprofit, as applied to any private agency, institution, or organization, means that no part of the entity's net earnings benefit, or may lawfully benefit, any private shareholder or individual.

Quality healthcare is safe, effective, client-centered, timely, efficient, and equitable.

Secretary means the Secretary of Health and Human Services (HHS) and any other officer or employee of the Department of Health and Human Services to whom the authority involved has been delegated.

Service site is a clinic or other location where Title X services are provided to clients. Title X recipients and/or their subrecipients may have service sites.

State includes, in addition to the several States, the District of Columbia, Guam, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the U.S. Virgin

Islands, American Samoa, the U.S. Outlying Islands (Midway, Wake, et al.), the Marshall Islands, the Federated State of Micronesia, and the Republic of Palau.

Trauma-informed means a program, organization, or system that is trauma-informed realizes the widespread impact of trauma and understands potential paths for recovery; recognizes the signs and symptoms of trauma in clients, families, staff, and others involved with the system; and responds by fully integrating knowledge about trauma into policies, procedures, and practices, and seeks to actively resist re-traumatization.

### § 59.3 Who is eligible to apply for a family planning services grant?

Any public or nonprofit private entity in a State may apply for a grant under this subpart.

### § 59.4 How does one apply for a family planning services grant?

(a) Application for a grant under this subpart shall be made on an authorized form.

(b) An individual authorized to act for the applicant and to assume on behalf of the applicant the obligations imposed by the terms and conditions of the grant, including the regulations of this subpart, must sign the application.

(c) The application shall contain

　　(1) A description, satisfactory to the Secretary, of the project and how it will meet the requirements of this subpart;

　　(2) A budget and justification of the amount of grant funds requested;

　　(3) A description of the standards and qualifications which will be required for all personnel and for all facilities to be used by the project; and

　　(4) Such other pertinent information as the Secretary may require.

### § 59.5 What requirements must be met by a family planning project?

(a) Each project supported under this part must:
　　(1) Provide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and

services (including pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, STI services, preconception health services, and adolescent-friendly health services). If an organization offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of acceptable and effective medically approved family planning methods and services. Title X service sites that are unable to provide clients with access to a broad range of acceptable and effective medically approved family planning methods and services, must be able to provide a prescription to the client for their method of choice or referrals to another provider, as requested.

(2) Provide services without subjecting individuals to any coercion to accept services or to employ or not to employ any particular methods of family planning. Acceptance of services must be solely on a voluntary basis and may not be made a prerequisite to eligibility for, or receipt of, any other services, assistance from or participation in any other program of the applicant.

(3) Provide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed; protects the dignity of the individual; and ensures equitable and quality service delivery consistent with nationally recognized standards of care.

(4) Provide services in a manner that does not discriminate against any client based on religion, race, color, national origin, disability, age, sex, sexual orientation, gender identity, sex characteristics, number of pregnancies, or marital status.

(5) Not provide abortion as a method of family planning. A project must:

> (i) Offer pregnant clients the opportunity to be provided information and counseling regarding each of the following options:
>
>> (A) Prenatal care and delivery;
>>
>> (B) Infant care, foster care, or adoption; and
>>
>> (C) Pregnancy termination.
>
> (ii) If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of

75

the options, and, referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling.

(6) Provide that priority in the provision of services will be given to clients from low-income families.

(7) Provide that no charge will be made for services provided to any clients from a low-income family except to the extent that payment will be made by a third party (including a government agency) which is authorized to or is under legal obligation to pay this charge.

(8) Provide that charges will be made for services to clients other than those from low-income families in accordance with a schedule of discounts based on ability to pay, except that charges to persons from families whose annual income exceeds 250 percent of the levels set forth in the most recent Poverty Guidelines issued pursuant to 42 U.S.C. 9902(2) will be made in accordance with a schedule of fees designed to recover the reasonable cost of providing services.

> (i) Family income should be assessed before determining whether co-payments or additional fees are charged.

> (ii) With regard to insured clients, clients whose family income is at or below 250 percent of the FPL should not pay more (in copayments or additional fees) than what they would otherwise pay when the schedule of discounts is applied.

(9) Take reasonable measures to verify client income, without burdening clients from low-income families. Recipients that have lawful access to other valid means of income verification because of the client's participation in another program may use those data rather than re-verify income or rely solely on clients' self-report. If a client's income cannot be verified after reasonable attempts to do so, charges are to be based on the client's self-reported income.

(10) If a third party (including a Government agency) is authorized or legally obligated to pay for services, all reasonable efforts must be made to obtain the third-party payment without application of any discounts. Where the cost of services is to be reimbursed under title XIX, XX, or XXI of the

Social Security Act, a written agreement with the title XIX, XX, or XXI agency is required.

(11)

(i) Provide that if an application relates to consolidation of service areas or health resources or would otherwise affect the operations of local or regional entities, the applicant must document that these entities have been given, to the maximum feasible extent, an opportunity to participate in the development of the application. Local and regional entities include existing or potential subrecipients which have previously provided or propose to provide family planning services to the area proposed to be served by the applicant.

(ii) Provide an opportunity for maximum participation by existing or potential subrecipients in the ongoing policy decision making of the project.

(b) In addition to the requirements of paragraph (a) of this section, each project must meet each of the following requirements unless the Secretary determines that the project has established good cause for its omission. Each project must:

(1) Provide for medical services related to family planning (including consultation by a clinical services provider, examination, prescription and continuing supervision, laboratory examination, contraceptive supplies), in person or via telehealth, and necessary referral to other medical facilities when medically indicated, and provide for the effective usage of contraceptive devices and practices.

(2) Provide for social services related to family planning, including counseling, referral to and from other social and medical service agencies, and any ancillary services which may be necessary to facilitate clinic attendance.

