No. 24-5220

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

STATE OF TENNESSEE,

*Plaintiff-Appellant*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER
BECERRA, in his official capacity, OFFICE OF POPULATION AFFAIRS, and
JESSICA S. MARCELLA, in her official capacity,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Tennessee
Case No. 3:23-cv-384

---

**BRIEF OF AMICI CURIAE THE AMERICAN ASSOCIATION OF
PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS,
THE CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,
THE CATHOLIC MEDICAL ASSOCIATION, AND THE
NATIONAL ASSOCIATION OF CATHOLIC NURSES
IN SUPPORT OF APPELLANT STATE OF TENNESSEE**

---

John J. Bursch
Erin M. Hawley
ALLIANCE DEFENDING FREEDOM
440 First Street, N.W., Suite 600
Washington, D.C. 20001
(202) 393-8690
jbursch@ADFlegal.org
ehawley@ADFlegal.org

Christopher P. Schandevel
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and 6th Cir. R. 26.1(a), Amici Curiae, the American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG), the Christian Medical & Dental Associations (CMDA), the Catholic Medical Association (CMA), and the National Association of Catholic Nurses, USA (NACN-USA) state that they have no parent corporation and do not issue stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement...............................................i

Table of Authorities......................................................... iii

Interest of Amici Curiae............................................................1

Introduction....................................................................4

Argument.......................................................................6

I.    Tennessee is likely to prevail because the 2021 Rule violates
      federal conscience protections, and HHS's 2023 Rescindment
      increases the risk of conscience violations......................................6

      A.    The referral requirement violates the Coats-
            Snowe Amendment. ..........................................................10

      B.    The referral requirement violates the Weldon
            Amendment. ........................................................13

      C.    The referral requirement violates the Church
            Amendments. ........................................................15

      D.    The referral requirement violates RFRA. ...........................16

II.   An injunction would serve the public good by protecting
      conscientious healthcare professionals and entities from
      being driven out of the practice of medicine.................................17

Conclusion ....................................................................20

Rule 32(g)(1) Certificate of Compliance.................................................21

Certificate of Service ..........................................................22

# TABLE OF AUTHORITIES

**Cases**

*California by & through Becerra v. Azar,*
 950 F.3d 1067 (9th Cir. 2020) ............................................................6

*California v. Azar,*
 911 F.3d 558 (9th Cir. 2018) ...........................................................17

*Fulton v. City of Philadelphia,*
 593 U.S. 522 (2021) ......................................................................16

*Motor Vehicle Manufacturers Association v. State Farm Mutual*
 *Automobile Insurance Company,*
 463 U.S. 29 (1983) ...............................................................13, 15

*National Family Planning & Reproductive Health Association, Inc.*
 *v. Gonzales,*
 468 F.3d 826 (D.C. Cir. 2006) .......................................................6

*National Institute of Family & Life Advocates v. Becerra,*
 585 U.S. 755 (2018) ......................................................................17

*New Concepts for Living, Inc. v. National Labor Relations Board,*
 94 F.4th 272 (3d Cir. 2024) ...........................................................7

*Ohio v. Becerra,*
 87 F.4th 759 (6th Cir. 2023) ....................................................7, 14

*Rust v. Sullivan,*
 500 U.S. 173 (1991) ..........................................................6, 17, 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
 582 U.S. 449 (2017) ......................................................................16

**Statutes**

42 U.S.C. § 2000bb-1(a)–(b.................................................................16

42 U.S.C. § 238n ....................................................................................10

42 U.S.C. § 300a-6 ...........................................................................4, 6, 7

42 U.S.C. § 300a-7 ................................................................... 15

5 U.S.C. § 706 ........................................................................... 6

Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, title
    V, § 508(d)(1), 118 Stat. 2809 ........................................... 13

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div.
    H, title V, § 507(d)(1), 136 Stat. 4459 (2022) ........................... 13, 14

TENN. CODE ANN. § 39-15-213 ........................................... 5, 12

## Regulations

Ensuring Access to Equitable, Affordable, Client-Centered,
    Quality Family Planning Services, 86 Fed. Reg. 56144–01
    (Oct. 7, 2021) ........................................... 4, 6–8, 14–16, 19

