No. 24-5220

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

STATE OF TENNESSEE,
*Plaintiff-Appellant*,

v.

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, in her official
capacity as Deputy Assistant Secretary for Population Affairs; OFFICE OF
POPULATION AFFAIRS,
*Defendants-Appellees*.

———————————

On Appeal from the United States District Court
for the Eastern District of Tennessee

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

FRANCIS M. HAMILTON III
*United States Attorney*

MICHAEL S. RAAB
COURTNEY L. DIXON
BRIAN J. SPRINGER
*Attorneys, Appellate Staff
Civil Division, Room 7246
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-8189*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION ................................................................... 2

STATEMENT OF THE ISSUE .......................................................................... 2

STATEMENT OF THE CASE ........................................................................... 2

    A.    Title X ................................................................................................ 2

    B.    Regulatory History ........................................................................... 3

    C.    Tennessee's Title X Grant and HHS's Decision to
           Not Issue a Continuation Award ................................................... 7

    D.    This Lawsuit ...................................................................................... 11

SUMMARY OF ARGUMENT ....................................................................... 14

STANDARD OF REVIEW ............................................................................. 17

ARGUMENT .................................................................................................. 17

I.    Tennessee Has Not Demonstrated a Likelihood of Success
    on the Merits ............................................................................................ 17

    A.    Tennessee Is Unlikely to Succeed on Its APA Claims ............................. 17

           1.    HHS Acted Well Within Its Statutory Authority
                  in Declining to Issue a Title X Continuation
                  Award to Tennessee ........................................................ 17

           2.    HHS's Decision Is Consistent with Its Regulations .................... 22

3.      HHS's Decision Is Neither Arbitrary Nor
        Capricious ........................................................................ 25

        a.   HHS Considered All Important Aspects of
             Its Decision ................................................................ 25

        b.   HHS Did Not Unlawfully Change its Position ....................... 29

        c.   HHS Did Not Disregard Any Legally Cognizable
             Reliance Interests ....................................................... 31

4.      Notice-and-Comment Procedures Were Not Required ............... 32

B.   Tennessee Is Unlikely to Succeed on its Spending
     Clause Arguments ............................................................ 32

II.   The Remaining Preliminary Injunction Factors Do Not
      Favor Relief .................................................................... 39

CONCLUSION ............................................................................ 42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Cases:**                                                                   Page(s)

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*,
    570 U.S. 205 (2013) ................................................ 21, 41

*Arlington Cent. Sch. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ................................................ 35

*Auer v. Robbins*,
    519 U.S. 452 (1997) ................................................ 15, 26

*Becerra v. Louisiana*,
    No. 21A241, 2021 WL 8939385 (U.S. Dec. 30, 2021) ................................................ 5, 38

*Becerra v. Mayor of Baltimore*,
    141 S. Ct. 2170 (2021) ................................................ 5

*Bennett v. Kentucky Dep't of Educ.*,
    470 U.S. 656 (1985) ................................................ 34

*Biden v. Missouri*,
    595 U.S. 87 (2022) ................................................ 16, 37, 38

*California ex rel. Becerra v. Azar*,
    950 F.3d 1067 (9th Cir. 2020) (en banc) ................................................ 4-5

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ................................................ 17

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    596 U.S. 212 (2022) ................................................ 13, 32, 35

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ................................................ 8

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................ 31

*Fullilove v. Klutznick*,
    448 U.S. 448 (1980) ................................................ 33

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) ................................................ 34, 38, 39

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ................................................................ 23

*Mayor of Baltimore v. Azar,*
    973 F.3d 258 (4th Cir. 2020) (en banc) ................................... 4, 5

*Ohio v. Becerra,*
    87 F.4th 759 (6th Cir. 2023) ........................................ 1, 6, 14, 15, 16, 18, 19,
                                                                21, 22, 25, 26, 27, 39, 40

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ................................................................ 34, 35, 36

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ...............................................................4, 18, 21, 34

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................ 33

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev..,*
    992 F.3d 518 (6th Cir. 2021) .................................................. 39

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury,*
    59 F.4th 1124 (11th Cir. 2023) ........................................... 38, 39

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................ 17

**U.S. Constitution:**

Art. I, § 8, cl ................................................................ 32

**Statutes:**

Consolidated Appropriations Act, 2023,
    Pub. L. No. 117-328, div. H, tit. II, 136 Stat. 4459, 4857 (2022) ............................ 33

Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (1970).................................................... 2

28 U.S.C. § 1292(a)(1) ................................................................ 2

28 U.S.C. § 1331 ................................................................ 2

42 U.S.C. § 254b(k)(3)(N)................................................................ 33

42 U.S.C. § 300(a) ................................................................ 3, 17, 22, 33

42 U.S.C. § 300a-4(a) ................................................................ 3, 17, 33

42 U.S.C. § 300a-4(a)-(b) ................................................................ 15, 36

42 U.S.C. § 300a-4(b) ................................................................ 3, 33

42 U.S.C. § 300a-6 ................................................................ 3, 18, 36

42 U.S.C. § 300a-7 ................................................................ 21

42 U.S.C. § 1395x(e)(9) ................................................................ 37

42 U.S.C. § 1793(f)(2) ................................................................ 33

49 U.S.C. § 5309(c)(4) ................................................................ 34

Tenn. Code Ann. § 39-15-213 ................................................................ 10, 23-24

Tenn. Code Ann. § 39-15-213(a)(1) ................................................................ 11

## Regulations:

42 C.F.R. § 59.5(a)(5) ................................................................ 3, 18, 20, 37

42 C.F.R. § 59.5(a)(5)(ii) ................................................................ 37

42 C.F.R. § 59.5(b)(6) ................................................................ 23

42 C.F.R. § 59.5(b)(8) ................................................................ 24

42 C.F.R. § 59.7 ................................................................ 7

42 C.F.R. § 59.8 ................................................................ 7

42 C.F.R. § 59.8(a) ................................................................ 7

42 C.F.R. § 59.8(b) ................................................................ 7, 11, 31, 41

42 C.F.R. § 59.8(c) ................................................................ 7, 32

42 C.F.R. § 59.9 ................................................................ 7

45 C.F.R. § 75.372(a)-(b) ................................................................ 41

45 C.F.R. § 75.373(b)(3)-(5) ............................................................. 41

**Other Authorities:**

53 Fed. Reg. 2922 (Feb. 2, 1988) ...................................................... 3

58 Fed. Reg. 7462 (Feb. 5, 1993) ...................................................... 4

65 Fed. Reg. 41,270 (July 3, 2000) ................................................... 4

65 Fed. Reg. 41,281 (July 3, 2000) .............................. 3, 4, 9, 18, 20

84 Fed. Reg. 7714 (Mar. 4, 2019) ..................................................... 4

86 Fed. Reg. 19,812 (Apr. 15, 2021) ................................................. 4

86 Fed. Reg. 56,144 (Oct. 7, 2021) .................... 5, 6, 16, 18, 20, 22, 23, 26, 27

May 17, 2021 Letter from Ohio and 20 Other States to
    Xavier Becerra, Secretary, HHS (May 17, 2021),
    https://perma.cc/BT6W-ZMSH ................................................ 36

Office of Population Affairs, HHS, *Fiscal Year 2023 Title X
    Service Grant Awards*, https://opa.hhs.gov/grant-programs/
    title-x-service-grants/current-title-x-service-grantees/
    fy2023-title-X-service-grant-awards (last visited April 26, 2024) ............................... 9

Order, *Oklahoma v. HHS*, No. 5:23-cv-01052-HE
    (W.D. Okla. Mar. 26, 2024), Dkt. No. 36 ................................... 10

## STATEMENT REGARDING ORAL ARGUMENT

The district court denied Tennessee's request for a preliminary injunction to compel the Department of Health and Human Services to issue a discretionary grant award despite Tennessee's stated refusal to comply with program requirements.  The district court's decision was based on settled precedents, including this Court's recent decision in *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023).  The government does not believe that oral argument is necessary but stands ready to present oral argument if this Court would find it helpful.

