No. 24-5220

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE,

*Plaintiff-Appellant*,

v.

XAVIER BECERRA, in his official capacity, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, JESSICA S. MARCELLA, in her official capacity, and OFFICE OF POPULATION AFFAIRS,

*Defendants-Appellees*.

*On Appeal from the United States District Court for the Eastern District of Tennessee (No. 3:23-cv-384-TRD-jem)*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY
  CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5220                    Case Name: State of Tennessee v. Xavier Becerra

Name of counsel: Brianne J. Gorod

Pursuant to 6th Cir. R. 26.1, Constitutional Accountability Center
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____ May 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Brianne J. Gorod
Brianne J. Gorod
Constitutional Accountability Center

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................... ii

INTEREST OF *AMICUS CURIAE*....................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ................................................................................. 7

I.   Binding Precedent Demonstrates that Congress May Delegate Its Authority to Impose Conditions on Federal Funding Without Running Afoul of the Spending Clause or Separation of Powers Principles ............................................................................ 7

II.  At the Founding, Congress Delegated Broad Swaths of Its Taxing and Spending Power Without Constitutional Objection .................... 14

A. Setting Conditions for Social Welfare and Entitlement Benefits............................................................................ 15

B. Refinancing the National Debt....................................... 16

C. Establishing Tax Policies .............................................. 18

CONCLUSION .............................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ................................................................. 9

*Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985) ................................................................. 9

*Biden v. Missouri*,
  595 U.S. 87 (2022) ............................................................. 4, 12, 13

*Blum v. Bacon*,
  57 U.S. 132 (1982) ................................................................. 4, 12

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937) ................................................................. 10

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022) ................................................................. 8

*Currin v. Wallace*,
  306 U.S. 1 (1939) ................................................................. 9

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ................................................................. 4, 11

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................. 3

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020) ................................................................. 6, 14

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ................................................................. 10

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ................................................................. 3, 8

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) .................................................................. 9

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ................................................................ 3, 11

*Mistretta v. United States*,
488 U.S. 361 (1989) ................................................................ 3, 8

*Ohio v. Becerra*,
87 F.4th 759 (6th Cir. 2023) ................................................ 2, 13

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) .................................................................. 8

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ...................................................................... 8

*Rust v. Sullivan*,
500 U.S. 173 (1991) .................................................................. 2

*South Dakota v. Dole,*
482 U.S. 203 (1987) .................................................................. 9

## STATUTES, CONSTITUTIONAL PROVISIONS, & REGULATIONS

Act of Sept. 29, 1789, 1 Stat. 95 .......................................... 5, 16

Act of Apr. 30, 1790, 1 Stat. 119 .......................................... 5, 15

Act of Aug. 4, 1790, 1 Stat. 138 .......................................... 5, 16, 17

Act of Aug. 12, 1790, 1 Stat. 186 .......................................... 5, 17

Act of July 9, 1798, 1 Stat. 580 .......................................... 6, 18, 19

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

42 C.F.R. § 482.22(c)(5) ................................................................ 13

42 C.F.R. § 482.42 ........................................................................ 13

42 C.F.R. § 482.45 ........................................................................ 13

42 C.F.R. § 483.30(e) .................................................................... 13

42 C.F.R. § 59.5(a)(5)(i) ............................................................... 2, 14

42 C.F.R. § 59.5(a)(5)(ii) .............................................................. 2, 14

20 U.S.C. § 1682 ........................................................................... 10

42 U.S.C. § 254b(k)(3)(N) ............................................................ 10

42 U.S.C. § 300a-4(a) ................................................................... 2, 14

42 U.S.C. § 300a-6 ........................................................................ 2

42 U.S.C. § 1395x(e)(9) ................................................................ 12

42 U.S.C. § 1793(f)(2) .................................................................. 10

49 U.S.C. § 5309(c)(4) .................................................................. 10

U.S. Const. art. I, § 8, cl.1 ............................................................ 7

## OTHER AUTHORITIES

Christine Kexel Chabot, *The Lost History of Delegation at the Founding*,
    56 Ga. L. Rev. 81 (2021) ....................................................... 16, 17

*Journals of the Continental Congress*, 1774-1789 (Worthington Chauncey
    Ford ed., 1906) ...................................................................... 15

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Lloyd's Notes, 19 May 1790, Debates in the House of Representatives*, *in*
  XIII *Documentary History of the First Federal Congress of the United*
  *States of America* (Helen E. Veit et al. eds., 1994) ............................ 17

