No. 24-5220

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

STATE OF TENNESSEE,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
XAVIER BECERRA, in his official capacity, OFFICE OF POPULATION
AFFAIRS, and JESSICA S. MARCELLA, in her official capacity,

*Defendants-Appellees*.

_____

On Appeal from the Judgment of the United States District Court for the
Eastern District of Tennessee (No. 3:23-cv-384-TRD-jem)

_____

## REPLY BRIEF OF APPELLANT

_____

JONATHAN SKRMETTI
  *Attorney General*
J. MATTHEW RICE
  *Solicitor General*
WHITNEY HERMANDORFER
  *Director of Strategic Litigation*
HARRISON GRAY KILGORE
  *Strategic Litigation Counsel*
PHILIP HAMMERSLEY
  *Assistant Solicitor General*
TRENTON MERIWETHER
  *Assistant Attorney General*
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................2

   I.  Tennessee Is Likely to Succeed on the Merits. ...............................2

      A. The Rescindment Violates the Spending Clause. ....................2

         1. HHS's Action Triggers Constitutional Scrutiny. .................2

         2. HHS's Action Fails Constitutional Scrutiny. ......................3

      B. The Rescindment Violates the APA. .....................................10

         1. *Ohio* Does Not Foreclose Tennessee's APA Challenge. ...................10

         2. The Rescindment Exceeds HHS's Authority. ....................13

         3. The Rescindment Is Arbitrary and Capricious. ..................17

         4. The Rescindment Is Procedurally Invalid. .........................23

   II.  The Remaining Equitable Factors Favor Preliminary Relief. ....................24

      A. Tennessee Has Shown Irreparable Harm. ..............................24

      B. An Injunction Will Not Harm HHS or the Public Interest. ...................27

CONCLUSION ................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
   46 F.4th 489 (6th Cir. 2022) ................................................................27

*Advocate Health Care Network v. Stapleton*,
   581 U.S. 468 (2017)...........................................................................14

*Appalachian Power Co. v. EPA*,
   135 F.3d 791 (D.C. Cir. 1998)...........................................................19

*Auer v. Robbins*,
   519 U.S. 452 (1997)...........................................................................18

*Bennett v. Ky. Dep't of Educ.*,
   470 U.S. 656 (1985)...........................................................................5

*Biden v. Missouri*,
   595 U.S. 87 (2022) (per curiam)........................................................5

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ...........................................................4

*Corner Post, Inc. v. Bd. of Governors of the Fed. Res. Sys.*,
   No. 22-1008 (U.S. Dec. 13, 2023)......................................................12

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)...........................................................................5

*Dep't of Educ. v. Brown*,
   600 U.S. 551 (2023)...........................................................................18

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020).......................................................................23

*District of Columbia v. Dep't of Labor*,
   819 F.3d 444 (D.C. Cir. 2016)...........................................................15

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022).................................................................*passim*

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005)..............................................................5

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ...............................................25

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) .................................................2

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022) ........................................1, 4, 5

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)............................................................17

*Meister v. U.S. Dep't of Agric.*,
   623 F.3d 363 (6th Cir. 2010) .............................................15

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
   59 F.4th 1124 (11th Cir. 2023) ..............................................4

*Moyle v. United States*,
   No. 23-726 (U.S. Mar. 21, 2024)........................................25

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018)............................................................25

*NRDC v. EPA*,
   755 F.3d 1010 (D.C. Cir. 2014)..........................................19

*Ohio v. Becerra*,
   87 F.4th 759 (6th Cir. 2023) .................................... *passim*

*Oklahoma v. Castro-Huerta*,
   597 U.S. 629 (2022)............................................................16

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935)..............................................................9

iii

*Shay v. Fed. Election Comm'n*,
528 F.3d 914 (D.C. Cir. 2008) ............................................................. 15

*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024) ................................................................ 19

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021) ................................................................ 23

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*,
5 F.4th 666 (6th Cir. 2021) ......................................................... 8, 9, 24

*United States v. Texas*,
144 S. Ct. 797 (2024) .......................................................................... 26

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ................................................................................ 27

## Statutes and Regulations

42 U.S.C.

§ 300a-1(a) ...................................................................................... 8
§ 300a-2(2) ...................................................................................... 8
§ 300a-4 ............................................................................. 6, 7, 8, 14
§ 300a-6 ................................................................................. *passim*

Tenn. Code Ann.

§ 39-15-213 ................................................................................... 26
§ 63-6-1104(a) ............................................................................... 26

42 C.F.R.

§ 59.5(b)(6) ................................................................................... 16
§ 59.5(b)(8) ................................................................................... 16
§ 59.8 ............................................................................................ 3

## Other Authorities

Exec. Order No. 14,076 (July 8, 2022) ........................................ 19, 25

iv

HHS, Remarks by Secretary Xavier Becerra at the Press Conference
in Response to President Biden's Directive following Overturning
of Roe v. Wade (June 28, 2022) ..........................................................................20

The White House, Fact Sheet:  Biden-Harris Administration Contin-
ues the Fight for Reproductive Freedom (Mar. 7, 2024)....................................20

## INTRODUCTION

HHS's Rescindment violates the rule that "Congress *itself*" must clearly spell out Spending-Clause conditions in the statute. *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022). HHS seeks to downplay *Yellen*, then says Title X's general rule-making delegation satisfies the Spending-Clause clear-statement rule regardless. But HHS's claim of unfettered power to set abortion conditions conflicts with its decades-long reliance on Section 1008's ambiguity, renders *Ohio v. Becerra*'s referral holding pointless, 87 F.4th 759 (6th Cir. 2023), generates severe nondelegation problems, and would gut Spending-Clause guardrails in any case involving a rule-making delegation.