(3) Provide for opportunities for community education, participation, and engagement to:

(i) Achieve community understanding of the objectives of the program;

(ii) Inform the community of the availability of services; and

(iii) Promote continued participation in the project by diverse persons to whom family planning services may be beneficial to ensure access to equitable, affordable, client-centered, quality family planning services.

(4) Provide for orientation and in-service training for all project personnel.

(5) Provide services without the imposition of any durational residency requirement or requirement that the patient be referred by a physician.

(6) Provide that family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning.

(7) Provide that all services purchased for project participants will be authorized by the project director or their designee on the project staff.

(8) Provide for coordination and use of referrals and linkages with primary healthcare providers, other providers of healthcare services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs, who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care.

(9) Provide that if family planning services are provided by contract or other similar arrangements with actual providers of services, services will be provided in accordance with a plan which establishes rates and method of payment for medical care. These payments must be made under agreements with a schedule of rates and payment procedures maintained by the recipient. The recipient must be prepared to substantiate that these rates are reasonable and necessary.

(10) Provide, to the maximum feasible extent, an opportunity for participation in the development, implementation, and evaluation of the project by persons broadly representative of all significant elements of the population to be served, and by others in the community knowledgeable about the community's needs for family planning services.

## § 59.6 What procedures apply to assure the suitability of informational and

**educational material (print and electronic)?**

(a) A grant under this section may be made only upon assurance satisfactory to the Secretary that the project shall provide for the review and approval of informational and educational materials (print and electronic) developed or made available under the project by an Advisory Committee prior to their distribution, to assure that the materials are suitable for the population or community to which they are to be made available and the purposes of Title X of the Act. The project shall not disseminate any such materials which are not approved by the Advisory Committee.

(b) The Advisory Committee referred to in paragraph (a) of this section shall be established as follows:

(1) Size. The committee shall consist of no fewer than five members and up to as many members the recipient determines, except that this provision may be waived by the Secretary for good cause shown.

(2) Composition. The committee shall include individuals broadly representative of the population or community for which the materials are intended (in terms of demographic factors such as race, ethnicity, color, national origin, disability, sex, sexual orientation, gender identity, sex characteristics, age, marital status, income, geography, and including but not limited to individuals who belong to underserved communities, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality).

(3) Function. In reviewing materials, the Advisory Committee shall:

(i) Consider the educational, cultural, and diverse backgrounds of individuals to whom the materials are addressed;

(ii) Consider the standards of the population or community to be served with respect to such materials;

(iii) Review the content of the material to assure that the information is factually correct, medically accurate, culturally and linguistically appropriate, inclusive, and trauma informed;

(iv) Determine whether the material is suitable for the population or community to which is to be made available; and

(v) Establish a written record of its determinations.

## § 59.7 What criteria will the Department of Health and Human Services use to decide which family planning services projects to fund and in what amount?

(a) Within the limits of funds available for these purposes, the Secretary may award grants for the establishment and operation of those projects which will in the Department's judgment best promote the purposes of section 1001 of the Act, taking into account:

(1) The number of clients, and, in particular, the number of low-income clients to be served;

(2) The extent to which family planning services are needed locally;

(3) The ability of the applicant to advance health equity;

(4) The relative need of the applicant;

(5) The capacity of the applicant to make rapid and effective use of the federal assistance;

(6) The adequacy of the applicant's facilities and staff;

(7) The relative availability of non-federal resources within the community to be served and the degree to which those resources are committed to the project; and

(8) The degree to which the project plan adequately provides for the requirements set forth in these regulations.

(b) The Secretary shall determine the amount of any award on the basis of an estimate of the sum necessary for the performance of the project. No grant may be made for less than 90 percent of the project's costs, as so estimated, unless the grant is to be made for a project which was supported, under section 1001, for less than 90 percent of its costs in fiscal year 1975. In that case, the grant shall not be

for less than the percentage of costs covered by the grant in fiscal year 1975.

(c) No grant may be made for an amount equal to 100 percent for the project's estimated costs.

## § 59.8 How is a grant awarded?

(a) The notice of grant award specifies how long HHS intends to support the project without requiring the project to recompete for funds. This anticipated period will usually be for three to five years.

(b) Generally, the grant will initially be for one year and subsequent continuation awards will also be for one year at a time. A recipient must submit a separate application to have the support continued for each subsequent year. Decisions regarding continuation awards and the funding level of such awards will be made after consideration of such factors as the recipient's progress and management practices and the availability of funds. In all cases, continuation awards require a determination by HHS that continued funding is in the best interest of the government.

(c) Neither the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application.

## § 59.9 For what purpose may grant funds be used?

Any funds granted under this subpart shall be expended solely for the purpose for which the funds were granted in accordance with the approved application and budget, the regulations of this subpart, the terms and conditions of the award, and the applicable cost principles prescribed in 45 CFR part 75.

## § 59.10 Confidentiality.

(a) All information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and must not be disclosed without the individual's documented consent, except as may be necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality. Otherwise, information may be disclosed only in summary, statistical, or other form which does not identify particular individuals. Reasonable efforts to collect charges without jeopardizing client confidentiality must be made.

Recipient must inform the client of any potential for disclosure of their confidential health information to policyholders where the policyholder is someone other than the client.

(b) To the extent practical, Title X projects shall encourage family participation. However, Title X projects may not require consent of parents or guardians for the provision of services to minors, nor can any Title X project staff notify a parent or guardian before or after a minor has requested and/or received Title X family planning services.

## § 59.11 Additional conditions.

The Secretary may, with respect to any grant, impose additional conditions prior to, at the time of, or during any award, when in the Department's judgment these conditions are necessary to assure or protect advancement of the approved program, the interests of public health, or the proper use of grant funds.