## Other Authorities

Brittni Fredericksen, Usha Ranji, Ivette Gomez, & Alina
    Salganicoff, *A National Survey of OBGYNs' Experiences After
    Dobbs*, Kaiser Family Foundation ................................. 19

H.R. Conf. Rep. No. 91–1667 (1970) ..................................... 19

Linda J. Hay, *Multiple Dentists Encounter Drug-Seeking Patient*,
    DENTAL INSIGHTS (Fall 2014) ........................................... 9

Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and
    Interpretation* (1943) ..................................................... 9

*The Growing Demand for Healthcare Workers in Tennessee*,
    American Immigration Council ..................................... 18

Thomas A. Moore & Matthew Gaier, *Liability of Referring
    Physicians*, NEW YORK LAW JOURNAL (Oct. 5, 2020) ............. 9

*Thomas Jefferson to Richard Douglas, 4 February 1809*, Founders
    Online, National Archives .............................................. 4

*Workforce*, Tennessee Hospital Association ........................... 18

## INTEREST OF AMICI CURIAE[1]

The American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG) is a nonprofit organization with over 7,000 medical professional members and associates who are experts in reproductive healthcare. AAPLOG strives to ensure pregnant women receive quality care and are informed of abortion's potential long-term consequences on a woman's health. AAPLOG offers medical professionals and the public a better understanding of abortion-related health risks, including depression, substance abuse, suicide, subsequent preterm birth, and placenta previa.

The Christian Medical & Dental Associations (CMDA) is a professional association of physicians and dentists that educates, encourages, and equips Christian healthcare professionals to glorify God by following Christ, serving with excellence and compassion, caring for all people, and advancing biblical principles of healthcare within the Church and throughout the world. CMDA has close to 13,000 members and 357 chapters at medical, dental, optometry, physician-assistant, and undergraduate schools across the country. CMDA also has approximately 450 members in the state of Tennessee.

---

[1] Counsel for both parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part or financially supported this brief, and no one other than amici curiae or their counsel contributed money intended to fund preparing or submitting this brief. Fed. R. App. P. 29(c)(5).

The Catholic Medical Association (CMA) is the largest association of Catholic individuals in healthcare. Its membership includes more than 2,400 physicians, nurses, and physician assistants nationwide, including three member guilds and 53 active members in Tennessee. CMA's mission is to inform, organize, and inspire its members to uphold the Catholic faith in the science and practice of medicine. CMA opposes direct abortion because it violates the teaching and tradition of the Catholic Church, respect for the sanctity of human life, Judeo-Christian medical ethics, and the best interest of patients. CMA's members are committed to the sanctity of human life, and it would violate their consciences to participate in or refer for direct abortions.[2]

CMA has actively sought conscience protections for its members and other healthcare professionals who might be forced by laws, regulations, or their employers to provide, counsel, or refer for abortions. Many CMA members work at healthcare facilities that receive Title X funds. These CMA members face a substantial risk of harm caused by strict enforcement of the 2021 Rule. And they face further risk of harm caused by the Department of Health and Human Services' decision to rescind Tennessee's Title X funding.

---

[2] CMA uses the phrase "direct abortions" to make clear that it does not oppose performing medically necessary therapeutic procedures—such as removing the fallopian tube to treat an ectopic pregnancy—intended to cure a serious pathology of the reproductive system that, left untreated, would result in the unintended but anticipated death of the embryo.

The National Association of Catholic Nurses, USA (NACN-USA) is the national professional organization for Catholic nurses in the United States. A nonprofit association of hundreds of nurses of different clinical expertise, NACN-USA focuses on promoting patient advocacy, human dignity, and professional and spiritual development in the integration of faith and health within the Catholic context in nursing. NACN-USA supports the protection of human life from conception to natural death.

Like the other organizations who have joined this brief, NACN-USA opposes any involvement in direct abortion of any kind. Any such involvement would contradict Roman Catholic teaching and values, including respect for the sanctity of human life and the well-being of members' patients.