**INTRODUCTION**

Title X of the Public Health Service Act authorizes the Department of Health and Human Services (HHS) to award discretionary grants to fund family-planning services. In 2021, HHS promulgated a rule restoring regulatory requirements that had been in effect for most of the program's history. The rule requires that Title X projects offer pregnant patients the opportunity to receive information and nondirective counseling on all options, including abortion, followed by factual information about where a service can be obtained if the patient requests that information. In *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023), this Court held that HHS acted reasonably and within the bounds of its statutory authority in restoring the referral requirement. This Court thus affirmed the denial of a preliminary injunction sought by several States to prevent its enforcement.

The Tennessee Department of Health, a longstanding recipient of Title X funds, accepted a Title X grant award in 2022. Like all Title X grants, Tennessee's grant was made expressly contingent on its project's compliance with applicable statutory and regulatory requirements, which included the 2021 rule's counseling and referral requirements. When Tennessee later refused to comply with those requirements, HHS declined to issue a continuation award. The district court correctly denied Tennessee's request for a preliminary injunction to compel HHS to award continued grant funds to Tennessee despite its stated refusal to comply with

program requirements that this Court recently upheld. Neither the law nor the equities support Tennessee's extraordinary request.

## STATEMENT OF JURISDICTION

Tennessee invoked the district court's jurisdiction under 28 U.S.C. § 1331. *See* Compl., R. 1, PageID#5. The district court denied a preliminary injunction on March 11, 2024. *See* Order, R. 30, PageID#857. Tennessee filed a timely notice of appeal on the same day. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court correctly denied a preliminary injunction where Tennessee has no likelihood of success on the merits of its claims that HHS violated the Administrative Procedure Act (APA) or the Constitution in declining to award Tennessee discretionary grant funds after Tennessee refused to comply with the regulatory requirements governing the program, and where the balance of the equities and the public interest do not favor an injunction that would shift grant funds away from projects that continue to comply with program requirements.

## STATEMENT OF THE CASE

### A.    Title X

In 1970, Congress enacted Title X of the Public Health Service Act to make "comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (1970). The Act authorizes HHS to "make grants to and enter into contracts with public or

nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Grants "shall be made in accordance with such regulations as the Secretary may promulgate," *id.* § 300a-4(a), and "shall be payable . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.* § 300a-4(b). Section 1008 of the Act provides that "[n]one of the funds appropriated . . . shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6.

### B. Regulatory History

For much of the Title X program's history, HHS has required—as it does now—that Title X projects offer pregnant patients the choice to be provided information and "nondirective 'options counseling'" about "prenatal care," "adoption and foster care," and "pregnancy termination (abortion)," "followed by referral for [any of] these services if [the patient] so requests." 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988) (describing prior agency opinions); *see* 42 C.F.R. § 59.5(a)(5) (current regulation). Consistent with Section 1008, HHS has explained that a Title X project may not "promote[] abortion or encourage[] persons to obtain abortion, although the project may provide patients with complete factual information about all medical options." 65 Fed. Reg. 41,281, 41,282 (July 3, 2000). Any referral for an abortion may consist of "relevant factual information" such as "the name, address [and] telephone number" of

3

a provider, but Title X projects may not take "further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." *Id.*

On two occasions over the course of the program, HHS has placed further restrictions on the type of counseling and referrals that Title X grantees may provide. First, in 1988, the agency issued a rule that "prohibited" grantees from discussing or referring for abortions. *See* 86 Fed. Reg. 19,812, 19,813 (Apr. 15, 2021) (describing 1988 rule). Although the Supreme Court upheld the 1988 rule as a "permissible construction" of the statute in light of the "broad directives provided by Congress in Title X," *Rust v. Sullivan*, 500 U.S. 173, 184-90 (1991), the rule was "never implemented on a nationwide basis," 65 Fed. Reg. 41,270, 41,271 (July 3, 2000). The agency issued an interim rule in 1993 that suspended the 1988 rule and reverted back to the pre-1988 compliance standards. 58 Fed. Reg. 7462 (Feb. 5, 1993). The agency issued a final rule in 2000, whose regulatory requirements—including the requirement for nondirective options counseling and a referral for any options the patient requested—remained in effect until 2019. *See* 65 Fed. Reg. at 41,271.

Second, in 2019, HHS "essentially revive[d]" the 1988 rule through a new final rule that significantly constrained the ability of Title X projects to provide pregnancy options counseling and prohibited Title X projects from referring for abortion. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 271 (4th Cir. 2020) (en banc); 84 Fed. Reg. 7714 (Mar. 4, 2019). The Ninth Circuit upheld the rule's restrictions, *California ex rel.*

4

*Becerra v. Azar*, 950 F.3d 1067, 1101-04 (9th Cir. 2020) (en banc), while the Fourth

Circuit enjoined their operation in the State of Maryland, *see Mayor of Baltimore*, 973

F.3d at 276-81, 283-90, 296.  The Supreme Court granted certiorari but dismissed the

case in light of HHS's intent to engage in new rulemaking.  *See Becerra v. Mayor of*

*Baltimore*, 141 S. Ct. 2170 (2021).

In October 2021, HHS promulgated a final rule—which remains in effect

today—revoking the 2019 rule's restrictions and again restoring the counseling and

referral requirements that have governed grantees "for much of the program's

history."  *See* 86 Fed. Reg. 56,144, 56,150 (Oct. 7, 2021).  HHS determined that the

2019 rule's restrictions on counseling and referrals had "interfered with the patient-

provider relationship and compromised [grantees'] ability to provide quality healthcare

to all clients," *id.* at 56,146; and had "shifted the Title X program away from its history

of providing client-centered quality family planning services," *id.* at 56,148.  HHS

explained that "offering pregnant clients the opportunity to receive neutral, factual

information and nondirective counseling on all pregnancy options—and providing

referral upon request for option(s) the client wishes to receive—are critical for the

delivery of quality, client-centered care," and that restoring the nondirective

counseling and referral requirements enables "healthcare providers to offer complete

and medically accurate information and counseling to their clients."  *See id.* at 56,154.

The 2021 rule reemphasized that a referral for an abortion "may include

providing a patient with the name, address, telephone number, and other relevant

factual information" about a medical provider, but that a Title X project "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." 86 Fed. Reg. at 56,150 (quotation marks omitted). HHS further explained that, in accordance with federal conscience statutes, individuals and entities that are covered by federal conscience laws and that have a conscience objection "will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law." *Id.* at 56,153.

Following the 2021 rule's promulgation, several States brought suit and sought a preliminary injunction against its enforcement, arguing (as relevant here) that the requirement to refer for an abortion upon a patient's request violates Section 1008 and is arbitrary and capricious. *See Ohio v. Becerra*, 87 F.4th 759, 767-68 (6th Cir. 2023). This Court affirmed the denial of a preliminary injunction with respect to the referral requirement, explaining that the requirement is based on a permissible construction of the statute and that HHS adequately explained its decision to restore the requirement. *See id.* at 771-75.[1]

---

[1] The *Ohio* litigation also involved another provision of the 2021 rule not at issue here. *See Ohio*, 87 F.4th at 784.

**C.    Tennessee's Title X Grant and HHS's Decision to Not Issue a Continuation Award**

**1.**  HHS's regulations afford broad discretion to allocate congressionally appropriated Title X grant funds among competing applicants.  *See* 42 C.F.R. §§ 59.7, 59.8.  In general, Title X grants are initially made for a one-year period, and HHS may issue further "continuation awards" that, although funded one year at a time, allow the recipient to receive continued support beyond the initial one-year period (typically for three to five years) without having to reenter the competitive funding process.  *See id.* § 59.8(a), (b).  Recipients of Title X grants must submit a new application each year to receive continued funding, and decisions regarding continuation awards and the funding level of such an award are made after considering several factors, including "that continued funding is in the best interest of the government."  *Id.* § 59.8(b).  Neither "the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application."  *Id.* § 59.8(c).  Awarded Title X funds must be spent for the purpose for which they were granted and in accordance with applicable regulations.  *See id.* § 59.9.