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*,
  121 Colum. L. Rev. 277 (2021) .......................................................... *passim*

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding:*
  *A Response to the Critics*,
  122 Colum. L. Rev. 2323 (2022) ........................................................ 4

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case*
  *Against Administrative Regulatory Power: New Evidence from the*
  *Federal Tax on Private Real Estate in the 1790s*,
  130 Yale L.J. 1288 (2021) .................................................................. 18, 19

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights and freedoms it guarantees. CAC has a strong interest in ensuring that Congress's authority to delegate its Article I powers, including its power to impose binding conditions on federal funding, is interpreted in a manner consistent with constitutional text, structure, and history, and therefore has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Despite its assertions to the contrary, Tennessee's Spending Clause claim is a full-throated facial attack on Title X's delegation of authority to the Department of Health and Human Services (HHS) to promulgate regulations imposing conditions on federal funding. After unilaterally ceasing compliance with an unambiguous grant condition HHS imposed through its lawfully delegated authority, the state asks this Court to order the reinstatement of its federal funding, asserting that it is not

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. All parties consent to its filing.

1

required to comply with *any* funding condition imposed by regulation.  This Court should reject that request.

For twenty-seven of the past twenty-nine years that Tennessee has received Title X funding, HHS regulations have required the state's family-planning facilities to provide abortion counseling and referral upon request.  Title X expressly delegates authority to HHS to prescribe such funding conditions.  *See* 42 U.S.C. § 300a-4(a) ("Grants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate.").  And while another provision of Title X states that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning," *id.* § 300a-6, both the Supreme Court and this Court have now squarely held that this text "does not speak directly to the issues of counseling [or] referral" for abortion, *Rust v. Sullivan*, 500 U.S. 173, 184 (1991); *see Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023).  Thus, just last year, this Court held that HHS's counseling and referral rule is a permissible construction of Title X.  *Id.*

Tennessee seeks to relitigate that issue by weaponizing the Spending Clause's clear-statement requirement.  According to the state, the fact that Congress itself did not explicitly address counseling or referral for abortion means that Tennessee necessarily lacked sufficient notice of the counseling and referral requirement.  Yet Tennessee admits that Congress expressly delegated authority to HHS to craft

regulations governing Title X funding, *see* 42 U.S.C. § 300a-4(a); Appellant's Br. 34, that HHS's counseling and referral requirement is unambiguous, *see* 42 C.F.R. § 59.5(a)(5)(i)-(ii); Appellant's Br. 9, and that the state was in fact aware of the relevant regulation and its imposition of a counseling and referral requirement when it applied for and accepted Title X funding two years ago, Appellant's Br. 9, 13-14. Indeed, Tennessee complied with that requirement for years until it unilaterally stopped doing so in the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

The state's argument is thus nothing less than a sweeping assertion that Congress lacks the power to delegate to agencies the authority to set conditions on federal funding. That is fundamentally wrong: Congress may delegate broad authority to establish funding conditions so long as those conditions are consistent with an "intelligible principle" set forth by statute. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019); *see Mistretta v. United States*, 488 U.S. 361, 373-74 (1989) (collecting cases illustrating the Court's deferential application of the "intelligible principle" standard). The Spending Clause, in turn, is satisfied so long as the relevant statute and regulations considered together provide sufficient notice of the conditions with which the grantee must comply.

Accordingly, the Supreme Court has repeatedly made clear that Congress may delegate the power to impose funding conditions to federal agencies, and that those

agencies' regulations can provide sufficient notice of funding conditions in accordance with the Spending Clause.  *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999); *Blum v. Bacon*, 457 U.S. 132, 138, 145-46 (1982); *Biden v. Missouri*, 595 U.S. 87, 89 (2022) (per curiam).  This Court should respect these precedents.  Doing otherwise would fundamentally transform the way the federal government operates grant programs, invalidating countless regulations that invoke lawfully delegated authority to impose conditions on grant recipients.

Not only is Tennessee's narrow conception of the authority to impose funding conditions contrary to binding precedent, it is also at odds with Founding-era examples of early Congresses delegating broad swaths of the taxing and spending power with almost no constitutional objections.  *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 349 (2021) (hereinafter "*Delegation I*") (calling the lack of such objections a "silence [that] is deafening").  On the rare occasions when government officials did voice delegation concerns, "their objections never carried the day and were derided as having been manufactured to bolster their opposition to Federalist legislation."  Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding: A Response to the Critics*, 122 Colum. L. Rev. 2323, 2328 (2022).