On the APA issues, HHS's principal response is to say that *Ohio* controls. But that does not work either, including because *Ohio* itself said future HHS actions would merit fresh APA scrutiny in light of *Dobbs*. Rather than confront that aspect of *Ohio*, HHS does not mention it, nor explain how the Rescindment's failure to address critical post-*Dobbs* issues is solved by the pre-*Dobbs* 2021 Rule.

Tennessee has shown a likelihood of success on the merits. Tennessee's impending harm is clearly irreparable, and the equities favor maintaining its longstanding and successful Title X program. This Court should reverse.

## ARGUMENT

## I.    Tennessee Is Likely to Succeed on the Merits.

### A.    The Rescindment Violates the Spending Clause.

The Rescindment exceeds HHS's power because it rests on a novel HHS-created condition Title X itself lacks.   Tenn. Br. 19-38.

#### 1.    HHS's Action Triggers Constitutional Scrutiny.

HHS (at 34-36) argues that its implementation of Title X's Spending-Clause program raises no Spending-Clause concerns.  Each argument fails.

HHS (at 34) first claims that Title X's status as a "voluntary" program shields its rule-made condition from Spending-Clause review.  But that is every Spending-Clause program.  HHS's take-it-or-leave-it reasoning would thus license agencies to indiscriminately adopt unlawful funding conditions.  *But cf. Kentucky v. Biden*, 57 F.4th 545, 555-56 (6th Cir. 2023).  If HHS instead means to suggest that the Spending Clause drops out once an agency issues a rule making a new condition clear, that misses Tennessee's and this Court's precedents' point that only "Congress *itself*" can set important funding conditions.  Tenn. Br. 4 (quoting *Yellen*, 54 F.4th at 354).

HHS (at 34) next says Spending-Clause review does not apply because Tennessee seeks to have HHS "award it a discretionary grant without having to comply with program requirements."  But the only "program requirement[]" HHS applied, and that Tennessee challenges, is the unlawful condition that the State counsel and

2

refer for abortions that are illegal.  HHS's briefing below and the administrative record confirm that this condition drove the Rescindment.  *E.g.*, PI Opp'n, R.26, PageID#367, 388 (HHS rescinded grant due to Tennessee's "noncompliance with Title X regulatory requirements set out most recently in the 2021 Rule").

HHS is wrong when it argues (at 34-35) that Tennessee's challenge does not implicate "previously awarded grant funds."  Tennessee accepted its grant in March 2022.  Mar. 2022 Notice of Award, R.1-7, PageID#170.  That grant award stated on its face that Tennessee's funded project ran through 2027.  *Id.*  To be sure, HHS structured the award so that it is dispensed as a series of annual non-competitive grants, rather than fronting Tennessee all five years' worth of funding.  But the point of a *non-competitive* award is to assure grant recipients that "HHS intends to support the project without requiring the project to recompete for funds."  42 C.F.R. § 59.8. This is, therefore, a scenario where Tennessee is seeking to restore a lost funding award—as the March 2022 "Notice of *Award*" confirms.  R.1-7, PageID#170.  Tennessee's challenge thus falls squarely within the scenarios HHS describes as implicating Spending-Clause scrutiny.

### 2.    HHS's Action Fails Constitutional Scrutiny.

a.    On the merits, the Rescindment violates the Spending Clause because agencies like HHS fundamentally lack the power to impose new funding conditions absent from the governing statute.  Tenn. Br. 19-28.

3

HHS (at 37) rejects the notion that the "Spending Clause requires that Congress itself articulate" funding conditions. But the "Congress *itself*" requirement flows from this Court's instruction in *Yellen*. 54 F.4th at 354. HHS has no answer, other than to say (at 38) *Yellen* is different because it involved a statutory condition that was "not ascertainable." But the statutory conditions in Section 1008 of Title X are likewise "not ascertainable" from the statute's text—hence HHS's flip-flopping position about that provision's import. Tenn. Br. 22-23; *infra* pp. 13-15, 22-23.

That aside, HHS's argument also omits the most pertinent part of *Yellen* for present purposes. After concluding that the statutory condition was unclear, the *Yellen* Court went on to address whether a Department of Treasury regulation could solve the Spending Clause problem by clarifying the funding condition. *Yellen*'s "primary concern" on that score was thus the same as Tennessee's: Whether "a state[] must accept as binding an agency regulation establishing an otherwise-uncertain spending-law condition." 54 F.4th at 353. And the *Yellen* Court rejected that the agency could impose such a condition because "Congress *itself* must have spoken with a 'clear voice.'" *Id.* at 354; *accord West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023) (cited at Opp'n 38). Other circuits have held similarly in decisions HHS generally ignores. Tenn. Br. 24-25; *accord City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231, 1234 (9th Cir. 2018).

HHS's remaining efforts to elide *Yellen* also fail. HHS jettisons *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), and *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), which the district court erred in citing for reasons Tennessee explained. *See* Tenn. Br. 32-33; *but see* CAC Br. 4, 11-12 (relying on same). HHS (at 34) instead subs in a new suggestion that *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 670 (1985), already held agencies can add new funding conditions "through 'regulations.'" *Accord* CAC Br. 9. But as Tennessee noted, *Bennett* in fact expressed "reluctan[ce] to conclude" that States may lose their funding based on later agency interpretations of the relevant statute. Tenn. Br 33 (quoting 470 U.S. at 670). *Bennett* ultimately did not need to address that issue because, unlike here, "[t]he requisite clarity … [was] provided *by Title I*." 470 U.S. at 666 (emphasis added). HHS offers no response.