AAPLOG, CMDA, CMA, and NACN-USA have a strong interest in ensuring that the states and federal government respect Congress's refusal to use taxpayer dollars to support abortions, and in opposing HHS's recent efforts to force Title X recipients to counsel and refer for abortions, thereby threatening to strip funding from pro-life healthcare entities and professionals.

### INTRODUCTION

Rights of conscience are at the core of our constitutional freedoms. Indeed, "[n]o provision in our constitution ought to be dearer to man, than that which protects the rights of conscience against the enterprises of the civil authority."[3] These protections are precious for a reason: the conscience not only serves as a moral compass but as a constant source of inspiration to serve others. So it is no surprise that many healthcare professionals put matters of faith and conscience at the heart of their Hippocratic mission to heal and do no harm.

Section 1008 of the Public Health Service Act prohibits "funds appropriated under" Title X from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Despite this prohibition—and multiple federal and state laws protecting constitutional rights of conscience—the Department of Health and Human Services issued a final rule in 2021 imposing a universal requirement that each Title X grantee *must* provide information, counseling, and referrals for abortion. Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56144–01, 56178–79 (Oct. 7, 2021) ("2021 Rule"). The Rule ignores the reality that referring for an abortion means formally cooperating with the taking of a human life, violating the conscience of many healthcare professionals.

---

[3] *Thomas Jefferson to Richard Douglas, 4 February 1809*, Founders Online, National Archives, perma.cc/G8R2-58RM.

The 2021 Rule violates Title X, disregards rights of conscience, and forces many healthcare professionals to make an impossible choice between violating their consciences and forgoing generally available public benefits that enable them to serve their patients. Thus, not only is the 2021 Rule illegal, it is also bad policy—depriving the public of valuable services from healthcare professionals who cannot in good conscience counsel or refer for abortion.

By contrast, Tennessee's decision to *stop* requiring Title X recipients to counsel and refer for abortion except in the narrow circumstances in which abortion remains legal in Tennessee compliments and reinforces Title X's text. In Tennessee, a person who performs an abortion commits a felony unless the abortion is "necessary to prevent the death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function," and the physician performs the abortion in the manner that "provides the best opportunity for the unborn child to survive" without increasing the risk of harm to the pregnant woman. TENN. CODE ANN. § 39-15-213(b), (c)(1)(A)–(B). By limiting the requirement to counsel and refer for abortions to these narrow circumstances, Tennessee has greatly reduced the risk that medical professionals will be forced to choose between their consciences and their Title X funding. HHS's failure to consider that result before rescinding all of Tennessee's Title X funding exacerbates the arbitrary and capricious nature of that decision.

## ARGUMENT

**I.   Tennessee is likely to prevail because the 2021 Rule violates federal conscience protections, and HHS's 2023 Rescindment increases the risk of conscience violations.**

Under the APA, a court must "hold unlawful and set aside" any agency action that is not in accordance with law or constitutional right. 5 U.S.C. § 706(2)(A)–(B). Indeed, the 2021 Rule recognizes that "a valid statute always prevails over a conflicting regulation." 86 Fed. Reg. at 56153 (quoting *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006)). Here, the 2021 Rule states that Title X grantees "must" provide "information," "counseling," and "referral upon request" for abortions. 86 Fed. Reg. at 56178–79. And the Rule enshrines these obligations as "requirements [that] must be met" by "[e]ach project" supported by Title X funding. *Id.*

At a threshold level, these requirements must be set aside because they violate Section 1008, which prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. By forcing recipients to counsel and refer for abortions, the Rule illegally requires them to treat abortion as a viable method of family planning. *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (holding that the "broad language of Title X plainly allows [for this] construction of the statute"); *Cal. by & through Becerra v. Azar*, 950 F.3d 1067, 1084–85 (9th Cir. 2020) (affirming that this is still true 30 years later).

That remains true even though a panel of this Court recently applied *Rust*'s reasoning—especially its *Chevron* analysis—to hold that HHS's current, contrary position is not an "impermissible" reading of Section 1008. *Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023). "In HHS's present judgment, a program that provides a referral for abortion upon request is *not* one 'where abortion is a method of family planning.'" *Id.* (quoting 86 Fed. Reg. at 56,149–50) (emphasis added). The panel conceded that might not be "the best interpretation of § 1008." *Id.* But under *Chevron*, the court's hands were tied. *Id.* at 770–71.