**2.**  The Tennessee Department of Health has been a longstanding recipient of Title X grants, including during the years in which HHS regulations have required Title X projects to offer nondirective options counseling and referrals for abortion

upon a patient's request. *See* Goodwin Decl., R. 1-4, PageID#102 ("Since 1972, Tennessee's Department of Health has received Title X grants to run its Title X program . . . ."); *supra* pp. 3-5.

In March 2022, HHS awarded the Tennessee Department of Health a Title X grant for the period April 1, 2022, through March 31, 2023. *See* 2022 Notice of Award, R. 1-7, PageID#170. The award explained, consistent with HHS's grant regulations, that Title X funding is provided one year at a time based on an annual application and Tennessee's continued compliance "with the requirements regarding the provision of family planning services that can be found in the statute . . . and the implementing regulations." *See id.*, PageID#170-73; *see also id.*, PageID#184-85 (reiterating federal grantee requirements, including that grantees must provide quarterly financial and annual progress reports and submit to an annual audit). Compliance with HHS's regulations—including the counseling and referral requirements—was therefore a condition of Tennessee's Title X grant award.

**3.** In June 2022, the Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which overturned prior precedent recognizing a constitutional right to abortion. Following that decision, HHS reminded Title X grantees that the counseling and referral requirements remained in effect. *See* HHS Q&A, R. 1-6, PageID#164. HHS thus reiterated that Title X projects are required to offer pregnant patients nondirective options counseling and a referral upon the patient's request, including for abortion. *Id.* HHS made clear that

8

Title X does not have geographic limitations, and thus projects may make out-of-state referrals. *Id.*, PageID#165. HHS again emphasized that any referral for an abortion may include "relevant factual information" such as the name, address, and telephone number of a provider, but that Title X projects "may not take further affirmative action . . . to secure abortion services for the patient." *Id.* (citing 65 Fed. Reg. at 41,281).

**4.** In January 2023, HHS notified grantees that it was "conducting a review of all Title X service grants to ensure compliance with the requirements for nondirective options counseling and referral" set forth in the agency's regulations. *See* Jan. 25, 2023 Letter, R. 1-8, PageID#187. HHS requested that each grantee submit its policy for providing nondirective options counseling and referrals and a signed statement confirming compliance with those regulations. *See id.*

Except for the Tennessee Department of Health and a state entity in Oklahoma, all state Title X grantees confirmed their compliance with the counseling and referral requirements. *See* Office of Population Affairs, HHS, *Fiscal Year 2023 Title X Service Grant Awards*, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (last visited April 26, 2024).[2] In response to HHS, Tennessee submitted a short letter attaching its

---

[2] When the Oklahoma state entity refused to comply with HHS's regulations, HHS terminated its grant funding. Oklahoma challenged that decision on similar grounds to those raised by Tennessee here, and a district court denied Oklahoma's

*Continued on next page.*

current policy, which stated that Title X "[p]atients with positive pregnancy test[s] must be offered the opportunity to be provided information and counseling regarding all options that are legal in the State of Tennessee." *See* Feb. 13, 2023 Letter, R. 1-3, PageID#98-99.  Tennessee did not elaborate but seemed to be referencing a state law that had recently taken effect restricting abortion in the State.  *See* Tenn. Code Ann. § 39-15-213.

HHS notified Tennessee that its response appeared to place it out of compliance with applicable Title X regulations.  *See* Mar. 1, 2023 Letter, R. 1-9, PageID#189-90.  HHS explained that it was "committed to working with grantees to ensure compliance with the" program requirements, and it allowed Tennessee an opportunity to submit further information.  *Id.*, PageID#190.  HHS also offered Tennessee the option of submitting an "alternate compliance proposal" with specific examples of acceptable arrangements, including that Tennessee could satisfy the counseling and referral requirements by providing Title X patients the number for a call-in hotline where operators would supply the requisite information.  *See id.*

Tennessee's short final response expressed its belief that its Title X project could comply with HHS's regulations by offering pregnant patients counseling and referrals for "pregnancy termination" that, under state law, would not be considered

---

motion for a preliminary injunction.  *See* Order, *Oklahoma v. HHS*, No. 5:23-cv-01052-HE (W.D. Okla. Mar. 26, 2024), Dkt. No. 36. Oklahoma's appeal is on an expedited briefing schedule in the Tenth Circuit.  *See Oklahoma v. HHS*, No. 24-6063 (10th Cir.).

an "abortion." *See* Mar. 13, 2023 Letter, R. 1-10, PageID#192 (citing Tenn. Code

Ann. § 39-15-213(a)(1)). After receiving Tennessee's submission, HHS decided not to

issue a Title X continuation award to the Tennessee Department of Health. HHS

explained that, based on Tennessee's submissions, Tennessee's Title X project was

"not in compliance with the Title X regulatory requirements and, therefore, the terms

and conditions of [its] grant." *See* Mar. 20, 2023 Letter, R. 1-11, PageID#195. HHS

noted that the applicable regulations require that Title X projects provide

"nondirective options counseling and referrals" upon client request, including for

abortion. *See id.* Based on its determination that Tennessee's Title X project was "not

in compliance with the Title X regulation," HHS concluded that a continuation award

was not "in the best interest of the government." *See* 2023 Notice of Award, R. 1-12,

PageID#198 (quoting 42 C.F.R. § 59.8(b)).

### D. This Lawsuit

**1.** Tennessee filed this suit and moved for a preliminary injunction, seeking to

"reinstate" its Title X funding. Compl., R. 1-1, PageID#31; *see* PI Mot., R. 21,

PageID#299. The district court denied a preliminary injunction, concluding that

Tennessee "has no chance of success on the merits" and that the balance of the

equities and the public interest do not favor relief. Order, R. 30, PageID#851, 856.

The district court held that Tennessee failed to establish a likelihood of success

on its challenge to HHS's decision under the APA. The court explained that, in *Ohio*

*v. Becerra*, this Court "held that HHS acted within its [statutory] authority by issuing its

2021 Rule requiring Title X grantees to counsel and refer for abortions" and that Tennessee had failed to comply with those requirements. Order, R. 30, PageID#833. The court emphasized that there has "been no changes to Title X" or the underlying regulations since this Court's decision and that Tennessee's arguments sought to "relitigat[e] binding precedent." *Id.*, PageID#833 & n.10. The court further rejected Tennessee's claim that HHS violated its regulations in denying a continuation award, explaining that Tennessee's arguments rested on "plainly unreasonable" interpretations of the regulations. *Id.*, PageID#839.

The district court also disagreed with Tennessee's arguments that HHS was arbitrary and capricious in denying a continuation award. The court found that HHS had "reasonably explained the basis for its decision"—specifically, HHS declined to issue a continuation award after it determined that Tennessee's Title X project was out of compliance with the counseling and referral requirements, HHS informed Tennessee of its noncompliance, and Tennessee "refused to change its policy." *See* Order, R. 30, PageID#843. The court highlighted that HHS has consistently maintained that its regulations require grantees to offer nondirective options counseling and referral for abortion upon a patient's request and that "HHS has never suggested that this requirement could be modified by a state's abortion laws." *Id.*, PageID#844. "In finding that Tennessee was not complying with the 2021 rule's abortion counseling and referral requirements, HHS continued to apply this same interpretation." *Id.*, PageID#845. For many of the same reasons, the court

determined that HHS considered relevant factors in making its funding decision and that HHS's decision was not procedurally invalid. *Id.*, PageID#847-48.