For instance, the First Congress delegated to the President the authority to issue regulations governing almost every aspect of the federal benefits program for members of the army, including setting conditions for eligibility for payment, fixing the amounts of awards (subject to a statutory limit), creating a method for distributing funds, and reconciling competing claims. *See* Act of Apr. 30, 1790, ch. 10, § 11, 1 Stat. 119, 121; *see also* Act of Sept. 29, 1789, ch. 24, 1 Stat. 95, 95 (similarly delegating to the President the authority to administer a pension program for wounded veterans of the Revolutionary War). Although *other* aspects of this benefits program were the subject of constitutional debate, at no point did anyone raise an objection to Congress's delegation of its authority to craft a federal benefits program through its exercise of the spending power. *See* Mortenson & Bagley, *Delegation I*, *supra*, at 343-44.

The same Congress also delegated nearly unfettered discretion to the executive to borrow money and make payments in furtherance of the restructuring of the staggering national debt following the Revolutionary War. The President was put in charge of the foreign debt, *see* Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 139, and a commission of high-level officials was given primary responsibility for refinancing the domestic debt, *see* Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186, 186. The commission's delegated task: to purchase debt "in such manner, and under

such regulations as shall appear to them best calculated to fulfill the intent of this act." *Id.*

And several years later when our nation faced the threat of another fiscal shortfall, Congress delegated expansive and coercive rulemaking authority to federal tax commissioners when exercising its power to levy a direct tax under the Taxing and Spending Clause. *See* Act of July 9, 1798, ch. 70, § 8, 1 Stat. 580, 585. Congress left this "major policy decision[]," Appellant's Br. 26, almost entirely to rulemakings by the commissioners, who used their authority to determine the tax liabilities of literally every property-holder in the nation. Yet no one objected that the commissioners were exercising unlawfully delegated taxing or spending authority.

These "practice[s] of the First Congress [are] strong evidence of the original meaning of the Constitution." *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659 (2020). They demonstrate that since our nation's Founding, Congress has delegated the power to make all sorts of determinations related to its spending power to executive officials without constitutional objection. And considered alongside Supreme Court precedent on the Spending Clause's requirements and the permissibility of legislative delegation, they put to lie Tennessee's claim that the power to prescribe funding conditions should be treated as nondelegable today.

# ARGUMENT

## I.  Binding Precedent Demonstrates that Congress May Delegate Its Authority to Impose Conditions on Federal Funding Without Running Afoul of the Spending Clause or Separation of Powers Principles.

The district court correctly recognized Tennessee's Spending Clause claim as "nothing less than a facial challenge to the Title X program, and indeed to *any* statute that conditions receiving a grant on compliance with agency regulations not fully described by the authorizing statute."  Mem. Op., R.30, PageID#830.  Though Tennessee purports to bring an as-applied challenge to HHS's revocation of its Title X funding, the State unabashedly seeks a ruling that the regulation providing the *basis* for that revocation is facially unconstitutional—that is, that Tennessee was never required to comply with the funding condition it violated because the condition "appears only in a *rule* the agency adopted."  Appellant's Br. 4-5 (emphasis in original).

Presented in this fashion, Tennessee asks this Court to grapple with the intersection of two areas of constitutional law: the requirements for Spending Clause legislation and the degree to which Congress may delegate its legislative powers, including the power "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1.  The state fundamentally misconstrues the former while, at the same time, obfuscating the highly deferential and permissive standard for the latter.

7

The Supreme Court has frequently observed that federal legislation premised on the spending power is "much in the nature of a contract," because, "in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218-19 (2022). Relying on that contract-law analogy, the Court has made clear that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. This rule ensures that funding recipients "voluntarily and knowingly accept[] the terms of the 'contract.'" *Id.*

At the same time, the Court has held "time and again" that Congress has broad power to delegate its vested authorities, so long as it "lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy*, 139 S. Ct. at 2123 (alterations and quotation marks omitted). In cases involving legislative delegations, the Court's "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. Thus, the Supreme Court has only twice in the history of our nation struck down a statute on the ground that it impermissibly delegated legislative authority to the executive branch. *See Panama Refining Co. v.*

*Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).  Put simply, "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which . . . enable it to perform its function." *Currin v. Wallace*, 306 U.S. 1, 15 (1939).