HHS (at 37-38) renews its reliance on the Supreme Court's stay-phase decision in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam), as resolving the Spending-Clause question here. *See* PI Opp'n, R.26, PageID#385-86. But not even the district court accepted HHS's (and its amicus's, *see* CAC Br. 9-11) view of *Missouri*, and for good reason. While the parties in *Missouri* discussed the Spending Clause, the Supreme Court's opinions—which turned on statutory interpretation issues only—nowhere mention it. *See generally Missouri*, 595 U.S. at 87-108. Needless to say, a precedent that holds nothing about the Spending Clause is not a binding

Spending-Clause holding.  That HHS seeks to stretch *Missouri* to suit its distinct purposes here speaks volumes about its Spending-Clause problems.

In sum, the Spending Clause and separation-of-powers do not permit HHS to impose new abortion conditions absent from Title X.  At the very least, HHS cannot establish the controversial illegal-abortion condition it proposes here, because that condition runs afoul of major-questions principles, Tenn. Br. 26-27, intrudes on state sovereignty, Tenn. Br. 28-32, and flouts HHS's prior statements that the relevant statutory authority is ambiguous, *see infra* p. 7; States' Br. 14-20.  Whatever agencies' power to adopt conditions under other statutory regimes, these factors take HHS's novel condition here far outside any Spending-Clause norms.

b.      HHS (at 36-37) continues to claim that Title X grants it unchecked authority to exercise Congress's Spending-Clause power through rulemaking.  HHS's argument rests (at 36) on Section 1006 of Title X, which generally specifies that "'grants and contracts' are subject to HHS's 'regulations' and 'conditions.'"  (Quoting 42 U.S.C. § 300a-4(a)-(b)).  This means, HHS continues (at 36), that States like Tennessee "are aware that once they accept Title X funding" they "must comply with the regulatory requirements set by HHS."  In HHS's view, Section 1006's general delegation is itself a clear-enough condition for Spending-Clause purposes—the statutory "condition" being that HHS gets to unilaterally adopt some unspecified set of additional future conditions.  Section 1006 thus allows HHS to set whatever

6

subsequent conditions it wants, HHS concludes, including abortion counseling-and-referral requirements.

HHS's Section 1006 position contravenes the agency's longstanding reliance on Section 1008 and this Court's analysis in *Ohio*. Even if Section 1006 empowers HHS to promulgate rules that contain grant conditions, other Title X provisions necessarily limit and inform the scope of HHS's rulemaking authority. For decades, HHS has understood Section 1008 to be one such limiter. Tenn. Br. 8-9. Thus, in *Ohio*, the debate centered on whether the 2021 Rule's abortion-referral requirement "fall[s] inside or outside of § 1008's prohibition." 87 F.4th at 772. HHS's brief in *Ohio* mentions Section 1008 twenty-four times, including in a subheading entitled "The Rule's Referral Requirement Is Consistent with Section 1008." Br. for HHS 33, *Ohio*, 87 F.4th 759.

HHS (at 36) now says Section 1008 is entirely "irrelevant" to its power to set abortion counseling-and-referral conditions. But *Ohio* thought otherwise, and upheld the 2021 Rule on the basis that Section 1008 is ambiguous. 87 F.4th at 771-72. Under the Spending Clause clear-statement rule, this ambiguity holding means HHS has no clear statutory condition it can cite as a basis for stripping Tennessee's Title X funding. Tenn. Br. 22-23. Nowhere in *Ohio* did HHS suggest, as it does now, that the Court could have sustained the 2021 Rule under Section 1006's rulemaking delegation alone.

7

Regardless, HHS's novel Section 1006 argument fails on its own terms. A statute permitting an agency to make conditions through rulemaking by definition does not provide clear notice of what those future conditions might be. The relevant conditions that control grantees' rights still derive from rules in the first instance, contrary to Spending-Clause requirements. *Supra* pp. 4-5. If anything, HHS's reliance on a general rulemaking delegation—which HHS reads as unlimited—would generate even *worse* lack-of-notice problems than unclear statutes with a range of reasonable readings. Tenn. Br. 27-28. HHS offers no response.

Finally, HHS's Section 1006 reading would violate Spending-Clause and non-delegation-doctrine limits by passing wholesale condition-setting authority to HHS absent *any* statutory restraints. Tenn. Br. 35-36. Here too, HHS is silent on the constitutional problems its blank-check view of Title X creates. HHS's position is far broader than taking an "ascertainable condition" from Congress and "elaborat[ing] its content" or "fill[ing] in gaps." Opp'n 38 (citations omitted). HHS is not, for instance, defining the meaning of "nonprofit private entities," 42 U.S.C. § 300a-1(a), or describing what type of "behavioral" research Title X funds might cover, *id.* § 300a-2(2). HHS instead claims carte blanche power to establish controversial funding conditions untethered to *any* statutory language or limitation.

Indeed, HHS nowhere identifies *any* limit on its power under Section 1006, which says only that grants "shall be made in accordance with such regulations as

8

the Secretary may promulgate." *Id.* § 300a-4. As in *Tiger Lily, LLC v. U.S. Department of Housing and Urban Development*, 5 F.4th 666, 672 (6th Cir. 2021), such unchecked agency power raises "nondelegation problem[s]" by vesting HHS with authority to adopt any Title X regulation "it can conceive of." *Cf.* CAC Br. 14 (asserting Congress can permissibly delegate "broad swaths" of its spending power). If anything, HHS's reading is *broader* than the one rejected in *Tiger Lily*, since the provision there at least required HHS to determine any regulations were "necessary to prevent the introduction, transmission, or spread of communicable diseases." *Id.* at 671-72. Here, HHS's claimed condition-setting power lacks *any* limit. Put simply, in attempting to evade the implications of tying its regulatory authority to Section 1008 (no clear statutory condition), HHS runs headlong into the nondelegation doctrine's requirement that Congress delegate authority subject to an "intelligible principle" setting the "circumstances and conditions" in which agencies may act. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