Whether *Chevron's* deference mandate should be overruled is directly at issue in two cases pending before the Supreme Court: *Loper Bright Enterprises. v. Raimondo*, No. 22-451 (argued Jan. 17, 2024), and *Relentless, Inc. v. Department of Commerce*, No. 22-1219 (argued Jan. 17, 2024). "*Chevron* deference itself may not survive" those cases. *New Concepts for Living, Inc. v. Nat'l Lab. Rels. Bd.*, 94 F.4th 272, 290 n.1 (3d Cir. 2024) (Krause, J., concurring). If it doesn't, this Court should employ traditional tools of statutory interpretation to hold that the referral requirement violates Title X's prohibition on using funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Regardless, Tennessee is likely to prevail for an independent reason: the referral requirement violates multiple laws protecting the conscience rights of healthcare professionals.

In issuing the 2021 Rule, HHS conceded that "Congress has passed several laws protecting the conscience rights of providers, particularly in the area of abortion," and that "under these statutes, objecting providers or Title X grantees are *not* required to counsel or refer for abortions." 86 Fed. Reg. at 56153 (emphasis added). The preamble reaffirms these protections, stating that "objecting individuals and grantees will not be required to counsel or refer for abortions." *Id.*

Yet both the preamble, and more important, the legally operative text of the Rule, fail to safeguard federal conscience rights on the front end. That's because the Rule states in a footnote that "[p]roviders *may* separately be covered by federal statutes protecting conscience and/or civil rights." 86 Fed. Reg. at 56178 n.2 (emphasis added). So the Rule merely recognizes that healthcare professionals *may* be able to obtain some relief *after* their rights have been violated.

The preamble similarly adds that while federal conscience protections "may at times interact with the requirements of Title X," interpreting them is "beyond the scope" of the Rule. 86 Fed. Reg. at 56153. It then concludes weakly that "[p]roviders may avail themselves of existing conscience protections and file complaints with OCR, which will be evaluated on a case-by-case basis as is done with other complaints." 86 Fed. Reg. at 56156.

The Rule thus gives short shrift to the reality that referring for abortion makes healthcare professionals complicit in what many view as an immoral procedure. It suggests that the professional endorses the procedure and potentially takes some responsibility for its outcome. In an analogous context, if a physician declines to prescribe opioids to a patient seeking them with no medical indication for them but still refers the patient to a physician who will prescribe them, the referring physician could bear professional responsibility for enabling the patient's drug-seeking behavior. *See* Linda J. Hay, *Multiple Dentists Encounter Drug-Seeking Patient*, DENTAL INSIGHTS 3 (Fall 2014), perma.cc/DCE6-JGB8 (noting that "practitioners may find themselves on the wrong end of a lawsuit" if the patient overdoses); Thomas A. Moore & Matthew Gaier, *Liability of Referring Physicians*, NEW YORK LAW JOURNAL (Oct. 5, 2020), www.law.com/newyorklawjournal/2020/10/05/liability-of-referring-physicians/ (describing other "circumstances under which referring physicians may be held liable").

Similarly, forcing a physician to participate by referral in the ending of a human life forces the physician to violate the Hippocratic Oath, which explicitly states that the doctor will not deliberately end a human life by abortion or euthanasia and will never "make a suggestion to this effect." Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* 3 (1943). By requiring abortion referrals, the 2021 Rule forces healthcare professionals to counsel and refer for

ending the lives of their unborn patients. Forcing performance of—or counseling or referral for—a procedure that ends a human life is an egregious violation of the conscience of a medical professional. Four different federal laws prohibit it. And Tennessee is right to do everything it can to avoid it.