The district court also rejected Tennessee's reliance on principles limiting Congress's power under the Spending Clause. The court recognized that "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." Order, R. 30, PageID#827 (quoting *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022)). In the Title X statute, "Congress made compliance with HHS regulations a clear and unambiguous condition of receiving a Title X grant." *Id.*, PageID#828. The court rejected Tennessee's argument that "Congress cannot make compliance with agency regulations a condition of receiving a federal grant," explaining that it is "commonplace for Congress to" do so. *Id.*, PageID#830. The court emphasized that Tennessee "knew" when it applied for and accepted its grant that "it was required to comply with HHS regulations" governing the grant, including HHS's regulation requiring nondirective options counseling and referral, which was "in place at the time." *Id.*, PageID#829. The court thus found no Spending Clause concern.

The district court briefly discussed the remaining preliminary injunction factors and determined that they did not favor Tennessee. The court emphasized that the bulk of Tennessee's claimed harms are speculative or nonexistent, and concluded that Tennessee's loss of "a very small fraction of the Federal funding that" its Department of Health receives does not outweigh the harm to the government's and the public's

interest that would result from requiring HHS to allocate competitive grant funds to an entity that has refused to comply with program requirements.  *See* Order, R. 30, PageID#851-56.  The court concluded that Tennessee "has no basis to force funding from HHS without meeting the obligations upon which the funding is conditioned." *Id.*, PageID#857.

**2.**  After the district court denied a preliminary injunction, HHS agreed to an expedited briefing schedule and to voluntarily reserve Title X funding on a temporary basis in order to permit this Court sufficient time to consider Tennessee's appeal while also allowing HHS sufficient time to obligate funds before the end of the fiscal year.  The parties have requested a decision on this matter by mid-July 2024.

**SUMMARY OF ARGUMENT**

**I.**  The district court correctly held that Tennessee has no likelihood of success on the merits of its claims.

**A.**  The district court correctly rejected Tennessee's APA claims.  Tennessee's statutory-authority argument seeks to rehash arguments that were considered and rejected in *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023).  This Court held in *Ohio* that HHS may require Title X projects to offer pregnant patients the opportunity to receive nondirective options counseling, including about abortion, followed by a referral upon a patient's request.  *Id.* at 770-72.  HHS did not exceed its statutory authority in applying its valid regulation by its terms to deny a Title X continuation

14

award where Tennessee refused to comply with those requirements. Tennessee's strained interpretations of other HHS regulations do not suggest a different result.

Tennessee's arbitrary-and-capricious arguments fare no better. This Court has recognized the "rational reasons" that underlie HHS's decision to require Title X projects to offer neutral, factual information to pregnant patients. *Ohio*, 87 F.4th at 775. At bottom, Tennessee would like HHS to revisit its counseling and referral requirements in light of the Supreme Court's decision in *Dobbs* and changing state abortion laws. The "proper procedure" for raising such arguments, however, is not an arbitrary-and-capricious claim in this posture but rather "a petition to the agency for rulemaking." *Auer v. Robbins*, 519 U.S. 452, 459 (1997). In any event, Tennessee provides no basis for setting aside HHS's reasoned decision to not issue a continuation award to an entity that has refused to comply with program requirements. And contrary to Tennessee's contentions, HHS has not applied any new interpretation of the counseling and referral requirements to Tennessee.

**B.** The district court also correctly rejected Tennessee's reliance on the clear-statement requirement for conditions on federal funds enacted under the Spending Clause. Congress has authorized HHS to make grants to public and nonprofit entities for the establishment of family-planning projects and has annually appropriated funds for the program. The Title X statute makes clear that such grants are subject to HHS's regulations. 42 U.S.C. § 300a-4(a)-(b). Tennessee has applied for and accepted Title X grants for 50 years without suggesting any lack of clarity that compliance with

15

HHS regulations is a condition of its grant. Tennessee's assertion that Spending Clause doctrine requires that Congress set out in the statute every requirement of the Title X program in order for the requirement to be enforceable cannot be squared with Supreme Court precedent, including the Supreme Court's recent decision upholding conditions on the Medicare and Medicaid programs in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam).

**II.** Tennessee likewise cannot establish that the remaining equitable factors favor relief. Any harm to the Tennessee Department of Health from the loss of discretionary grant funds cannot outweigh the balance of the equities and the public interest, which strongly counsel against an injunction that would require HHS to award competitive grant funds to an entity that will not comply with HHS's requirements. This Court has held that HHS lawfully issued the counseling and referral requirements and that HHS reasonably determined that those requirements are "critical for the delivery of quality, client-centered care." *Ohio*, 87 F.4th at 772-73 (quoting 86 Fed. Reg. at 56,154). It would flout the government's and the public's interest to require HHS to continue to award Title X funds to an entity that will not offer Title X patients the neutral and factual information the regulations require, particularly given that nonprofit providers have stepped in to offer Title X services in Tennessee's stead.

16

## STANDARD OF REVIEW

This Court "review[s] a district court's denial of a request for a preliminary injunction for abuse of discretion." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007).

## ARGUMENT

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The district court properly determined that Tennessee has not satisfied these requirements.

## I. Tennessee Has Not Demonstrated a Likelihood of Success on the Merits

### A. Tennessee Is Unlikely to Succeed on Its APA Claims

#### 1. HHS Acted Well Within Its Statutory Authority in Declining to Issue a Title X Continuation Award to Tennessee

**a.** Title X establishes a competitive grant program for the establishment of family-planning projects and requires that all Title X projects comply with program requirements set forth in agency regulations. *See* 42 U.S.C. § 300(a); *id.* § 300a-4(a). In 2021, HHS promulgated a final rule that restored the counseling and referral

17

requirements that have governed Title X projects "for much of the program's history." 86 Fed. Reg. at 56,150. Under the rule, Title X projects must provide, upon a pregnant patient's request, "neutral, factual information and nondirective counseling" on "[p]rental care and delivery," "[i]nfant care, foster care, or adoption," and "[p]regnancy termination," and must also provide a referral for any of those options if the patient so requests. *Id.* at 56,179; *see* 42 C.F.R. § 59.5(a)(5). Any referral for an abortion may consist only of "relevant factual information" such as "the name, address, [and] telephone number" of an abortion provider. 86 Fed. Reg. at 56,160 (quoting 65 Fed. Reg. at 41,281). A Title X project may not take "further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." *Id.* (quoting 65 Fed. Reg. at 41,281).

In *Ohio v. Becerra*, this Court held that the referral requirement is based on a permissible construction of the Title X statute. 87 F.4th 759, 771-72 (6th Cir. 2023). This Court rejected the argument, presented by several States, that the referral requirement violates Section 1008's prohibition on Title X funds being "used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6. Relying on the Supreme Court's decision in *Rust v. Sullivan*, 500 U.S. 173, 184-90 (1991), this Court explained that Section 1008 does not directly address whether a provider can supply neutral, factual information about abortion services, and "it must be permissible for an administration to treat referrals either as falling inside or outside

§ 1008's prohibition, so long as [HHS] adequately explains its choice." *Ohio*, 87 F.4th at 772. The Court held that HHS had adequately explained its decision in the 2021 rule. *See id.* at 772-75.

HHS's 2021 rule was in place when Tennessee applied for and accepted its Title X grant award, and Tennessee's grant (like all Title X grants) was made expressly contingent on the project's compliance with applicable regulations. *See* 2022 Notice of Award, R. 1-7, PageID#173. When Tennessee refused to bring its Title X project into compliance with the counseling and referral requirements, HHS determined not to issue Tennessee a continuation award. *See* 2023 Notice of Award, R. 1-12, PageID#198. This Court upheld the underlying regulation in *Ohio*, and HHS acted well within its statutory authority in applying that regulation to deny continued Title X funding to an entity that has declined to follow the regulation's requirements.

**b.** Despite its assertions to the contrary, Tennessee's arguments seek to "relitigate" this Court's decision in *Ohio*. *See* Br. 39 (quotation marks omitted). *Ohio* squarely forecloses Tennessee's contention that HHS violated Section 1008 in declining a continuation award to Tennessee. *See* Br. 41; *see also Ohio*, 87 F.4th at 771-72. Tennessee cannot escape *Ohio*'s holding by attempting to posit a difference between an "as-applied" and a "facial challenge." *See* Br. 39-40 (quotation marks omitted). The relevant point is that HHS applied the referral requirement that this Court "upheld." *See* Br. 10.