This principle applies just as much to the power to impose binding conditions on federal funding as it does to other Article I powers.  *Cf. Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 177-78 (2023) (refusing to abandon standard interpretive principles in the Spending Clause context).  The Supreme Court has expressly stated that when operating a grant program, "the Federal Government simply [cannot] prospectively resolve every possible ambiguity concerning particular applications of the requirements of" the underlying statute.  *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985).  Thus, when assessing a state's compliance with funding conditions, the federal government should look not just to "the statutory provisions," but also to the "regulations[] and other guidelines provided by the Department at [the] time" that funding was accepted.  *Id.* at 670.

This makes perfect sense, as any state official seeking to learn the conditions of accepting federal funding can easily find them in federal regulations—and certainly knows to do so.  *See, e.g.*, *South Dakota v. Dole*, 482 U.S. 203, 206 (1987) ("Congress . . . has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the

9

recipient with federal statutory *and administrative* directives'" (emphasis added) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980))); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 322 (1937) ("Appropriation and other acts of Congress are replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies.").

Indeed, countless federal grant programs, like Title X, expressly authorize agencies to impose funding conditions on grant recipients.  *See, e.g.*, 20 U.S.C. § 1682 (authorizing "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity" to "effectuate" Title IX's ban on sex discrimination "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute"); 42 U.S.C. § 254b(k)(3)(N) (requiring health center funding recipients to "ensure the appropriate use of Federal funds in compliance with applicable Federal statutes, regulations, and the terms and conditions of the Federal award"); *id.* § 1793(f)(2) (making federal funding of free school breakfasts available on the condition that the breakfast program "shall be carried out in accordance with applicable nutritional guidelines and regulations issued by the Secretary"); 49 U.S.C. § 5309(c)(4) (offering federal funding for new and expanded rail, bus rapid transit, and ferry systems, which "shall be subject to all terms, conditions, requirements, and provisions that the Secretary determines to be

10

necessary or appropriate"). Invalidation of the counseling and referral requirement on Spending Clause or separation-of-powers grounds would thus have far-reaching effects, calling into question the validity of myriad federal grant programs beyond Title X.

It would also defy Supreme Court precedent: the Court has clearly held that federal regulations can provide sufficient notice of grant conditions. For instance, in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Court held that a school that accepted federal Title IX funding was liable for retaliation when "[t]he regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years." *Id.* at 183. So too in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), in which the Court held that Title IX's regulatory scheme "has long provided funding recipients with notice that they may be liable for their failure to respond to nonagents' discriminatory acts." *Id.* at 630.

Tennessee attempts to minimize these precedents by claiming that the regulations in *Jackson* and *Davis* "merely bolstered the Court's conclusions about what the plain text [of the statute] required." Appellant's Br. 33. But that is just another way of saying that the Court considered both the statute and the regulations *together* to ascertain whether the grantee had clear notice of the relevant funding conditions. That is precisely the point, and that is all this Court needs to do here: look to Title X, including its express delegation of authority to HHS to impose

11

funding conditions, together with HHS's regulations, to determine whether Tennessee had fair notice of the counseling and referral requirement when it accepted Title X funding.

Other cases involving the Spending Clause reinforce the principle that Congress may delegate the authority to impose funding conditions, belying Tennessee's assertion that the content of a regulation cannot provide fair notice under the Spending Clause. For instance, in *Blum v. Bacon*, 457 U.S. 132 (1982), the Supreme Court struck down a New York law on the ground that it was preempted by a funding condition imposed by federal *regulations* alone—indeed, the Court deemed those regulations "dispositive of [the] case." *Id.* at 138; *see id.* at 145-46.

And just two years ago in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam), the Court upheld the lawfulness of a COVID-19 vaccination mandate imposed by an HHS regulation on the staff of facilities that received federal Medicare and Medicaid funding. *Id.* at 89. The statute that delegated the authority to HHS to impose that funding condition simply delegated to the Secretary the authority "to promulgate, as a condition of a facility's participation in the [Medicare and Medicaid] programs, such 'requirements as [he] finds necessary in the interest of health and safety of individuals who are furnished services in the institution.'" *Id.* at 90 (quoting 42 U.S.C. § 1395x(e)(9)). This "broad language," according to the Court, had historically given HHS significant leeway to impose funding conditions. *Id.* at 94.