If such general rulemaking authority alone provided "clear notice," then the Spending Clause and this Court's cases interpreting it would be rendered a nullity. HHS—or any other agency with a similar delegation—would have free rein to fashion whatever program conditions it wanted from whole cloth. There is no telling what other extra-statutory conditions—covering abortion, gender-identity issues, climate change, and so on—HHS may claim power to graft onto Title X through

rulemaking, rather than with Congressional approval.  This Court should reject reducing the Spending Clause and its related precedents to mere formalities Congress and agencies can circumvent at will.

      c.     If nothing else, HHS cannot apply its condition because the 2021 Rule did not clearly disclose the requirement that Tennessee, as a condition of Title X funding, would need to counsel and refer women to obtain elective abortions that violate state law.  Tenn. Br. 29-30.  HHS's insistence (at 37) that the 2021 Rule provided clear notice of this illegal-abortion condition overlooks the limited topics addressed in the 2021 rulemaking, *Ohio*'s discussion of important post-*Dobbs* developments, and the distinct ways in which the illegal-abortion condition conflicts with Title X and the regulations.  *Infra* pp. 13-15, 19-21.

      **B.    The Rescindment Violates the APA.**

      HHS (at 19) does not dispute that the Rescindment itself is a "final agency action" subject to independent APA review.  Because HHS's Rescindment violates Title X, implementing regulations, and the requirement of rationally reasoned agency decision-making, it is unlawful.  Tenn. Br. 38-53.

      **1.    *Ohio* Does Not Foreclose Tennessee's APA Challenge.**

      The 2021 Rule and the challenged Rescindment are two separate HHS actions that raise different legal questions.  Tenn. Br. 49.  As relevant here, *Ohio*'s review of the 2021 Rule determined two things.  *Ohio* first assessed whether, under *Rust*, it

"violates Section 1008" for HHS to adopt an abortion-referral requirement as a general matter. Opp'n 18 (citing 87 F.4th at 771-72). *Ohio* next assessed whether, under the APA, HHS had adequately addressed and reasoned through the body of notice-and-comment feedback it received in promulgating the 2021 Rule. Opp'n 19 (citing 87 F.4th at 772-75).

Thus, while *Ohio* "upheld" the *2021 Rule* against the challenge before it, neither of *Ohio*'s holdings implicates—let alone "forecloses," Opp'n 19—whether the *2023 Rescindment* is unlawful for different statutory, constitutional, and APA reasons. Courts, recall, are "limited" to judging an agency's action based on the facts and reasoning relevant at the time. *Ohio*, 87 F.4th at 774 n.7 (quoting *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020)). So *Ohio* noted that its holding was a limited determination about HHS's 2021 rulemaking based on the issues then before it. *Id.* *Ohio* itself confirms this, recognizing that future applications of the 2021 Rule would receive fresh APA scrutiny informed by the "impact of *Dobbs*." *Id.* Yet HHS disregards this discussion.

*Ohio*'s reserving judgment on future HHS enforcement actions tracks well-worn APA principles. There is a distinction between challenging a rule's promulgation in light of the rulemaking record, on one hand, and challenging a rule's application to a particular party or circumstance, on the other. Tenn. Br. 39-40 (collecting cases). As the Department of Justice recently told the Supreme Court:

"Where a court is reviewing an agency enforcement order that applies a regulation, the only 'final agency action' properly before the court is the enforcement order itself." Br. of Bd. Governors of the Fed. Res. Sys. 41 n.11, *Corner Post, Inc. v. Bd. of Governors of the Fed. Res. Sys.*, No. 22-1008 (U.S. Dec. 13, 2023).

A few examples illustrate the point. The 2021 Rule's facial validity plainly would not license HHS's applying the condition to strip funding of a state Title X program even though no other provider could lawfully fill the services gap. Or HHS's applying the condition to strip a single State's funds based on political targeting. Or HHS's applying the condition following federal lawmakers' choice to prohibit interstate telehealth abortion appointments. Instead, each of those HHS actions would trigger fresh review under statutory, constitutional, and APA principles. The same goes now that HHS has issued a separate decision "applying" the 2021 Rule to Tennessee here. Opp'n 19. Tennessee seeks not to relitigate *Ohio*, Opp'n 12, 19, 20, but to subject HHS's new action to the scrutiny *Ohio* left open.

HHS's get-out-of-APA-free reading of *Ohio* would greenlight agencies to inexplicably plow forward with applying old rules overtaken by factual and legal events. HHS (at 20) claims the Rescindment reflects only the "same requirements" Tennessee accepted in the 2021 Rule. But as Tennessee and its amici explain, HHS has *never* before applied Title X to override States' lawful abortion regulations—like limits on abortion-related communications with minors or late-term abortions.

*See* Tenn. Br. 51-52; EPPC Br. 3-5, 7-10. HHS's novel step, as *Ohio* predicted, "undoubtedly" implicates a swath of "important" new statutory, regulatory, compliance, and public-health issues HHS needed to address per the APA, but nowhere has. 87 F.4th at 774 n.7; *see* Tenn Br. 39-52. HHS cannot cure that flaw by simply pointing to a pre-*Dobbs* rule that likewise "did not justify" applying an abortion-referral requirement to States where elective abortions are illegal. Tenn. Br. 44.

### 2. The Rescindment Exceeds HHS's Authority.

HHS does not dispute that the Rescindment is the first time HHS has used its asserted Title X authority to strip a State's funding for failure to counsel and refer for illegal elective abortions. The Rescindment thus represents a new and unjustified assertion of HHS's purported authority that *Ohio* did not consider. Tenn. Br. 39-41. And as Tennessee explained, neither Title X nor the implementing regulations permit HHS's novel step here. Tenn. Br. 39-47.