## A. The referral requirement violates the Coats-Snowe Amendment.

In 1996, Congress enacted the Coats-Snowe Amendment to the Public Health Service Act to protect the conscience rights of "health care entit[ies]," including physicians, postgraduate physician-training programs, and participants in health-training programs. 42 U.S.C. § 238n(c)(2). The Amendment prohibits the "Federal government, and any State or local government that receives Federal financial assistance," from discriminating against hospitals or physicians based on a refusal "to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions." *Id*. § 238n(a)(1).

Going further, a separate provision prohibits the government from discriminating against healthcare entities for refusing to "make arrangements" for any of those activities. *Id*. § 238n(a)(2). Read together, these provisions prohibit the government from discriminating against an entity or physician because it refuses to provide abortion referrals or even for failing to make arrangements for such referrals. *Id*.

10

The 2021 Rule's referral requirement squarely violates these prohibitions. Rather than safeguard entities and physicians who decline to refer for or make arrangements for referral for abortion, the Rule *excludes* from Title X funding any healthcare entity that refuses to provide abortion counseling and referrals. That is precisely the type of discrimination the Coats-Snowe Amendment prohibits.

Because the 2021 Rule violates the Coats-Snowe Amendment— and because the Rule tries to force states like Tennessee to violate the Amendment themselves by forcing them to deny funding to healthcare entities that cannot in good conscience counsel or refer for abortions— Tennessee is right to seek ways to minimize the risk that complying with the Rule will cause it to violate the Amendment. And by narrowing the circumstances in which Title X recipients are required to provide abortion counseling and referrals to such a small subset of abortions, Tennessee *has* greatly reduced the risk that it will be forced to choose whether to deny funding to healthcare entities that invoke their federally protected conscience rights.

Under Tennessee's approach, for example, Title X recipients are not required to counsel or refer for elective abortions—which amici and their members object to on religious grounds. Similarly, recipients are not required to counsel or refer for most "therapeutic" abortions—only for the narrow subcategory that are "necessary to prevent the death of the pregnant woman or to prevent serious risk of substantial and irre-

versible impairment of a major bodily function." TENN. CODE ANN. § 39-15-213(c)(1)(A). What's more, at least some abortions falling in that narrow subcategory do not qualify as "direct abortions" as amici define them. For example, removing the fallopian tube to treat an ectopic pregnancy fits the statutory exception. And it equally fits amici's understanding that an abortion is not a "direct abortion" if it is intended to cure a serious pathology of the reproductive system that, left untreated, would result in the unintended but anticipated death of the embryo.

Tennessee law also requires physicians to perform any permissible abortions in the manner that "provides the best opportunity for the unborn child to survive" without increasing the risk of harm to the pregnant woman. TENN. CODE ANN. § 39-15-213(c)(1)(B). At least past the point of viability, then, this additional requirement further reduces the risk that conscientious healthcare professionals and entities will be forced to counsel or refer for abortions that would result in the direct taking of the life of the unborn child.

HHS does not appear to have considered any of this when it chose to cut off Tennessee's Title X funding based on the State's decision to limit the circumstances in which abortion counseling and referrals are required to those that remain legal under state law. Doing so exceeded HHS's authority and was arbitrary and capricious for all the reasons Tennessee lists in its brief. Tenn.'s Opening Br. at 38–52. But that's not all. HHS's rescindment decision was arbitrary and capricious for the

added reason that it "entirely failed to consider an important aspect of the problem," namely Tennessee's obligation to comply with the Coats-Snowe Amendment—not to mention HHS's own obligation to comply with that Amendment. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For this additional reason, Tennessee is likely to succeed on its APA claim, and this Court should enjoin HHS's enforcement of the 2021 Rule's referral requirement and its rescindment decision.

### B. The referral requirement violates the Weldon Amendment.

The same result follows from HHS's failure to consider Tennessee's—and its own—obligations under the Weldon Amendment. A bipartisan Congress first passed the Weldon Amendment in 2004 as an appropriations rider prohibiting funds from the Departments of Health, Labor, and Education from flowing to any federal, state, or local government or program that discriminates against healthcare professionals or institutional healthcare providers based on their refusal to "provide, pay for, provide coverage for, or refer for abortions." Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, title V, § 508(d)(1), 118 Stat. 2809. Congress has included the rider in every such act since. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, title V, § 507(d)(1), 136 Stat. 4459, 4908 (2022).