Tennessee therefore errs in describing HHS's decision as a "seismic policy shift." Br. 43. HHS has not applied any new interpretation of the Title X statute or the implementing regulations to Tennessee. The 2021 rule unequivocally requires Title X projects to offer pregnant patients the opportunity to be provided "neutral, factual information" about options, including abortion, and "relevant factual information" about where an abortion can be obtained if the patient requests such information, consistent with "client-centered care." *See* 86 Fed. Reg. at 56,160, 56,154 (quoting 65 Fed. Reg. at 41,281). The rule does not refer to or incorporate state law, nor does it limit the required nondirective options counseling and referrals to procedures available within a particular State. *See* 86 Fed. Reg. at 56,153-54; *see also* 42 C.F.R. § 59.5(a)(5). Thus, in June 2022, HHS reminded grantees of the rule's requirements, that Title X does not have "geographic limits," and that projects may provide referrals for services that are available out of state. *See* HHS Q&A, R. 1-16, PageID#165. HHS reiterated the same requirements to Tennessee in declining to issue a continuation award. *See* Mar. 1, 2023 Letter, R. 1-9, PageID#189-90; Mar. 20, 2023 Letter, R. 1-11, PageID#194-95.

Tennessee's assertion that the counseling and referral requirements "force" the States to "participate in abortions," Br. 42, is likewise incorrect and only underscores the extent to which Tennessee seeks to relitigate *Ohio*. The plaintiff States in *Ohio* similarly claimed that the rule's referral requirement "force[s] the States to support abortion by making referrals upon request," Brief of Appellants at 53, *Ohio v. Becerra*,

No. 21-4235 (6th Cir. Feb. 22, 2022), but this Court upheld the requirement against the States' challenge, *see* 87 F.4th at 771-72, 775, and Tennessee's claim is no more persuasive here. The rule requires that Title X projects offer pregnant patients neutral, factual information about abortion. *See Ohio*, 87 F.4th at 772. Tennessee agreed to comply with that requirement when it applied for and accepted its Title X grant. But if Tennessee now does not wish to provide such information to Title X patients about a service available out of state (or even to provide patients the number for a call-in hotline where operators could provide such information, *see supra* p. 10), Tennessee may "decline" the funds and not participate. *See Rust*, 500 U.S. at 199 n.5 (recognizing that entities are "in no way compelled to operate a Title X project; to avoid the force of the regulations, [they] can simply decline the subsidy"); *accord Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205, 214 (2013). Tennessee instead "wants to have its cake and eat it too; it wants the federal money but does not want to comply with the federal conditions" that apply to the federal program. *See* Order, R. 30, PageID#826. Tennessee does not get to pick and choose which program requirements it prefers to follow.

Tennessee's reliance on other Title X provisions is similarly misplaced. Tennessee cites federal conscience protections such as the Church Amendment, 42 U.S.C. § 300a-7. *See* Br. 42. As this Court explained in *Ohio*, the rule recognizes that individuals and entities that have a conscience objection and that are covered by federal conscience laws "will not be required to counsel or refer for abortions in the

Title X program" in accordance with federal law. *See* 87 F.4th at 774 (quoting 86 Fed. Reg. at 56,153). Tennessee's attempt to conjure a conflict between those conscience protections and the rule lacks merit.

Tennessee fares no better in invoking 42 U.S.C. § 300(a), which requires that Title X projects offer "a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." *See* Br. 42. The statutory phrase "acceptable and effective" refers to whether the method or service being offered is medically suitable, not—as Tennessee would have it (Br. 42)—to whether a method or service has been deemed "acceptable" by a particular State. And in all events, HHS's requirement that Title X projects provide "complete and medically accurate information and counseling" to pregnant patients, 86 Fed. Reg. at 56,164, does not conflict with Tennessee state law—which does not purport to prohibit nondirective options counseling or referrals for abortion, *see* Order, R. 30, PageID#840—let alone conflict with 42 U.S.C. § 300(a) and "the broad directives provided by Congress in Title X," *see Ohio*, 87 F.4th at 771-72 (quoting *Rust*, 500 U.S. at 184).

## 2.    HHS's Decision Is Consistent with Its Regulations

HHS's decision rests on a straightforward application of its regulations to Tennessee. *See* Mar. 20, 2023 Letter, R. 1-11, PageID#194-95. Tennessee's contention that HHS's decision contradicts two regulatory provisions, Br. 44-47, is premised on a "plainly unreasonable" interpretation of those provisions. *See* Order,

R. 30, PageID#839.  And at a minimum, Tennessee's arguments do not overcome the deference owed to HHS's interpretation of its own regulations.  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2413-14 (2019).

　　**a.**  First, Tennessee relies (Br. 44-45) on 42 C.F.R. § 59.5(b)(6), which states that Title X projects must "[p]rovide that family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning."  As an initial matter, that regulatory provision has no application here.  As the district court explained, that provision addresses "*who*" may direct a Title X program, not the types of services provided under Title X programs.  *See* Order, R. 30, PageID#840.  HHS regulations previously required that Title X services be "performed under the direction of a physician," but HHS received comments during its 2021 rulemaking that, in many States, "other healthcare providers, including physician assistants and [advanced practice registered nurses] . . . have authority to direct family planning programs."  *See* 86 Fed. Reg. at 56,163-64.  HHS thus agreed with commenters that it should expand its regulation to permit those other providers to direct Title X projects where "allowable under state law."  *Id.*; *see* 42 C.F.R. § 59.5(b)(6).

　　Regardless, as the district court explained, Tennessee's argument would fail even if the phrase "allowable under state law" could be read out of context as Tennessee suggests.  *See* Br. 44-45.  Tennessee law prohibits abortion, *see* Tenn. Code

Ann. § 39-15-213, but Tennessee's prohibition "contains no language whatsoever related to counseling or referral," *see* Order, R. 30, PageID#840.  Thus, there is no indication that the nondirective options counseling and neutral information required by the rule are not "allowable under state law" in Tennessee.  *See id.*

**b.**  Second, Tennessee relies (Br. 45-47) on 42 C.F.R. § 59.5(b)(8), which requires that Title X projects affirm that they will "[p]rovide for coordination and use of referrals and linkages" with various health care providers.  These "referrals and linkages" should be with providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care."  42 C.F.R. § 59.5(b)(8).  As the district court correctly recognized, the phrase "when feasible" in this provision plainly modifies the requirement to refer to providers "in close physical proximity to the Title X site," and thus the regulation requires that Title X projects refer patients to nearby healthcare providers "when it is possible to do so," but permits the referral to be made "to a provider father away" where such close-in-proximity referrals are not possible.  *See* Order, R. 30, PageID#837-39 (quoting 42 C.F.R. § 59.5(b)(8)); 86 Fed. Reg. at 56,164 (agreeing with commenters to add language to the regulations "to state that referrals are to be to providers in close proximity to the Title X site when feasible").

The district court properly rejected Tennessee's effort to distort the regulation's plain language to mean that any referral "*must* be" to a provider that is "in close physical proximity to the Title X site."  Br. 45-46 (emphasis added; quotation marks

24

omitted).  Tennessee cannot reconcile that interpretation with the text of the regulation, and it would lead to absurd results, as the district court explained.  *See* Order, R. 30, PageID#837-39.  For similar reasons, it is not plausible to read the regulation, as Tennessee suggests, to mean that a Title X project may unilaterally determine that referrals for abortions are not "feasible," Br. 45-46, and thus effectively "veto" the regulations' specific requirement that projects offer nondirective options counseling followed by a referral for any of the options the pregnant patient requests, *see* Order, R. 30, PageID#838-39.[3]

### 3.    HHS's Decision Is Neither Arbitrary Nor Capricious

#### a.  HHS Considered All Important Aspects of Its Decision

In *Ohio*, this Court held that HHS detailed the "rational reasons" supporting its decision to reinstate the referral requirement, and as already explained, HHS's decision here was based on a straightforward application of that requirement to Tennessee.  *See Ohio*, 87 F.4th at 775.  HHS did not act in an arbitrary and capricious manner in applying its valid regulation in accordance with its terms.