Listing a slew of Medicare and Medicaid *regulations*, the Court explained that "healthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare." *Id.* (citing 42 C.F.R. § 482.22(c)(5); *id.* § 482.45; *id.* § 483.30(e); *id.* § 482.42).

The clear-notice requirement for federal funding conditions and the deferential standard for reviewing legislative delegations are therefore easily harmonized: Congress may delegate broad authority to establish funding conditions so long as those conditions are consistent with an intelligible principle set forth by statute. The Spending Clause, in turn, is satisfied so long as the relevant statute and regulations considered together provide sufficient notice of the conditions with which the grantee must comply.

There is no question that Title X and HHS's counseling and referral rule meet these standards. This Court held just last year that the counseling and referral rule is consistent with the principles set forth by Congress in Title X. *See Ohio*, 87 F.4th at 772. And Tennessee does not assert—nor could it—that it was unaware of the counseling and referral requirement when it accepted Title X funds. The counseling and referral rule, promulgated via notice and comment rulemaking, was in place in March 2022 when the state accepted Title X funding. The regulation itself is unambiguous, requiring that Title X grantees provide pregnant patients with

counseling as to all options, including "[p]renatal care and delivery; [i]nfant care, foster care, or adoption; and [p]regnancy termination," 42 C.F.R. § 59.5(a)(5)(i), and "referral upon request" with respect to "each of [these] options," *id.* § 59.5(a)(5)(ii). And Title X plainly states that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." 42 U.S.C. § 300a-4(a). This is not a case of implied delegation through statutory silence; rather, it is a case of *express* delegation in no uncertain terms.

This Court should thus reject Tennessee's assertion that it is exempt from compliance with a lawfully promulgated regulation on Spending Clause or separation-of-powers grounds. A ruling that only Congress can provide the clear notice required under the Spending Clause would defy Supreme Court precedent and fundamentally transform the way the government operates programs that provide funding for all aspects of American life.

## II. At the Founding, Congress Delegated Broad Swaths of Its Taxing and Spending Power Without Constitutional Objection.

Early legislation is "strong evidence of the original meaning of the Constitution." *Aurelius*, 140 S. Ct. at 1659. And in the Republic's first decade, Congress routinely delegated its taxing and spending authority to the executive branch on the most pressing issues facing the nation, conveying immense, often unguided discretion. These broad delegations of Congress's spending authority make clear how modest the delegation at issue here is, and they undermine

14

Tennessee's claim that the power to prescribe funding conditions should be treated as nondelegable today.

### A.    Setting Conditions for Social Welfare and Entitlement Benefits

At the Founding, the "most politically salient benefits programs targeted members of the army," yet Congress delegated to the President broad and largely unfettered power to set eligibility conditions and payment amounts for the program. Mortenson & Bagley, *Delegation I*, *supra*, at 342.  Other than placing limits on the size of awards, Congress left it up to the executive branch to determine which soldiers were deemed "wounded or disabled while in the line of his duty in public service," and to put them on "the list of the invalids of the United States, at such rate of pay, and under such regulations as shall be directed by the President of the United States, for the time being."  Act of Apr. 30, 1790, ch. 10, § 11, 1 Stat. 119, 121.  Congress offered no guidance on how to administer such payments; instead, it gave the executive the prerogative to issue "regulations as shall be directed by the President" that would set eligibility conditions, determine how funds would be paid out, and reconcile competing claims.

For those veterans who had been wounded in the Revolutionary War, the First Congress created a similar regime delegating broad authority to the executive branch, grounded in a pension scheme originally created by the Continental Congress.  *See* Mortenson & Bagley, *Delegation I*, *supra*, at 342-43 (citing 5

*Journals of the Continental Congress*, 1774-1789, at 702-04 (Worthington Chauncey Ford ed., 1906) (1776)). The statute specified only that pensions for "the invalids who were wounded and disabled during the late war, shall be continued and paid by the United States . . . under such regulations as the President of the United States may direct." Act of Sept. 29, 1789, ch. 24, 1 Stat. 95, 95. Thus, Congress simply authorized the executive to promulgate regulations governing the federal benefits program; it said nothing about the policies that should animate those regulations, priorities for the implementation of the pension scheme, or other guiding principles to cabin the President's discretion. And although *other* aspects of this pension regime garnered constitutional scrutiny, at no point did anyone raise an objection to Congress's delegation of its spending power. *See* Mortenson & Bagley, *Delegation I*, *supra*, at 343-44.