Title X. Title X forecloses the interpretation Tennessee challenges—*i.e.*, that Title X gives HHS "statutory authority" to condition States' funding on their counseling or referring for abortions that state law makes illegal. Tenn. Br. 40.

HHS (at 18-19) says that *Ohio* controls the Title X analysis here. Yet HHS's Spending-Clause response (at 36) insists that Section 1008—on which *Ohio* rested—is irrelevant to its abortion counseling-and-referral power. It is thus HHS, not Tennessee, that "'wants to have its case and eat it too'" by benefiting from *Ohio*'s

13

Section 1008 holding on the statutory question, then disavowing Section 1008's relevancy for Spending-Clause purposes. Opp'n 21 (quoting Op., R.30, PageID#826). Both cannot be right.

Section 1006—to an even greater degree than Section 1008—lacks the type of clear text needed to allow HHS to resolve this major question or to intrude into States' lawful domain in regulating abortions. Tenn. Br. 33-36 (citing *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *Yellen*, 54 F.4th at 354). Reading it to confer such power further raises grave nondelegation questions. *Supra* pp. 8-9. Nor is it plausible that Congress, through Section 1006, empowered HHS to override States' otherwise lawful restrictions on elective abortions given that elective abortion was overwhelmingly illegal when Congress passed Title X. Tenn. Br. 43.

HHS's reading moreover raises new legal problems absent from *Ohio*. Chief among them: Title X requires grantees to offer only "*acceptable* … family planning methods." Tenn. Br. 42 (quoting 42 U.S.C. § 300(a) (emphasis added)). The ordinary meaning of "acceptable" plainly excludes referring or counseling patients for procedures that state law makes illegal. *Id.* (collecting definitions). HHS (at 22) responds by repeating its ipse dixit that "acceptable and effective" in fact asks only whether a method or service is "medically suitable." But "[h]ad Congress wanted to refer only to medical suitability, it had "an easy way to do so"—use the term "medically suitable," not "acceptable," whose "most natural reading" is different.

14

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).  HHS's contrary reading would deem "acceptable" any number of illegal services (*e.g.*, marijuana prescription for pain, third-trimester abortions), so long as a doctor believes they are medically sound.  HHS offers no textual basis for this implausible position.

Further, because HHS unveiled its illegal-abortion interpretation only in the Rescindment, and in ways that violated other APA procedures, that interpretation warrants no deference.  Tenn. Br. 41.  But even accepting that *Ohio* requires assessing HHS's interpretation using the *Chevron* framework, HHS's illegal-abortion-conditions reading fails.  As Tennessee explained, agency positions can be so unreasonable as to fall outside the zone of permissible interpretive authority under *Chevron*.  *See* Tenn. Br. 39, 41-42.  Examples include when agencies "stretch" their authority beyond what the statute's "text, structure, and purpose" allow, *District of Columbia v. Dep't of Lab.*, 819 F.3d 444, 449 (D.C. Cir. 2016), or "frustrate the policy that Congress sought to implement," *Shays v. Fed. Election Comm'n*, 528 F.3d 914, 925 (D.C. Cir. 2008) (citation omitted).  That applies here, where HHS's interpretation is novel, raises significant constitutional questions, and conflicts with Congress's general stance of declining to sponsor activities that promote elective abortion.  Tenn. Br. 28-32, 41-42.  HHS offers no original response, just its off-base omnibus objection that *Ohio* controls.

HHS Regulations.  The Rescindment violates the "elemental principle of administrative law that agencies are bound to follow their own regulations." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010); *see* Tenn. Br. 44-47.  Far from "straightforward," Opp'n 22, HHS's and the district court's readings preference atextual assertions of purpose over the provisions' plain meaning.

Consider first HHS's take on 42 C.F.R. § 59.5(b)(6), which requires that Title X services "be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law."  Citing a notice-and-comment exchange for support, HHS (at 23) claims this provision dictates only *who* may direct Title X programs, not *what* services are permitted.  But it is the promulgated text—not HHS's post-hoc assertions of its subjective intent—that controls Title X recipients' obligations.  *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022).  And as written, the "allowable" qualifier plainly modifies the types of services offered.  *See* Tenn. Br. 44-45.  HHS (at 23-24) counters that Tennessee does not outlaw counseling and referring for abortions.  But elective abortions are prohibited, and the Health Department's post-*Dobbs* Title X policy reasonably reflects the view that referring for illegal procedures is not an "allowable practice under Tennessee law."  Feb. 13 Ltr., R.1-3, PageID#98; *accord* Mar. 13 Ltr., R.1-10, PageID#192 (Tennessee's policy is "in compliance with Title X given the standard of care in Tennessee").

16

HHS (at 24) next insists that its "when feasible" provision, 42 C.F.R. § 59.5(b)(8), only limits a provider's duty to make a proximate referral, not whether a provider can appropriately refer the service to anyone. But that again ignores the plain text, which shows that the "when feasible" language modifies providers' general obligation to use referrals. Tenn. Br. 45-46. HHS (at 25) claims Tennessee's reading would lead to "absurd results" or States being able to "veto" Title X requirements. But it is not absurd to read HHS's regulations to reflect States' "historic primacy [over] matters of health and safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). By contrast, HHS's reading would require, for the first time, that States and other Title X providers refer women for illicit procedures long distances across the country. That result is far less workable than Tennessee's interpretation, which reads "feasible" in line with its ordinary meaning to exclude referring women for procedures that are unlawful. Tenn. Br. 45-46.