13

HHS violated the Weldon Amendment by issuing and enforcing the 2021 Rule. Indeed, this Court strongly suggested as much in *Ohio v. Becerra*, explaining that it was "somewhat puzzled about the interaction between the Rule's referral requirement and…the Weldon Amendment, as applied to State grantees." 87 F.4th at 774 n.8. That's because the Rule "would seem to forbid States from subgranting to 'health care entities' who will not refer for abortion," and "that, in turn, seems to force the States to 'discriminat[e] on the basis that the health care entity does not…refer for abortions,' the very thing the Weldon Amendment forbids." *Id.* (quoting § 507(d)(1), 136 Stat. at 496).

That's exactly right. Because the 2021 Rule makes "referral upon request" for abortions a universal "requirement" that must be met by "each" Title X grantee, 86 Fed. Reg. at 56178–79, it violates the Weldon Amendment by forcing states to categorically exclude and discriminate against healthcare entities that refuse to refer for abortions. Again, HHS does not appear to have considered any of this when it ended Tennessee's Title X funding. For this reason, too, then, Tennessee is likely to succeed on its APA claim, and this Court should enjoin HHS's referral requirement and its rescindment decision.

14

**C.    The referral requirement violates the Church Amendments.**

Years before the Coats-Snowe and Weldon Amendments, the Supreme Court's decision in *Roe v. Wade* prompted Congress to pass laws protecting healthcare professionals and institutions that object to participating in abortion. Those provisions—collectively referred to as the Church Amendments—remain in force today.

One provision prohibits the government from conditioning grants on whether an individual will "perform or assist in the performance" of abortion-related activities. 42 U.S.C. § 300a-7(b)(1). Another protects against being forced "to perform or assist in the performance of *any part* of a [federally funded] health service program" if such participation "would be contrary to [the healthcare professional's] religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d) (emphasis added).

Here again, the 2021 Rule violates these federal protections. The Rule requires that abortion counseling and referral "must" be part of "each" Title X program. 86 Fed. Reg. at 56178–79. But the Church Amendments guarantee that no individual can be forced to perform "any part" of a program contrary to their religious or moral convictions. 42 U.S.C. § 300a-7(d). So the Rule violates the Church Amendments, and HHS's apparent failure to consider this "important aspect of the problem" when it cut off Tennessee's funding further proves the decision was arbitrary and capricious. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

**D.    The referral requirement violates RFRA.**

The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). Funding conditions can substantially burden religious exercise when they put recipients to the choice of violating their religious convictions or forgoing funding. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017).

By requiring "each" grantee to provide abortion counseling and referrals or fail to meet a "requirement" for Title X funding, 86 Fed. Reg. at 56178–79, the Rule puts grantees to the choice of violating their religious convictions or forgoing Title X funds. As a result, the Rule substantially burdens the religious exercise of current and potential Title X funding recipients who oppose abortion counseling and referral for religious reasons. *Fulton*, 593 U.S. at 532; *Trinity Lutheran*, 582 U.S. at 462.

There is also no government interest—much less a compelling government interest—in requiring abortion referrals in the Title X program. Because "the Government has no affirmative duty to commit

16

any resources to facilitating abortions," the Supreme Court has upheld previous Title X regulations *prohibiting* abortion counseling or referral. *Rust*, 500 U.S. at 184–87, 201 (cleaned up).

Nor is the abortion-referral requirement the least restrictive means of advancing any conceivable government interest. There are many other ways the government could provide information about abortion providers without forcing all Title X grantees to provide abortion counseling and referrals. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018) (agreeing that the government could "inform the women itself with a public-information campaign" rather than force private speakers to provide information about abortion). Thus, the referral requirement also violates RFRA, and HHS should have considered that before it rescinded Tennessee's Title X funding.

## II.    An injunction would serve the public good by protecting conscientious healthcare professionals and entities from being driven out of the practice of medicine.

"Protecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). An injunction restoring Tennessee's Title X funding would help protect the religious liberty and conscience rights of many healthcare entities and healthcare professionals across the state—and it would help secure healthcare access for Tennesseans, especially for those living in rural communities already facing healthcare shortages.