---

[3] On appeal, Tennessee does not appear to renew the argument raised in district court that HHS's regulations require only that Title X projects provide options counseling and referrals for "pregnancy termination," which Tennessee sought to distinguish from "abortion."  *See* PI Mot., R. 21, PageID#322-33.  The district court thoroughly explained why that interpretation of HHS's regulations is incorrect.  *See* Order, R. 30, PageID#835-37.

Tennessee claims that HHS failed to "grapple with the myriad problems implicated" by its counseling and referral requirements now that Tennessee restricts abortion in its state. *See* Br. 47-49. But as the district court recognized, Tennessee's arbitrary-and-capricious argument is, at bottom, a claim that HHS should "revisit" its counseling and referral requirements "in light of the *Dobbs* decision" and state-law changes. *See* Order, R. 30, PageID#842; *see also* Br. 47. Addressing a substantially similar objection in *Auer v. Robbins*, 519 U.S. 452 (1997), the Supreme Court explained that where a litigant's objection is that the agency "failed to give adequate consideration to whether it really ma[de] sense to apply" a rule "in the wake of" a Supreme Court decision, the "proper procedure" for such an objection is "set forth explicitly in the APA: a petition to the agency for rulemaking, denial of which must be justified by a statement of reasons, and can be appealed to the courts." *Id.* at 458-59 (citations omitted).

Tennessee does not contend that it raised any of its arguments to the agency, but in all events, it provides no basis to set aside HHS's funding decision. Tennessee's apparent belief that a "key justification for the 2021 rule" is to facilitate abortions, Br. 47, rests on a plain misstatement of the preamble. What the relevant passage actually says is that HHS chose to restore the counseling and referral requirements because the provision of "neutral, factual information" to pregnant patients is "critical for the delivery of quality, client-centered care." 86 Fed. Reg. at 56,150, 56,154; *see Ohio*, 87 F.4th at 773. Tennessee's decision to limit access to

26

abortion in its State does not "undercut[]," Br. 47, the importance of Title X projects supplying "complete and medically accurate information and counseling" to pregnant patients, *see* 86 Fed. Reg. at 56,163-64.

For similar reasons, Tennessee errs in contending that HHS failed to consider potential costs from out-of-state referrals. Br. 48. The 2021 rule allowed out-of-state referrals, even before *Dobbs*. And none of Tennessee's speculative costs (Br. 48) provide a basis to "second guess[]" the agency's reasoned policy judgment that it is critically important to provide pregnant patients with neutral, factual information about options. *See Ohio*, 87 F.4th at 775. Tennessee emphasizes purported costs to Title X projects of having to "identify" which providers are able to offer abortion services, *see* Br. 48, but that is not a new issue: Title X projects have always had to keep track of which providers are able to offer services at the time of a referral (whether for abortion or for other health services), and even before *Dobbs*, available providers may have changed over time. Moreover, although Tennessee complains of needing to "monitor[] state-by-state abortion laws," Br. 48, HHS has explained that Title X projects may use third parties, such as the All-Options Talkline, to provide nondirective options counseling and referrals, *see* Mar. 1, 2023 Letter, R. 1-9,

PageID#190.[4]  HHS offered such alternatives to Tennessee, *see id.*, but Tennessee declined to engage with the agency, *see* Mar. 13, 2023 Letter, R. 1-10, PageID#192.

Tennessee's assertion that HHS failed to "address the potential gaps in care" that would be created by declining to issue Tennessee a continuation award, Br. 48-49, similarly provides no basis to set aside the agency's decision.  Tennessee is not the only Title X grantee or provider of family-planning services in the State, and non-profit providers have stepped in to provide Title X services now that Tennessee has refused to comply with HHS regulations.  *See* Compl., R. 1, PageID#4; *see also* Office of Population Affairs, HHS, Fiscal Year 2023 Title X Service Grant Awards.[5]  Tennessee's conjecture that HHS's rule will drive States out of the program (Br. 49) is likewise meritless.  Only two state Title X grantees—Tennessee and Oklahoma—refused to comply with the counseling and referral requirements.  *See supra* p. 9.  And in all events, HHS acted reasonably in denying a continuation award to a grantee that has failed to comply with applicable regulations.

---

[4] Tennessee's reference to "abortions by 'telehealth'" or "mail-shipped" abortion medications, Br. 48, is difficult to understand.  HHS has been clear, both before and after *Dobbs*, that Title X projects "are not allowed to provide abortion as a method of family planning as part of the Title X project," including "medication abortion pills."  *See* HHS Q&A, R. 1-6, PageID#166.  The telehealth alternatives HHS suggested to Tennessee would provide the "nondirective options counseling" and referrals required by the 2021 rule.  *See* Mar. 1, 2023 Letter, R. 1-9, PageID#190; *see also* All-Options, https://perma.cc/MEX8-TECX.

[5] https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (last visited April 26, 2024).

28

### b.  HHS Did Not Unlawfully Change Its Position

Tennessee errs in asserting that HHS changed positions without explanation in declining to grant a continuation award.  *See* Br. 49.  As already explained, the counseling and referral requirements have been in place since 2021, before Tennessee applied for and received Title X funds, and HHS has been consistent about what its regulations require.

Tennessee attempts to demonstrate that HHS unlawfully changed positions by relying on a July 2022 program review of its Title X project.  *See* July 2022 Program Review, R. 1-1, PageID#33.  But as HHS explained when it delivered that review to Tennessee in October 2022, the review was based on Tennessee's services "as of the date of the Program Review."  *See* Oct. 19, 2022 Email, R. 1-2, PageID#96.  At the time, Tennessee's post-*Dobbs* abortion restriction had not yet gone into effect.  *See* Tenn. Code Ann. § 39-15-213; *see also* Br. 50 (recognizing that "elective abortions" became "unavailable" in Tennessee in "August 2022").  HHS's review was thus limited to Tennessee's practices when the agency conducted its review, and at that time, HHS found that Tennessee's project sites were "allowed to provide resource lists to clients seeking information on" abortion services, and that Tennessee's policies required "staff to offer clients with positive pregnancy tests all options counseling and referrals upon request."  July 2022 Program Review, R. 1-1, PageID#90, 92.

The July 2022 program review specifically contemplated a follow-up if Tennessee changed its counseling and referral policies in response to the abortion

restriction that was soon to take effect.  The review noted that Tennessee's forms and policies were "under review by [Tennessee Department of Health] legal staff," and that a future decision was expected as to what project staff would be "allowed to provide to or say to clients seeking pregnancy termination counseling and referral." *See* July 2022 Program Review, R. 1-1, PageID#92.  Thus, when HHS delivered the July 2022 review to Tennessee in October 2022, the agency requested an "update . . . on the policy changes in response to the enactment of Tenn. Code Ann. § 39-15-213." *See* Oct. 19, 2022 Email, R. 1-2, PageID#96.  As explained above, when Tennessee confirmed that it was not in compliance with the requirements of the 2021 rule—and refused to engage with any of HHS's suggestions for alternative compliance arrangements—HHS declined to issue a continuation award.

HHS made no "unexplained position-switch."  Br. 51.  In arguing otherwise, Tennessee relies heavily on a sentence in the July 2022 program review stating that "[n]o referrals for abortion are made."  *See* July 2022 Program Review, R. 1-1, PageID#56.  Although that sentence is not worded precisely, the district court correctly recognized that the agency was confirming that Tennessee's project complied with the requirement that Title X projects not take affirmative steps in providing a referral for an abortion, such as making appointments, arranging for payment, or providing transportation.  *See* Order, R. 30, PageID#846 n.16; *see also* July 2022 Program Review, R. 1-1, PageID#91 (confirming that Tennessee's project does not "provid[e] services that directly facilitate the use of abortion as a method of family

30

planning"). It is not plausible to read that sentence to say that HHS signed off on a project that was not offering any referrals for abortion in contravention of agency regulations, *see* Br. 49-51, particularly when other sentences of the review confirm that Tennessee's Title X project was providing referrals at that time, *see supra* p. 28; *see also, e.g.*, July 2022 Program Review, R. 1-1, PageID#63 (noting that a project site had a "comprehensive list of abortion providers in nearby states who provide abortion to clients," and recommending that such resources be made available "insofar as this procedure will no longer be available in Tennessee").