### B. Refinancing the National Debt

"Delegation was the First Congress's solution to what was arguably the greatest problem facing our fledgling Republic: a potentially insurmountable national debt." Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81, 81 (2021). To help solve this problem, Congress authorized the President to restructure the nation's foreign debt on essentially whatever terms he judged best. The President could borrow up to about $1.3 trillion (in today's dollars) in new loans, and could make other contracts regarding the debt

"as shall be found for the interest of the [United] States."  Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 139.  Aside from a time limit on the duration of new loans, *id.*, the statute left key decisions concerning terms, parties, and conditions entirely to the President's discretion.  *See* Chabot, *supra*, at 124; Mortenson & Bagley, *Delegation I*, *supra*, at 344-45.

The First Congress also delegated broad authority to refinance the domestic debt.  *See* Act of Aug. 12, 1790, ch. 47, 1 Stat. 186, 186-87.  It vested this authority in the President and the other members of a body known as the Sinking Fund Commission.  *Id.* § 2, 1 Stat. at 186.  Specifically, the President and the commission could purchase debt "in such manner, and under such regulations as shall appear to them best calculated to fulfill the intent of this act."  *Id.*  Thus, the entire responsibility for Congress's plan to reduce the public debt was vested in a commission given no meaningful guidance.

By delegating "decisions regarding borrowing and payment policies of the utmost importance to the national economy," Chabot, *supra*, at 81, Congress essentially instructed the executive branch to set national fiscal policy as it saw best.  The debt legislation did prompt a constitutional discussion in Congress, where one legislator questioned "whether [Congress was] authorized to delegate such important power."  *Id.* at 117 (quoting *Lloyd's Notes, 19 May 1790, Debates in the House of Representatives*, *in* XIII *Documentary History of the First Federal Congress of the*

*United States of America* 1349 (Helen E. Veit et al. eds., 1994)).  But a majority in Congress supported the delegation, given that the statute capped the amount to be borrowed, *id.* at 117-18, ensuring that it was delegating "*less than* its whole borrowing power," *id.* at 119.

### C.    Establishing Tax Policies

Facing another threatened fiscal shortfall in 1798, Congress exercised its power to levy a direct tax on property.  *See* Act of July 9, 1798, ch. 70, § 8, 1 Stat. 580, 585.  Yet again, Congress delegated broad and coercive rulemaking authority over a "major policy decision[]," Appellant's Br. 26, related to federal finances.

The direct tax "fell upon literally every farmer, homeowner, and slaveholder" in the nation, subjecting them "to federal rulemakings that could determine their tax liabilities."  Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1302 (2021).  To ensure that direct taxes were apportioned among the states, Congress established an "administrative army" to estimate the value of virtually "all private real estate in every state."  *Id.* at 1332-33; *see* Act of July 9, 1798, § 8, 1 Stat. at 585.  To further ensure that valuations were consistent, Congress empowered commissioners "to revise, adjust and vary" these valuations by altering their tax burdens "as shall appear to be just and equitable."  *Id.* § 22, 1 Stat. at 589.

The statute did not define "just and equitable," and the subjective nature of real estate valuation meant that just about any approach could merit that label. Parrillo, *supra*, at 1304. The only requirement was that the "relative valuations" of properties within an assessment district could not be altered. *See* Act of July 9, 1798, § 22, 1 Stat. at 589.

The valuation boards used their authorities in a "dramatic and sweeping" fashion. Parrillo, *supra*, at 1306. Although their determinations decided the amounts that Americans would owe, with no opportunity for review, no one objected on delegation grounds. *Id.* at 1312.

* * *

Tennessee is correct that the spending power is "one of the most important authorities allocated to Congress." Appellant's Br. 21 (quotation marks omitted). To that end, the Supreme Court has adopted a rule requiring clear notice of spending conditions to grantees to avoid the threat of unfair surprise. But there is simply nothing in precedent or constitutional text, structure, or history that prevents Congress from unambiguously delegating its power to impose funding conditions to executive officials—so long as those officials, in turn, comply with the clear-statement requirement, and their regulations are consistent with a statutory "intelligible principle." Those conditions are plainly met here, and this Court should rule accordingly.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: May 3, 2024

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 4,510 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief *amicus curiae* complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 3rd day of May, 2024.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on May 3, 2024.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 3rd day of May, 2024.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*