### 3.  The Rescindment Is Arbitrary and Capricious.

HHS's Rescindment fails baseline APA requirements for rational and adequately explained agency decision-making. Tenn. Br. 47-52.

a.  HHS's attempts to short-circuit APA scrutiny fail. HHS's reliance (at 25) on *Ohio*'s approval of the 2021 Rule is wrong for reasons already discussed. *Supra* pp. 10-13. Not to mention, *Ohio* itself rejected HHS's view by noting that state laws prohibiting abortion post-*Dobbs* would be "undoubtedly an 'important

aspect'" of HHS's regulatory problem.  87 F.4th at 774 n.7.  That would make little

sense if the 2021 Rule forever insulated HHS's going-forward abortion actions.

HHS (at 26) echoes the district court's claim that Tennessee is seeking to have

HHS "revisit" the 2021 Rule itself in light of *Dobbs*.  Citing *Auer v. Robbins*, 519

U.S. 452 (1997), HHS claims Tennessee needed to file a petition for a rulemaking

to pursue this course.  But *Auer* did not involve an APA challenge to agency en-

forcement against a regulated party like Tennessee.  Instead, the lawsuit in *Auer* was

a private dispute between aggrieved employees and their public-sector employer.  *Id.*

at 455.  The employees claimed they were entitled to overtime pay under the Fair

Labor Standards Act; the employer said they fell within an exception to the Act, as

interpreted by an existing Department of Labor rule.  *Id.*  In response, the employees

argued that the regulation was procedurally invalid because the Department of Labor

arbitrarily failed to "revisit" it in the wake of case law developments.  *Id.* at 458-59;

*see also Dep't of Educ. v. Brown*, 600 U.S. 551, 565 (2023) (*Auer* involved party's

attempt to "induce an agency to take a desired action").  The Supreme Court rejected

the employees' collateral attack on the regulation's validity, noting that the proper

course was for the employees to file an "application for relief addressed to the

agency itself" in the form of a petition for rulemaking.  *Auer*, 519 U.S. at 459.

The difference here, of course, is that *the agency itself has issued a decision*

directly against Tennessee via a final agency action subject to independent APA

18

review.  And that makes all the difference for APA purposes.  Tennessee is not mounting a bare challenge to the continued validity of the 2021 Rule absent any agency action; it is challenging the distinct action HHS has taken against it.

HHS (at 26) in passing asserts that Tennessee did not "raise[] any of its arguments to the agency."  But as *Ohio* noted, States *did* try to flag the illegal-abortion issue to the agency in the 2021 rulemaking.  *See* 87 F.4th at 773-74 & nn.6-7.  HHS's 2021 Rule did not meaningfully respond.  In any event, HHS in issuing the Rescindment had an "affirmative burden" under the APA to ensure its action was reasonable and reasonably explained, *Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998), including by "examin[ing] key assumptions" justifying its decision to rescind Tennessee's funding, *NRDC v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014). It was not lost on HHS that *Dobbs* had fundamentally shifted the legal and factual landscape around abortion access—indeed, that was the impetus for aggressively reinterpreting Title X to "advance access" to abortion in the face of "the continued advancement of restrictive abortion laws in States."  Exec. Order No. 14,076, 87 Fed. Reg. 42,053, 42,053 (July 8, 2022) (cited at Guidance, R.28-2, PageID#475); *see* EPPC Br. 8 (similar).  HHS cannot now credibly imply it lacked information about this "sea change."  *Texas v. Becerra*, 89 F.4th 529, 541 (5th Cir. 2024).

b.    HHS's response to the substance of Tennessee's arbitrary-and-capricious arguments are no more convincing.  HHS's claim (at 26) that the 2021 Rule is

19

not aimed at "facilitat[ing] abortions" defies the many administration statements casting "Title X" as one way the "Biden-Harris Administration Continues the Fight for Reproductive Freedom" following the Supreme Court's "despicable" decision in *Dobbs*.[1]  Nor does HHS's distinction between counseling and referring for abortions versus providing abortions stand on its own terms:  Both further the promotion of elective abortion as a "family planning" option, contrary to Tennessee's state policy.

HHS (at 27) then seeks to rebut the flaws with the illegal-abortion condition's cost implications, administrative-tracking hassle, and out-of-state referral impracticalities by asserting that these issues existed "even before *Dobbs*."  But any minimal problems before *Dobbs* are orders of magnitude greater after *Dobbs* and the passage of abortion laws like Tennessee's, which necessitate out-of-state referrals as the only option in over a dozen States.  Nor can HHS (at 27) point to "telehealth" or third-party hotlines to solve the problem.  Both undermine state abortion policy by increasing awareness of and access to elective abortions the State opposes.  Tenn. Br. 47-49, 51-52.  And both raise significant compliance issues and costs HHS nowhere addressed.  Tenn. Br. 47-49.  Either a woman is to speak via telehealth or a hotline

---

[1] The White House, Fact Sheet:  Biden-Harris Administration Continues the Fight for Reproductive Freedom (Mar. 7, 2024), https://perma.cc/7PDR-4AU4; HHS, Remarks by Secretary Xavier Becerra at the Press Conference in Response to President Biden's Directive following Overturning of Roe v. Wade (June 28, 2022), https://perma.cc/TX29-AG3D.

regarding a service she can only lawfully access by traveling out of state. Or a woman is to receive the referred-for abortion using medication abortions "mail-shipped" to where she lives—an outcome HHS has promoted elsewhere, but that presents its own public-health challenges and costs. Tenn. Br. 48.[2] HHS's claim (at 28 n.4) that it does not "understand" why remote abortions are relevant only drives home its arbitrary and capricious failure to consider the practical upshots of its ille-gal-abortions condition.