"Tennessee hospitals are facing an unprecedented staffing crisis that is projected to last well into the next decade." *Workforce*, Tennessee Hospital Association, perma.cc/P5DK-U9KD. "In 2015, long before the COVID-19 pandemic," Tennessee already "faced severe physician shortages, with some counties across the state registering zero physicians per 100,000 residents." *The Growing Demand for Healthcare Workers in Tennessee* 3, American Immigration Council, perma.cc/X2ZW-XP3Z. And post-COVID, "[p]rojections remain dire." *Id.* The state is "expected to need an additional 1,107 primary care physicians by 2030, significantly impacting the accessibility of healthcare, particularly in rural communities." *Id.*

Absent an injunction restoring Tennessee's Title X funding, the barriers to care Tennesseans already are experiencing likely will only be made worse. As Tennessee explains, there is "no guarantee the State will fill the funding gap left by the Rescindment." Tenn.'s Opening Br. 55. And even if it does, "the diversion of funds necessary to fill the gap" may undermine access to quality healthcare in other ways. *Id.*

Meanwhile, if Tennessee capitulates to HHS's illegal demands to regain access to its Title X funding, healthcare professionals who conscientiously object to counseling or referring for abortion may be forced out of providing Title X services like fertility education and treatment. A recent survey found that 30 percent of OBGYNs practicing in states like Tennessee that protect life from conception do not provide any sort of

counseling or referrals for abortions. Brittni Fredericksen, Usha Ranji, Ivette Gomez & Alina Salganicoff, *A National Survey of OBGYNs' Experiences After Dobbs*, Kaiser Family Foundation, perma.cc/BV8Q-JG6R. Among the OBGYNs surveyed in these states, 35 percent of them cited their personal beliefs as one of the reasons they do not participate in abortion. *Id.*

In some cases, depending on their specialty, experience, and geographic location, these healthcare professionals could be driven out of the field of medicine entirely. The result would deprive Tennesseans of vital healthcare services from conscientious healthcare professionals dedicated to doing no harm to their patients or their children—medical professionals who share many of their patients' moral and religious beliefs about abortion.

Congress intended for Title X grants to fund a diverse array of healthcare professionals and entities engaged in a wide range of activities, including "preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Rust*, 500 U.S. at 178–79 (quoting H. R. Conf. Rep. No. 91–1667, p. 8 (1970)). The Department claims to promote diversity among Title X grantees, 86 Fed. Reg. at 56168, but that claim rings hollow. Far from granting religious and conscientious exemptions, the 2021 Rule categorically excludes many religious healthcare professionals from receiving funding under Title X.

19

As a result, the Rule reduces the resources available to members of the public who seek fertility services, family-planning information, and other medical services from healthcare professionals who share their beliefs about abortion and the sanctity of human life. Diminishing healthcare services in this way cannot advance the public interest. The public interest favors an injunction restoring Tennessee's Title X funding *without* requiring strict compliance with HHS's illegal abortion-counseling-and-referral mandate.

## CONCLUSION

For these reasons, and those submitted by Tennessee on appeal, this Court should enjoin HHS from enforcing its illegal abortion-counseling-and-referral mandate on Tennessee and from withholding Tennessee's Title X grant disbursements—or else remand to the district court with instructions to enter that injunction.

Dated: April 12, 2024                    Respectfully submitted,

                                        */s/ Christopher P. Schandevel*

John J. Bursch                          Christopher P. Schandevel
Erin M. Hawley                          ALLIANCE DEFENDING FREEDOM
ALLIANCE DEFENDING FREEDOM              44180 Riverside Pkwy
440 First Street, N.W.                  Lansdowne, VA 20176
Suite 600                               (571) 707-4655
Washington, D.C. 20001                  cschandevel@ADFlegal.org
(202) 393-8690
jbursch@ADFlegal.org
ehawley@ADFlegal.org

*Attorneys for Amici Curiae*

20

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because it contains 4375 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook font.

Dated: April 12, 2024

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Attorney for Amici Curiae*