### c. HHS Did Not Disregard Any Legally Cognizable Reliance Interests

Tennessee gains no ground by invoking the principle that an agency changing positions must "be cognizant that longstanding policies may have 'engendered serious reliance interests.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). For the reasons already explained, in declining to grant a continuation award, HHS adhered to the counseling and referral requirements in its regulations, which Tennessee agreed to abide by in accepting its grant award. Moreover, Tennessee has no legally cognizable reliance interest in the receipt of a discretionary funding award on the conditions that it prefers. HHS's regulations make clear that Title X grants provide funding for one year (while sometimes providing HHS with the option of issuing noncompetitive continuation grants for additional years), 42 C.F.R. § 59.8(b), and that "[n]either the approval of any application nor the award of any grant

31

commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application," *id.* § 59.8(c).

### 4.    Notice-and-Comment Procedures Were Not Required

Finally, Tennessee briefly argues that HHS was required to undertake notice-and-comment rulemaking procedures in order to impose "*new* requirements" on Tennessee's Title X project.  Br. 53.  This argument, too, fails for the reasons already explained.  HHS has not imposed any new requirements on grantees but has rather applied the plain language of its regulations to Tennessee.  *See* Order, R. 30, PageID#850 ("Tennessee has the same duties it always had under the Rule: to counsel and refer for abortions upon a woman's request.").

### B.    Tennessee Is Unlikely to Succeed on its Spending Clause Arguments

Tennessee's invocation of Spending Clause doctrine similarly lacks merit.  The Spending Clause authorizes Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  Pursuant to that authority, Congress has "broad power" to "set the terms on which it disburses federal funds."  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).  Congress has long "condition[ed] receipt of federal moneys upon compliance by the recipient with federal statutory and

administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting

*Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)).

Title X is a straightforward exercise of Congress's spending power.  Congress

appropriates money every fiscal year to fund the Title X program.  *See, e.g.*,

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat.

4459, 4857 (2022) (providing over $286 million in funding).  The statute authorizes

HHS to issue grants to public and nonprofit private entities for the establishment of

projects that offer voluntary family-planning services.  *See* 42 U.S.C. § 300(a).  And

Congress expressly provided that such grants shall "be made in accordance with such

regulations as the Secretary may promulgate," *id.* § 300a-4(a), and that payment of the

grants is "subject to such conditions as the Secretary may determine to be appropriate

to assure that such grants will be effectively utilized for the purposes for which

made," *id.* § 300a-4(b).

Tennessee's lengthy discussion of Spending Clause "first principles" (Br. 19-21)

and its assertion that HHS has "seize[d] congressional spending power" (Br. 23) are

therefore difficult to understand.  Title X is just one among numerous "federal grant

programs requiring compliance with regulations as a condition of a grant."  Order, R.

30, PageID#831.[6]  The Supreme Court has long recognized that Congress may leave

---

[6] *See, e.g.*, 42 U.S.C. § 254b(k)(3)(N) (requiring health center grantees to "ensure
the appropriate use of Federal funds in compliance with applicable Federal statutes,
regulations, and the terms and conditions of the Federal award"); *id.* § 1793(f)(2)

*Continued on next page.*

the particulars of implementing a spending program through "regulations" and "other guidelines" to the agency charged with administering the program. *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 670 (1985). As with other spending programs, state participation in Title X "is voluntary," and the States retain the option of "forgoing the benefits of federal funding" if they do not want to fulfill the program conditions. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 11 (1981); *see also Rust*, 500 U.S. at 199 n.5.

Tennessee misunderstands the authorities that it cites in seeking to wield the Spending Clause to compel HHS to award it a discretionary grant without having to comply with program requirements. Tennessee primarily relies on *Pennhurst* and cases applying that decision. Those cases reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a contract," where a State must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Pennhurst*, 451 U.S. at 17. The cases thus articulate a "federalism-based clear-statement rule . . . of statutory interpretation," *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022), which courts apply by declining to enforce against grant recipients conditions that were not sufficiently apparent when the

---

(providing grants for school breakfast program that "shall be carried out in accordance with applicable nutritional guidelines and regulations issued by the Secretary"); 49 U.S.C. § 5309(c)(4) (stating that transit grants "shall be subject to all terms, conditions, requirements, and provisions that the Secretary determines to be necessary or appropriate").

34

recipient accepted the funding, *see Pennhurst*, 451 U.S. at 25 (explaining that Congress may not "surpris[e] participating States with post acceptance or 'retroactive' conditions"). In *Pennhurst*, for example, the question was whether a federal statutory provision stated a "mandatory" and enforceable condition at all, and the Court determined as a matter of statutory construction that it did not. *See id.* at 15-27; *see also, e.g., Cummings*, 596 U.S. at 219 (construing anti-discrimination statute not to authorize an award of emotional-distress damages); *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 293-94 (2006) (construing fee-shifting provision of the Individuals with Disabilities Education Act not to apply to expert fees).

Those cases do not aid Tennessee for several reasons. As an initial matter, Tennessee does not confront the sort of predicament that animated *Pennhurst* and its progeny: the need to construe supposedly ambiguous conditions to determine what obligations it incurred by accepting a prior grant. *Pennhurst*, 451 U.S. at 7-8, 17; *Arlington Cent. School Dist. Bd. of Educ.*, 548 U.S. at 294-95. Tennessee is not confronting an effort to recoup previously awarded grant funds, nor is it seeking to avoid liability on the basis of prior grant conditions. Rather, Tennessee is claiming entitlement to a continuation award from the limited pool of Title X funds that Congress authorized HHS to apportion, and it is seeking to compel HHS to issue it such an award. *Pennhurst* has no application in such a circumstance, and it provides no basis to override HHS's decision not to issue a discretionary continuation award to

Tennessee based on its stated refusal to comply with the regulatory requirements governing the program.

Even if *Pennhurst*'s standard were relevant here, it is satisfied. Congress "provid[ed] clear notice to the States that," "by accepting funds" under Title X, they would "be obligated to comply with" HHS regulations governing the program. *Pennhurst*, 451 U.S. at 25. As explained above, the statute is explicit that Title X "[g]rants and contracts" are subject to HHS's "regulations" and "conditions." 42 U.S.C. § 300a-4(a)-(b). Like all other Title X recipients, States are aware that once they accept Title X funding, they must comply with the regulatory requirements set forth by HHS, such as those in the 2021 rule. Tennessee has applied for and accepted Title X funds for 50 years without suggesting any lack of clarity that compliance with HHS regulations is a condition of its grant.

Tennessee invokes (Br. 22) Section 1008's prohibition on grant funds being "used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6, but that provision is irrelevant to the Spending Clause analysis. HHS has not sought to deny funding to Tennessee based on that prohibition, that prohibition is not the basis for HHS's rulemaking authority, and the existence of that prohibition does not detract from Title X's "unambiguous requirement that grantees abide by HHS regulations." Order, R. 30, PageID#830 n.6. Tennessee's assertions that Section 1008 precludes HHS from requiring that projects offer nondirective options counseling and referrals for abortion (Br. 28) merely repackage Tennessee's statutory-

36

authority arguments, which are foreclosed for the reasons already explained.  *See supra* pp. 18-19.