Nor can HHS (at 28) explain away the gap in health services the Rescindment left by pointing to other "non-profit[s]" who now provide Title X services in the State. Such reasoning ignores HHS's prior conclusion that Tennessee was "*the only agency* with the capacity, staff, and expertise to administer Title X funds with integ-rity and without a gap in services." Program Review, R.1-1, PageID#36 (emphasis added). If anything, the out-of-state location (Virginia and Mississippi) of the cited stand-in recipients gives more reason for reliability concerns. *See* OPA, HHS, Fiscal Year 2023 Title X Service Grant Awards (cited at Opp'n 28 n.5).

HHS's argument (at 29) that it did not unlawfully switch positions stems from the premise that it never approved Tennessee's only-legal-abortion referral policy. HHS is mistaken. Tennessee does not dispute that the July Program Review assessed

---

[2] *See, e.g.*, Becerra Remarks, *supra* n.2.

"Tennessee's practices when the agency conducted its review." Opp'n 29. But the review also involved "staff interview[s]" with members of the Department. Program Review, R.1-1, PageID#56. And as undisputed testimony of a lead Department official explained, Tennessee explicitly "told [OPA] that our new July 2022 protocol … would only direct staff to offer counseling and referrals for pregnancy terminations that are legal in Tennessee." Amosun Decl., R.1-5, PageID#133.

HHS's knowledge and approval of this new policy—not HHS's failure to "word[]" its report "precisely," Opp'n 30—explains HHS's statement that the Tennessee "met" program requirements, even though "[n]o referrals for abortion are made." Program Review, R.1-1, PageID#56. And because Tennessee's policy never changed, it warranted no "update." Opp'n 30. *Compare* Amosun Decl., R.1-5, PageID#135-37 (July 1, 2022 policy), *with* Feb. 13 Ltr., R.1-5, PageID#99-101 (providing same policy). HHS (at 30) strains to read this language to mean Tennessee was not being *overly* facilitative of abortions—by, for example, also "making appointments, arranging for payment, or providing transportation." But that reading ignores that such issues were discussed in a separate portion of the report, not where the "no referrals" language appears. Program Review, R.1-1, PageID#90.

HHS (at 31) errs in casting Tennessee's reliance interest as solely centered on receiving "discretionary funding" on terms Tennessee prefers. Tennessee's interest is instead maintaining its fifty-year history of "autonomy [in] administer[ing] its

Title X program according to state laws regulating the medical profession and medical ethics." Tenn. Br. 52. HHS's sudden Rescindment upended that interest and threatened Tennessee's Title X program, employees, and patients. Tenn. Br. 51-52. It is no answer (at 31-32) that HHS maintains discretion to grant or deny Title X funds. Agencies must consider reliance interests even in the context of discretionary programs. *See Texas v. Biden*, 20 F.4th 928, 990 (5th Cir. 2021) (citing *Regents*, 140 S. Ct. at 1910), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022). It was thus incumbent on HHS to justify the abrupt end to Tennessee's "legitimate reliance" in running its decades-long Title X program consistent with its criminal law, regulation of medical procedures, and sovereign interests in furthering its duly enacted abortion policies. *Regents*, 140 S. Ct. at 1913.

### 4. The Rescindment Is Procedurally Invalid.

The Rescindment imposes a new requirement that Tennessee counsel and refer for illegal abortions, which is not "the same dut[y] [Tennessee] always had." Opp'n 32 (quoting Op., R.30, PageID#850); *see supra* pp. 12-13. Both before and for some time after *Dobbs*, HHS allowed Tennessee to respect its abortion laws while implementing its well-respected Title X program. Imposing a new illegal-abortion condition that the 2021 Rule does not disclose or justify and that conflicts with enacted regulations marks the type of change in agency approach that requires rulemaking. Tenn. Br. 53.

23

**II.    The Remaining Equitable Factors Favor Preliminary Relief.**

Tennessee has a likelihood of success on the merits of its challenge.  At a minimum, Tennessee presents "serious questions" about the legality of HHS's un-fettered Spending-Clause argument and unprecedented Title X funding decision.  *Tiger Lily, LLC*, 992 F.3d at 525 (citation omitted) (cited at Opp'n 39).  And the remaining preliminary-injunction factors weigh heavily in Tennessee's favor.

**A.    Tennessee Has Shown Irreparable Harm.**

HHS's Rescindment will continue to inflict irreparable harm on Tennessee, warranting intervention.  Tenn. Br. 54-57.

HHS (at 40) does not dispute that Tennessee faces an impending loss of $7 million in funds; that this loss will recur over the next few years; that HHS itself has said any such sums would be unrecoverable; or that this Court's cases establish that an unrecoverable loss in funding or compliance expenses counts as irreparable harm.  Tenn. Br. 54 (citing *Biden*, 57 F.4th at 555).  And while HHS and the district court downplay Tennessee's many-millions loss as "small," Opp'n 40 (quoting Op., R.30, PageID#852), HHS does not dispute that *Ohio* held a much smaller Title X funding loss to be irreparable harm warranting preliminary relief.  Tenn. Br. 54-55 (discussing 87 F.4th at 782-83).  Nor does HHS anywhere address the important health pro-grams Tennessee must forgo to fill this loss in federal funds, lest its highly successful family-planning program cease operating.  Tenn. Br. 55.

HHS's drive-by responses to Tennessee's sovereignty and reputational harms fare no better. HHS (at 41) claims Tennessee has offered "no explanation" of how an abortion counseling-and-referral requirement "impair[s] its 'sovereign decision about how to regulate abortions.'" But harms to Tennessee's abortion policies abound. Tenn. Br. 56-57; *see Kentucky v. Biden*, 23 F.4th 585, 598-99 (6th Cir. 2022); Br. of Oklahoma 27-28, *Oklahoma v. HHS* (10th Cir. No. 24-6063) (argument scheduled for May 31, 2024). To repeat: Tennessee law does not approve elective abortions and has made them illegal. HHS says Tennessee must nonetheless use *its own state employees* to tell women "how to obtain" those same abortions Tennessee is "devoted to opposing." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018). Self-evidently, Tennessee's promoting elective-abortion access undermines Tennessee's elective-abortion limits. States' Br. 19-20. And that's the point: HHS's post-*Dobbs* directive was to use Title X to "expand access to abortion" against state prohibitions adopted in response to the Supreme Court's "eliminating the right recognized in *Roe*." Exec. Order No. 14,076, 87 Fed. Reg. 42,053, 42,053 (July 8, 2022) (cited at Guidance, R.28-2, PageID#475); EPPC Br. 7-10.