Tennessee's suggestion that HHS "unveiled" its counseling and referral requirements "long after Tennessee accepted its Title X grant," Br. 29, likewise lacks merit.  As explained above, the 2021 rule was promulgated well before Tennessee applied for and received its Title X grant in 2022, and the rule unambiguously requires that Title X projects "provide neutral, factual information and nondirective counseling" to pregnant patients, including on "pregnancy termination," followed by a "referral upon request."  42 C.F.R. § 59.5(a)(5)(ii).  Tennessee was undoubtedly aware of those requirements—indeed, it commented during the 2021 rulemaking on HHS's proposal to reinstate them.  *See* May 17, 2021 Letter from Ohio and 20 Other States to Xavier Becerra, Secretary, HHS, at 2, 12-13 (May 17, 2021), https://perma.cc/BT6W-ZMSH (objecting to the proposed requirement that projects "counsel[] or refer[] on abortion").

Tennessee thus resorts to arguing that the Spending Clause requires that Congress itself articulate every condition of the Title X program.  *See* Br. 21, 23-25, 35-36.  That argument cannot be squared with Supreme Court precedent, *see supra* pp. 33-34, including the Supreme Court's recent decision in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam).  There, as here, the operative statute broadly "authorized the [agency] to promulgate, as a condition of a facility's participation in the [Medicare and Medicaid] programs, such 'requirements as [the agency] finds necessary in the interest

of the health and safety of individuals who are furnished services in the institution.'"
*Id.* at 90 (quoting 42 U.S.C. § 1395x(e)(9)).  And there, as here, States objected that
they could not be subjected to a spending condition that was not articulated in the
statute.  *See* Response to Application for a Stay at 23-24, *Missouri*, 595 U.S. 87 (No.
21A240), 2021 WL 8946189, at *23-24; Response to Application for a Stay at 26-28,
*Becerra v. Louisiana*, No. 21A241, 2021 WL 8939385, at *26-28 (U.S. Dec. 30, 2021).
The Supreme Court disagreed, explaining that the agency has properly "established
long lists of detailed conditions with which facilities must comply to be eligible to
receive Medicare and Medicaid funds" and is not limited to issuing "bureaucratic rules
regarding the technical administration of" the programs.  *Missouri*, 595 U.S. at 90, 94.

None of the court of appeals decisions on which Tennessee relies is to the
contrary.  In *Kentucky* and *West Virginia*, this Court and the Eleventh Circuit held that
a statutory funding condition placed on the States' expenditure of COVID-19
stimulus funds was not "ascertainable."  *See West Virginia ex rel. Morrisey v. U.S. Dep't of
Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023); *Kentucky*, 54 F.4th at 354.  That holding
has no application here, where, as in *Biden v. Missouri*, the statutory condition is
perfectly clear.  *See* 595 U.S. at 92-96.  Both *Kentucky* and *West Virginia* properly
recognize that where Congress has articulated an ascertainable condition, agencies can
permissibly elaborate its content.  *See West Virginia*, 59 F.4th at 1148 ("[W]e do not
question an agency's authority to fill in gaps that may exist in a spending condition.");
*Kentucky*, 54 F.4th at 353-54 (discussing prior cases that approve this practice).  And as

discussed above, this Court has already held that HHS acted within its statutory authority in promulgating the referral requirement.  *Ohio*, 87 F.4th at 770-72.

*Kentucky* and *West Virginia* involved, moreover, a funding condition that "arguably threatened a significant intrusion upon state taxing authority."  *Kentucky*, 54 F.4th at 329; *see West Virginia*, 59 F.4th at 1145 (expressing concern that "[t]he States face[d] billions of dollars in potential recoupment actions" because the condition was aimed "at each state's *entire* budget and every single one of its taxes").  HHS's counseling and referral requirements present no comparable invasion of state sovereignty.  The requirements apply only to the family-planning projects that are established by public and nonprofit entities with Title X funds; Tennessee has applied for and accepted Title X funds for decades while those requirements have been in place; and the requirements in no way interfere with Tennessee's decision to restrict abortion in its State.  *See* Order, R. 30, PageID#855.

## II.  The Remaining Preliminary Injunction Factors Do Not Favor Relief

Because Tennessee has failed to establish a likelihood of success on the merits, this Court need not consider the remaining preliminary injunction factors.  *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev..*, 992 F.3d 518, 524 (6th Cir. 2021).  The district court correctly concluded, however, that Tennessee has likewise not established that the remaining factors favor relief.

Tennessee emphasizes that HHS's decision denies Tennessee approximately $7 million in Title X grant funds. Br. 54. Even putting aside that the funds at issue represent "a very small fraction of the Federal funding that [the Tennessee Department of Health] receives," Order, R. 30, PageID#852, any such loss of federal funding cannot outweigh the balance of the equities and the public interest, which strongly counsel against the issuance of a preliminary injunction that would compel HHS to issue a discretionary funding award to a grantee that has refused to comply with program requirements. This Court has held that HHS lawfully issued the counseling and referral requirements and that HHS reasonably determined that those requirements are "critical for the delivery of quality, client-centered care." *Ohio*, 87 F.4th at 773 (quoting 86 Fed. Reg. at 56,154). It would flout the government's and the public's interest to require HHS to continue to award Title X funds to an entity that will not offer Title X patients the "neutral, factual" information the regulations require. *See* 86 Fed. Reg. at 56,154. Tennessee is not the only recipient of Title X funds in the State, and non-profit providers have stepped in to provide services to clients now that Tennessee has refused to comply with HHS regulations. *Supra* p. 28.

Tennessee speculates that it will suffer reputational harm if HHS reports Tennessee's violation of its grant to the Federal Awardee Performance and Integrity Information System. *See* Br. 56. HHS expressly informed Tennessee in making its funding decision that it did "not intend to report any concerns regarding the award to" that system. *See* May 30, 2023 Email, R. 1-17, PageID#213. Any suggestion that

HHS is legally obligated to do so misreads the relevant regulations. The reporting requirement applies only when HHS terminates a grant, 45 C.F.R. § 75.372(a)-(b), not where, as here, HHS declines to issue a continuation award, 42 C.F.R. § 59.8(b). *See* Mar. 20, 2023 Letter, R. 1-11, PageID#193; *see also* 2023 Notice of Award, R. 1-12, PageID#198. Nor does Tennessee demonstrate that irreparable consequences are likely or imminent even if its Department of Health were reported. *See, e.g.*, 45 C.F.R. § 75.373(b)(3)-(5) (noting that HHS awarding agencies "consider" information in the system as well as "comment[s]" from the reported entity in assessing qualifications for a federal award).

Tennessee also invokes its "sovereign interest" but offers no explanation of how HHS is impairing its "sovereign decision about how to regulate abortions." Br. 57. Tennessee willingly applied for and received Title X funding, and for the reasons explained above, there is no conflict between HHS's counseling and referral requirements and Tennessee state law. To the extent that Tennessee no longer wants to offer Title X clients the nondirective options counseling and referrals that it has provided for decades without complaint, it is free to make that decision and forgo the benefit of Title X funding. *See Agency for Int'l Dev.*, 570 U.S. at 214.

41

## CONCLUSION

For the foregoing reasons, the order of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

FRANCIS. M. HAMILTON III
*United States Attorney*

MICHAEL S. RAAB
 *s/ Courtney L. Dixon*
COURTNEY L. DIXON
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-8189*
*courtney.l.dixon@usdoj.gov*

April 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,219 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*
Courtney L. Dixon

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

*s/ Courtney L. Dixon*
Courtney L. Dixon

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the government designates the

following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| RE 1 | Complaint | 1-32 |
| RE 1-1 | July 2022 Program Review | 33-95 |
| RE 1-2 | October 19, 2022 Email | 96 |
| RE 1-3 | February 13, 2023 Letter | 98-101 |
| RE 1-6 | HHS Q&A | 161-169 |
| RE 1-7 | 2022 Notice of Award | 170-186 |
| RE 1-9 | March 1, 2023 Letter | 189-191 |
| RE 1-10 | March 13, 2023 Letter | 192 |
| RE 1-11 | March 20, 2023 Letter | 193-195 |
| RE 30 | Order Denying Prelim. Inj. | 815-857 |