HHS (at 41) counters that its counseling-and-referral mandate does not technically "conflict" with Tennessee state law. But the federal government often argues that state laws thwart federal policies' "full purposes and objectives" even without a technical conflict. Br. of United States at 20, *Moyle v. United States*, No. 23-726

25

(U.S. Mar. 21, 2024) (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)).[3] That reasoning runs both ways.  Regardless, HHS's Rescindment rests on the premise that States like Tennessee can use out-of-state telehealth to work around the fact that they prohibit elective abortion procedures.  *See* Mar. 1 Ltr., R.1-9, PageID#190; *accord Dobbs* FAQ, R.1-6, PageID#165.  That directive does conflict with Tennessee law, which prohibits using telehealth or online methods to prescribe medication abortions.  *See* Tenn. Code Ann. § 63-6-1104(a) (requiring examination "in person").  HHS's point (at 41) that Tennessee before provided abortion counseling and referrals "without complaint" ignores that, before *Dobbs* Tennessee had to allow most abortions, but no longer does.  *See* Tenn. Code Ann. § 39-15-213.

HHS's claims (at 40) that it does not "intend" to report Tennessee to the federal grant system do not assuage Tennessee's reputational harms.  Tenn. Br. 55-56.  This trust-us-now approach is cold comfort to Tennessee, which just witnessed HHS approve and then reject Tennessee's Title X policy in a matter of months.  *Supra* pp. 21-22.  HHS says Tennessee is not subject to reporting because agency regulations draw a distinction between a reportable termination, and a decision to "decline[] to issue a continuation."  Opp'n 41 (citing 45 C.F.R. § 75.372 and 42 C.F.R. § 59.8).  But HHS repeatedly threatened "terminat[ion]" in the past, *see* Jan. 25 Ltr., R.1-8,

---

[3] *See also, e.g.*, Appl. to Vacate Stay of Prelim. Inj. at 25, *United States v. Texas*, 144 S. Ct. 797 (U.S. Mar. 19, 2024).

PageID#187; Mar. 1 Ltr., R.1-9, PageID#190, and refused to disavow termination when pressed, *see* May 30 Email, R.1-17, PageID#213. Anyway, the Rescindment—which casts Tennessee's gold-star Title X program as unlawful—is "precisely" the sort of reputation-tarnishing action that "constitute[s] irreparable harm" in and of itself. *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022).

### B.    An Injunction Will Not Harm HHS or the Public Interest.

HHS (at 40) says any harm running to Tennessee does not overcome HHS's and the public's interest in having Title X grantees "comply with program requirements" by engaging in abortion counseling-and-referral activities. *Accord* Op., R.30, PageID#856 ("Because the Court has determined that HHS's actions were lawful, [the public interest] favors [HHS]."). This presumes that requiring States to refer and counsel for illegal abortion procedures is permissible, which Tennessee contests. *Supra* pp. 13-17.

When "balanc[ing]" the equities independent of the merits, they strongly weigh in Tennessee's favor. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Tennessee (at 57) explains how the Rescindment puts its entire Title X program—and the health services of thousands of low-income Tennesseans who depend on it—in jeopardy. *Accord* ADF Br. 18-20. HHS (at 40) responds that other "non-profit providers" have stepped in to provide services. But Tennessee's Department of Health is,

27

in HHS's own words, "the *only* agency" in the state capable of "administer[ing] Title X funds with integrity."  Program Review, R.1-1, PageID#36 (emphasis added). HHS's public-interest position thus boils down to the assertion that it is better to fund inferior Title X providers so long as they promote abortion.  *Cf. Ohio*, 87 F.4th at 784 (granting preliminary injunction against Title X rule permitting unqualified providers).  But if *Dobbs* means anything, it is that Tennessee citizens can disagree with HHS's view that furthering abortion is the end-all-be-all health objective.  The public interest is not harmed by allowing the State to continue to serve tens of thousands of needy Tennesseans through its Title X program while vindicating duly enacted abortion policies that promote respect for and preservation of fetal life.

## CONCLUSION

This Court should reverse the district court's decision and remand for entry of preliminary relief.

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE
  *Solicitor General*
WHITNEY D. HERMANDORFER
  *Director of Strategic Litigation*
HARRISON GRAY KILGORE
  *Strategic Litigation Counsel*
PHILIP HAMMERSLEY
  *Assistant Solicitor General*
TRENTON MERIWETHER
  *Assistant Attorney General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Matt.Rice@ag.tn.gov
Whitney.Hermandorfer@ag.tn.gov
Harrison.Kilgore@ag.tn.gov
Philip.Hammersley@ag.tn.gov
Trenton.Meriwether@ag.tn.gov

*Counsel for the State of Tennessee*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 6,481 words. *See* Fed. R. App. P. 27(d)(2)(A).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 6th day of May 2024 on the following:

Courtney L. Dixon
Brian James Springer
Civil Division, Appellate Staff
U.S. Department of Justice
Tel: (202) 353-8189
courtney.l.dixon@usdoj.gov
brian.j.springer@usdoj.gov

*Counsel for Defendants*

/s/ Whitney Hermandorfer
WHITNEY HERMANDORFER
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

31